**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------- x
                                          :
In re:                                    :    Chapter 11
                                          :
NOVUM PHARMA, LLC,                        :    Case No. 19-10209 (___)
                                          :
                         Debtor.¹         :
                                          :
-------------------------------------------------------- x
```

**DECLARATION OF THOMAS S. O'DONOGHUE, JR. IN SUPPORT
OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Thomas S. O'Donoghue, Jr., pursuant to section 1746 of title 28 of the United

States Code, hereby declare that the following is true and correct to the best of my knowledge,

information and belief:

1.      I am the Chief Restructuring Officer ("CRO") of Novum Pharma, LLC

("Novum" or the "Debtor"), a limited liability company organized under the laws of the state of

Delaware and the debtor and debtor-in-possession in the above-captioned chapter 11 case (the

"Chapter 11 Case").  I have served in such capacity since January 7, 2019.

2.      In addition to serving as the Debtor's CRO, I also am a partner at CR3

Partners, LLC ("CR3"), a leading national business advisory firm which has seven (7) offices

nationwide and over sixty (60) professionals.  CR3 has been retained by the Debtor to provide

my services as CRO.

3.      To minimize any disruption to the Debtor's business and ensure a smooth

transition into chapter 11, the Debtor intends to request limited types of relief in "first day"

applications and motions (collectively, the "First Day Pleadings") in connection with the

---

¹       The last four digits of the Debtor's federal tax identification number are 7895.  The mailing address for the
        Debtor is 200 South Wacker Drive, 31st Floor, Chicago, IL 60606.

Chapter 11 Case.[2]  I submit this declaration (the "Declaration") in support of the Debtor's

(a) voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1532 (the "Bankruptcy Code"), and (b) the First Day Pleadings.  I am over the age of 18,

competent to testify and authorized to submit this Declaration on behalf of the Debtor.

4.      As a result of my time with the Debtor, my review of relevant documents

and my discussions with the Debtor's employees, consultants, professionals and Board of

Managers (the "Board"), I am familiar with the Debtor's day-to-day operations, business affairs

and books and records.

5.      Except as otherwise noted, all facts set forth in this Declaration are based

on my personal knowledge, my discussions with the Debtor's employees, consultants,

professionals and Board, my review of relevant documents or my opinion, based on my

experience and knowledge of the Debtor's operations and financial condition.  In making this

Declaration, I also have relied on information and materials that the Debtor's personnel and

advisors have gathered, prepared, verified and provided to me, in each case under my ultimate

supervision, at my direction and/or for my benefit in preparing this Declaration.  If I were called

to testify as a witness in this matter, I would testify competently to the facts set forth herein.

6.      This Declaration is divided into two parts.  Part I provides background

information regarding the Debtor, its business, its capital structure and the circumstances

surrounding the commencement of the Chapter 11 Case.  Part II sets forth the relevant facts in

support of each of the First Day Pleadings.

---

[2]      Except as otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the relevant First Day Pleading.

## PART I

## BACKGROUND

**A.     The Chapter 11 Filing**

7.     On the date hereof (the "<u>Petition Date</u>"), the Debtor filed a voluntary

petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues

to manage and operate its business as debtor-in-possession pursuant to sections 1107 and 1108 of

the Bankruptcy Code.

**B.     The Debtor's Business**

**1.     General Overview**

8.     The Debtor is a global specialty pharmaceutical company which owns a

portfolio of topical dermatology products that it purchased from Primus Pharmaceuticals, Inc.

("<u>Primus</u>") in March 2015.  The Debtor's dermatology products are marketed under the names

Alcortin®, Alcortin A®, Quinja® (formerly Aloquin®) and Novacort® (collectively, the

"<u>Dermatology Products</u>").  Each Dermatology Product is a fungicidal gel used to treat a variety

of skin conditions.

9.     Since acquiring the Dermatology Products, the Debtor has focused on

developing a business model which would ensure no-hassle access to, and reduced patient out-

of-pocket costs for, its branded therapies.  Through significant investment in commercial support

and a unique business model, the Debtor has significantly reduced the hassles associated with

filling Dermatology Product prescriptions, so that health care professionals ("<u>HCPs</u>") are able to

prescribe the best clinical option, and patients have confidence that they will be able to obtain

and afford the exact medication prescribed by their HCPs.

58448/0001-16602728v14

10. In addition to manufacturing and selling its Dermatology Products, the Debtor historically has provided consulting and sales support for several other pharmaceutical companies. Indeed, the Debtor's sales representatives currently provide sales support for a non-affiliated company in the pharmaceutical industry (*i.e.*, the Debtor effectively serves as a contract sales organization, or CSO, for this company).

2. **Overview of the Managed Care Environment**

11. In today's managed care environment, numerous barriers exist to patients receiving the medications that their HCPs deem appropriate for treatment. These barriers stem in large part from the "traditional" distribution channel for pharmaceutical products, through which pharmaceutical manufacturers sell their products directly to wholesalers,[3] which, in turn, sell the products to retail pharmacies. Critical to this distribution channel are pharmacy benefit managers ("PBMs"),[4] which are third-party administrators of prescription drug programs for commercial health insurance plans, self-insured employer plans, Medicare Part D plans, the Federal Employees Health Benefits Program and state government employee plans (*i.e.*, healthcare payors). Among other things, PBMs process prescription transactions, negotiate drug discounts and determine which pharmacies and drugs will be included in a particular health plan's benefits.

12. Wholesalers often have exclusive relationships with particular pharmacies, thereby requiring pharmaceutical manufacturers to contract with the wholesalers in order to move their products through the distribution channel to patients (*e.g.*, Cardinal has an exclusive

---

[3] The wholesale industry is dominated by three companies: AmerisourceBergen Corp. ("ABC"), Cardinal Health, Inc. ("Cardinal") and McKesson Corporation ("McKesson").

[4] The three largest PBMs in the United States are CVS Health (Caremark), Express Scripts, Inc. ("ESI") and OptumRx (UnitedHealth).

4

relationship with CVS pharmacies ("CVS")).  The wholesalers charge manufacturers a shipping fee for transmitting the product to a pharmacy, which is billed to the manufacturer regardless of whether the product ultimately is sold to a consumer.  If a wholesaler ultimately is unable to sell a pharmaceutical product that is has purchased, it generally has a contractual right to return that product to the manufacturer from whom the product initially was purchased.

13.    When a pharmacy sells a prescription drug to a patient, the pharmacy will receive payment from one or more of the following sources: (i) a PBM, which in turn is being reimbursed by a healthcare payor (*e.g.*, a health insurance plan); (ii) the patient, in the form of an insurance co-payment; and/or (iii) the drug manufacturer through an intermediary referred to as a "co-pay vendor."[5]

14.    PBMs have significant leverage in negotiating with manufacturers because the PBMs determine whether or not particular drugs are covered by healthcare payors' prescription drug programs.  As such, PBMs can extract administrative fees and rebates from manufacturers to reduce the ultimate the cost of a drug to the PBMs.  If a PBM and a manufacturer do not agree on the pricing of a particular drug, the PBM likely will exclude that drug from its formulary (*i.e.*, the list of drugs covered by a prescription drug plan), which will reduce availability to patients of the manufacturer's drug because the drug will not be covered by the prescription drug programs administered by that PBM.  In this scenario, the only way that a patient would be able to obtain the excluded drug would be to seek "prior authorization" from the patient's health insurance company.  This prior authorization process requires the HCP to complete onerous and varied paperwork to justify the use of the excluded drug.  For instance, the

---

[5]    The cost of prescriptions may be offset by co-pay programs established by drug manufacturers that lower the out-of-pocket costs of prescription drugs by supplementing insurance payments.  The Debtor has co-pay agreements with PSKW, LLC d/b/a ConnectiveRx and Triplefin LLC (together, the "Co-Pay Vendors").

HCP may be required to establish that the drug is "medically necessary" or that the patient already has tried a less expensive drug that was not effective.

15.     If a drug is listed on a PBM's formulary, a patient can obtain that drug either through a PBM-run mail order system, if available, or through a pharmacy. Even in this case, however, the patient is not guaranteed that she will receive the drug prescribed by her HCP—or that the drug will be affordable. For example, if a HCP does not indicate that no substitutions are permitted when writing a prescription, the filling pharmacy can substitute a generic or a lower-priced alternative drug for the HCP's preferred medication. Moreover, a PBM can set certain restrictions on a pharmacy's ability to fill a prescription, such as setting geographic limits for where the drug can be shipped (*e.g.*, limiting distribution to a 90-mile radius of the pharmacy). Additionally, PBMs can make the determination to place a drug on a "specialty tier" of a formulary,[6] which can increase a patient's insurance co-payment. Finally, retail pharmacies can inflate the price of a drug, which benefits both pharmacies and co-pay vendors, but creates another barrier to drug access for patients.

**3.     The Debtor's Response: The Enhanced Patient Access Model**

16.     In response to the foregoing distribution challenges, the Debtor has developed an enhanced patient access ("EPA") business model to ensure that, when a HCP writes a prescription for one of the Dermatology Products, the patient should receive that drug at no cost—whether or not the patient's insurance program covers the drug, and indeed whether or not the patient has health insurance. HCPs are offered an option to send patients to a nationwide network of pharmacies which have agreed to comply with the Debtor's program guidelines ("Compliant Pharmacies"), thereby ensuring a "hassle free" experience by the patient when

---

[6]     Drugs can fall within several formulary tiers, ranging from preferred generic to generic to preferred to non-preferred to specialty.

filling her prescription.  If a pharmacy in the Debtor's network cannot fill a prescription because a PBM denies coverage, that pharmacy will transfer the prescription to a "consignment hub," which is a specialty pharmacy that stocks the Debtor's products on a consignment or bailment basis and will fill a prescription for a nominal fee (paid by the Debtor).  Alternatively, if a patient seeks to fill her prescription at a pharmacy that does not participate in the Debtor's EPA programs and a PBM denies coverage, the patient will still receive the drug for free—but the patient will be required to work with the pharmacy to have the prescription transferred to the consignment hub.[7]

17.    The Debtor does not sell its products directly to the traditional wholesalers (*i.e.*, ABC, Cardinal and McKesson), but rather sells its products to Cardinal Health 105, Inc., part of Cardinal's specialty pharmaceutical division ("Cardinal SPS").  When the Debtor sells its products to Cardinal SPS, it earns revenue.[8]  In contrast, when a prescription is filled by a pharmacy, the Debtor expends funds to facilitate the transaction.  In particular, when a healthcare plan covers some or all of the cost of a Dermatology Product prescription, the Debtor, through its Co-Pay Vendors, pays the amount that is not covered by the healthcare plan.  Alternatively, when a healthcare plan rejects a Dermatology Product prescription, the Debtor facilitates the transfer of that prescription to one of its consignment hubs so that the prescription can be filled and mailed to the patient, at no cost to the patient.

---

[7]    HCPs prescribing Dermatology Products are encouraged to provide their patients with a patient hotline phone number provided by the Debtor which is staffed with personnel familiar with dealing with pharmacies and facilitating the transfer of prescriptions to the consignment hub.

[8]    Cardinal SPS has the contractual right to setoff certain fees and expenses against its accounts payable to the Debtor.  Historically, Cardinal SPS also has setoff against amounts owed to the Debtor certain fees and expenses purportedly owed by the Debtor to Cardinal.  The Debtor does not believe that such setoffs were permitted under the terms of its agreements with Cardinal SPS.

18.     In order to conduct its business and implement its EPA business model, the Debtor relies on services provided by certain affiliated companies (the "Service Affiliates").[9] First, pursuant to a services agreement, the Debtor is provided with patient access solutions, and analytical and operational support.  These services are necessary because nearly all of the Debtor's employees are sales representatives, so that the company requires a third party to provide the "back office" support that is necessary to operate its business and implement its business model.  Second, pursuant to a master services agreement, the Debtor is provided with patient-related services necessary to implement the EPA model, including access to its network of Compliant Pharmacies and support for the consignment hub system.  The Service Affiliates provide similar services to other non-affiliated companies in the pharmaceutical industry.

## C.     The Debtor's Corporate Structure

19.     The Debtor was formed on October 2, 2014 as an Illinois limited liability company, and was re-domiciled to the State of Delaware on February 20, 2015.  It operates pursuant to that certain Second Amended and Restated Limited Liability Company Agreement of Novum Pharma, LLC, dated March 16, 2016 (as amended).  The Debtor's shares are privately held, consisting of three classes of common stock and various restricted stock units.  Since its inception, the Debtor's corporate headquarters has been located in Chicago, Illinois.

20.     The Debtor is governed by the Board, which has the authority to manage the Debtor's business affairs.  On January 4, 2019, the Board appointed an independent manager, Mr. Thomas J. Allison, and formed a committee of the Board (the "Restructuring Committee") charged with, among other things, evaluating and investigating potential strategies for the

---

[9]     The Debtor and the Service Affiliates share common ownership.

Debtor's restructuring and refinancing, and implementing such strategies.[10]  On January 7, 2019, the Restructuring Committee appointed me as the Company's CRO.  I am subject to the supervision and control of the Restructuring Committee, and can only be removed from my position by resolution of such committee.

**D.     The Debtor's Prepetition Capital Structure**

21.     As of the date hereof, the Debtor has assets of approximately $19.4 million and liabilities of approximately $53.1 million, consisting of approximately $35 million in current liabilities and approximately $18 million in long-term liabilities.

22.     The Debtor's assets are comprised primarily of the intellectual property it owns related to the Dermatology Products, the contracts under which it provides consulting and sales support to other entities and accounts receivable.  Additionally, as of the Petition Date, the Debtor has approximately $3.1 million in cash and cash equivalents, including professional retainer amounts and security for a letter of credit with respect to one of the Debtor's leases.

23.     The Debtor's long-term liabilities relate to: (i) approximately $15.2 million under that certain Loan Agreement, dated as of August 1, 2017 (the "Secured Loan"), by and between the Debtor and RGP Pharmacap, LLC ("RGP Pharmacap"); and (ii) approximately $2.8 million under that certain Office Lease between the Debtor and 150 North Riverside Titleholder LLC.[11]  RGP Pharmacap is owned by a member of the Debtor's Board who owns approximately twenty-six percent (26%) of the Debtor's membership interests.

24.     The Secured Loan bears interest at the greater of prime plus 9.75% or 14% for the life thereof, and is payable in 36 consecutive monthly principal installments commencing

---

[10]     Mr. Allison is the sole member of the Restructuring Committee.

[11]     The lease obligations are secured, in part, by a $500,000 letter of credit issued by The Huntington National Bank ("Huntington").

on September 1, 2019, with the last principal payment being made on August 1, 2022, the maturity date of the Secured Loan.  As collateral for the Secured Loan, the Debtor granted RGP Finance LLC (together with RGP Pharmacap, the "Prepetition Secured Lender") a security interest in substantially all of its assets.

25.     On April 30, 2018, the Debtor, the Service Affiliates and certain other affiliated companies (collectively with the Service Affiliates, the "Affiliates")[12] and RGP Pharmacap entered into that certain First Amendment and Joinder to Loan Agreement (the "Joinder"), pursuant to which one of the Debtor's Affiliates (i) became a "New Loan Party" under the Secured Loan; (ii) guaranteed the Secured Loan; and (iii) pledged substantially all of its assets to RGP Pharmacap to secure the obligations under the Secured Loan.  Additionally, pursuant to the Joinder, certain other Affiliates provided unsecured guarantees of collection for the Debtor's obligations under the Secured Loan.

26.     As of the Petition Date, the Debtor has approximately $35 million in unsecured debt in the form of accounts payable, accrued liabilities and other liabilities.

**E.     Events Leading to the Chapter 11 Filing**

27.     The Debtor has faced a series of financial and operational difficulties since acquiring the Dermatology Products from Primus.  As further described below, these challenges relate to, among other things: (i) manufacturing hurdles leading to production delays and product "stock-outs"; (ii) a dispute with Cardinal and CVS regarding the price at which the Dermatology Products can be returned to the Debtor; (iii) managed care actions leading to increased prescription rejection rates for the Dermatology Products; and (iv) market dilution and decreased total prescriptions due to unauthorized generic alternatives being introduced into the market.

---

[12]     The Debtor and the Affiliates share common ownership.

58448/0001-16602728v14

28.    <u>Product Manufacturing Challenges</u>.  The Debtor has encountered a series of manufacturing issues since it purchased the Dermatology Products from Primus in 2015 which have led to significant lost revenues.  At the time of the Primus transaction, the Dermatology Products were manufactured by Sonar Products, Inc. ("<u>Sonar</u>").  In order to avoid a gap in manufacturing, and to give the Debtor time to assess whether it was prudent to continue using Sonar as a manufacturer, the Debtor and Sonar entered into a manufacturing agreement pursuant to which Sonar agreed to continue manufacturing and selling the Dermatology Products to the Debtor for an initial term of five (5) years.  Shortly thereafter, however, the Debtor uncovered various information about Sonar that was not disclosed during the Debtor's diligence process, including that Sonar had been selling the Debtor's products to certain institutions and generic manufacturers without the Debtor's authorization and that another pharmaceutical company claimed to have an exclusivity agreement with Sonar.  Moreover, although the Debtor had known that Sonar was facing Food and Drug Administration ("<u>FDA</u>") scrutiny when it entered into the manufacturing agreement with Sonar, the depth of the FDA's concerns were not fully disclosed by Sonar during the Debtor's diligence process.  Ultimately the FDA shuttered Sonar's operations and, as part of this action, held the Debtor's finished pharmaceutical products which already had been run through the appropriate quality and release processes—all of which had a significant financial and operational impact on the Debtor.

29.    As a result, in early 2017, the Debtor was forced to transition its manufacturing operations to Sterling Pharmaceutical Services, LLC ("<u>Sterling</u>"), another contract manufacturing organization.  Relative to Sonar, Sterling appeared to have a better understanding of the manufacturing and control processes necessary to successfully produce the Debtor's products and a more committed management team.  However, throughout the parties'

11

relationship, Sterling has struggled to keep pace with the Debtor's manufacturing volume requirements, an issue which has been exacerbated by Sterling's continuing drive to take on new customer accounts without the necessary infrastructure.  As a result, numerous manufacturing delays and stock-outs of Novacort, Quinja and Alcortin A product and samples have occurred.

30.     Although Alcortin A has been the Debtor's most successful product to date, the Debtor does not believe that Alcortin A's full potential was ever realized due to persistent product shortages that have continued into the fourth quarter of 2018.  In particular, the lack of Alcortin A samples significantly impacted the Debtor's ability to expand its market and increase script volume for this product (both key to the Debtor's business model), and the stock-outs of product have led to lost sales and caused HCPs to move to alternative products, thereby inflicting significant long-term damage to the business.

31.     The product shortages for Quinja and Novacort similarly have impacted the Debtor's sales of these products, but here the impact on the Debtor's business was even more destructive.  Indeed, the Debtor never has had sufficient Quinja or Novacort product or samples to properly launch these products.  The Debtor believes that both products could be very commercially successful—and perhaps could rival the success that the Debtor has been able to achieve with Alcortin A.  Although the Debtor has not yet conducted a detailed analysis to quantify the damage to the Debtor's business caused by Quinja and Novacort manufacturing delays and stock-outs, the Debtor believes that its lost revenues could easily exceed $15 million—and likely would be far greater.

32.     <u>Cardinal/CVS Return Dispute</u>.  The Debtor's dispute with Cardinal and CVS regarding the price at which unsold Dermatology Products may be returned to the Debtor has materially reduced the Debtor's revenues over the course of its business.  In the past, the

12

Debtor sold its Dermatology Products directly to Cardinal (a wholesaler), which in turn sold the Dermatology Products to CVS (a retail pharmacy), with which Cardinal has an exclusive distribution arrangement.  Pursuant to the applicable contract between the Debtor and Cardinal (the "Novum-Cardinal Agreement"), Cardinal was permitted to return the Dermatology Products to the Debtor at the price at which they initially were sold to Cardinal.  However, over a period of years, Cardinal purchased product from the Debtor, and then unilaterally setoff amounts owed to the Debtor with its purported return liability (calculated at the current, rather than the historical, wholesale acquisition cost ("WAC")).  Although these returns regularly were disputed by the Debtor, the Debtor ultimately was unsuccessful in preventing Cardinal's unilateral offsets.  Cardinal's actions deprived the Debtor of as much as $15 million in payments over the course of the parties' relationship and significantly contributed to the Debtor's repeated working capital challenges.

33.    The Debtor's challenges with the Cardinal relationship have persisted, and are not limited to those arising under the Novum-Cardinal Agreement.  As noted above, the Debtor no longer sells its products directly to the Cardinal and the other traditional wholesalers, but rather sells its products exclusively to Cardinal SPS pursuant to the terms of separate contracts.  However, despite no longer doing business directly with Cardinal, in 2018 Cardinal SPS setoff approximately $1.6 million owed to the Debtor against certain fees and expenses purportedly owed by the Debtor to Cardinal.  The Debtor does not believe that such setoff was permitted under the terms of its agreements with Cardinal SPS.

34.    Managed Care Actions; Increased Prescription Rejection Rates.  As described above, the Debtor's EPA business model was designed to counter the barriers present in the managed care environment preventing patients from gaining access to the Dermatology

13

Products.  The Dermatology Products, however, have continued to be added to the PBMs'

exclusion lists (*i.e.*, removed from formularies), which has significantly impacted the Debtor's

profitability.  Indeed, the overall prescription rejection rate for the Dermatology Products has

reached a point that makes it impossible for the Debtor to sustain its business, given the

significant and lasting damage to the business due to the manufacturing issues and Cardinal/CVS

return dispute described above, the threat of additional unilateral (and unauthorized) setoffs by

Cardinal SPS, and the secured debt and other liabilities that burden the business.  To counteract

the increasing prescription rejection rates, the Debtor increased the WAC of the Dermatology

Products several times since 2015.  These price increases, although necessary to support patient

access commitments and ensure a minimum level of profitability for the business, led to public

scrutiny regarding the Debtor's business model and further increased prescription rejection rates.

35.    In early August 2018, the Debtor learned that Alcortin A had been

excluded from ESI's formulary, effective as of January 1, 2019.[13]  Although the Debtor's

management understood that the formal listing of Alcortin A on the exclusion list could result in

a meaningful reduction in prescription approval rates, such a reduction was far from certain

given the already low approval rates for the Dermatology Products at that time, and the

likelihood that ESI already had taken certain actions to exclude the Debtor's products from its

formulary.  Unfortunately, preliminary data for 2019 suggests that ESI has taken additional

actions to exclude the Debtor's Dermatology Products from its formulary—which has led to a

further reduction in prescription approval rates.

36.    <u>Unauthorized Generic Competition</u>.  In mid-2017, the Debtor became

aware that Seton Pharmaceuticals LLC ("<u>Seton</u>") had caused its generic pharmaceutical product

---

[13]    In particular, Alcortin A was listed on ESI's 2019 National Preferred Formulary Exclusions.

to be linked to the Debtor's primary product—Alcortin A—in certain drug pricing databases. Then, later in 2017, Mesora Pharma, LLC ("Mesora" and, together with Seton, the "Generic Competitors") introduced another competing generic product.  By introducing their generic products into the distribution channel, and representing their products as less-expensive and equivalent alternatives to the Debtor's product, the Generic Competitors deprived the Debtor of product sales and injured its business.

37.     The Decision to Restructure.  The Debtor's historically low prescription approval rates, compounded by (i) the Debtor's persistent manufacturing issues which directly damaged the Debtor's business because the Debtor's sales force was unable to distribute sample products during a critical product growth period and HCPs were forced to prescribe alternative medications, (ii) the Debtor's working capital shortages stemming in part from the Cardinal/CVS product return dispute and (iii) generic drug competition (which the Debtor believes is unlawful), led the Debtor to the inevitable conclusion that its business was no longer sustainable and that a restructuring and refinancing of the business would be necessary.[14]  Accordingly, on January 4, 2019, the Board formed the Restructuring Committee to assess strategic alternatives and appointed an independent manager to the Board, who also was appointed as the sole member of the Restructuring Committee.  Thereafter, on January 7, 2019, I was appointed by the Restructuring Committee as the CRO.

38.     After my appointment, the Restructuring Committee and I moved swiftly to understand the Debtor's business and to determine what course of action to take given the

---

[14]     Although the Debtor began implementing a series of cost-saving measures beginning in early 2018, including outsourcing its "back office" activities, decreasing the size of its sales force and entering into a more cost-effective lease, the Debtor was not able to overcome the significant challenges facing its business.

58448/0001-16602728v14

financial and operational difficulties described above.  In connection therewith, on January 23,

2019, the Restructuring Committee retained the investment banking firm of Teneo Capital LLC

to assist the Debtor in the marketing and sale of its Dermatology Products and all related

intellectual property.

   39. After carefully considering the alternatives, the Restructuring Committee,

in consultation with the full Board, made the difficult decision to file for chapter 11 protection in

order to preserve the Debtor's assets and conduct a bankruptcy sales process for the Company's

Dermatology Products, all in an effort to maximize value for the benefit of the Debtor's creditors.

The Debtor anticipates that it will seek approval of appropriate bidding and sale procedures in

the early weeks of the Chapter 11 Case.

**PART II**

**<u>FIRST DAY PLEADINGS</u>**

   40. In furtherance of these objectives, the Debtor has filed the First Day

Pleadings, and respectfully requests that the Court enter the proposed orders granting the relief

sought in such pleadings.  I have reviewed each of the First Day Pleadings and the facts set forth

therein are true and correct to the best of my knowledge, information and belief.  Moreover, I

believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtor to

make the transition to, and operate in, chapter 11 with minimum interruption or disruption to its

business or loss of productivity or value and (b) constitutes a critical element in maximizing

value during the Chapter 11 Case.

**A.** **Motion to Continue Use of Cash Management System**

   41. The Debtor filed a motion (the "<u>Cash Management Motion</u>") seeking entry

of interim and final orders (i) authorizing, but not directing, the Debtor to continue to maintain

16

and use its existing cash management system, including maintenance of the Debtor's existing

bank accounts, checks and business forms; (ii) granting the Debtor a waiver of certain bank

account and related requirements of the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee"); (iii) authorizing, but not directing, the Debtor to continue to

maintain and use its existing deposit practices notwithstanding the provisions of section 345(b)

of the Bankruptcy Code, and waiving the requirements of section 345(b) of the Bankruptcy Code;

(iv) scheduling a final hearing to consider the relief requested on a final basis; and (v) granting

related relief.

**1.      The Debtor's Bank Accounts and Cash Management System**

42.     In the ordinary course of its business, the Debtor maintains four (4) active

bank accounts (the "Bank Accounts") at Huntington:[15] (i) a general operating account used for

accounts payable, accounts receivable, payroll funding[16] and expense reimbursements (the

"Operating Account"); (ii) an account holding a security deposit for a lease of real property;

(iii) a health-reimbursement arrangement account; and (iv) an account into which each

employee's pre-tax wage deductions are funded for benefits such as transit and dependent care

programs.   The Operating Account is subject to a certain Deposit Account Control Agreement,

dated as of August 2, 2017, by and among the Debtor, Huntington and the Debtor's secured

lender, RGP Pharmacap, pursuant to which RGP Pharmacap can exercise exclusive control upon

transmission of a "Notice of Exclusive Control" to Huntington.   As of the date hereof, RGP

Pharmacap has not sent any such notice.

---

[15]      The Debtor also maintains a lockbox account at Huntington, but such account currently is not being used.

[16]      The Debtor utilizes Namely, Inc. ("Namely"), a third-party payroll service, to process and administer its payroll and payroll taxes.  As such, the Debtor transfers funds sufficient to satisfy such obligations to Namely in advance of each applicable pay period, and Namely makes the necessary payroll and tax payments on the Debtor's behalf.

43.     The Bank Accounts are in a financially stable institution that is insured by the Federal Deposit Insurance Corporation.  Moreover, the Debtor understands that Huntington is a party to a Uniform Depository Agreement with the U.S. Trustee and, therefore, the Debtor is not required to seek a bond or the deposit of securities from Huntington as otherwise required under section 345(b) of the Bankruptcy Code.  Accordingly, the Debtor believes that its funds are secure at Huntington, and there is no need to move its funds to another financial institution.

44.     The Debtor believes its cash management practices (the "Cash Management System") are similar to those utilized by many other companies of comparable size and complexity to collect, hold, transfer and disburse funds in a cost-effective and efficient manner.  The continued use of the Debtor's Bank Accounts and Cash Management System during the pendency of the Chapter 11 Case is essential to the Debtor's business operations and its goal of effectuating a going concern sale of its business assets.  Requiring the Debtor to close its existing Bank Accounts and open new accounts or adopt a new cash management system at this early and critical stage of the Chapter 11 Case would be expensive, impose needless administrative burdens and cause undue disruption to the receipt of payments received via electronic means, as well as payment of employees and vendors.

45.     Moreover, the Debtor is fully aware of its obligation not to pay prepetition claims unless such payment is authorized by the Court.  To this end, the Debtor intends to contact its representative at Huntington on the first business day after the chapter 11 filing, to work with Huntington to implement appropriate procedures to ensure that no payments will be made on any debts incurred by the Debtor before the Petition Date, other than those authorized by this Court.

## 2.    Business Forms

46.    In the ordinary course of business, the Debtor uses a number of business forms, including checks, stationery and other forms and correspondence (collectively, the "Business Forms").  If the Debtor were required to obtain new business forms as a result of the filing of this Chapter 11 Case, the Debtor would incur significant expense and attendant delay in effectuating its ordinary course, postpetition business transactions.  Under the proposed form of interim order, the Debtor will begin printing "Debtor-in-Possession" on all checks which the Debtor prints itself within ten (10) business days after the entry of such order, but requests that the Court authorize the continued use of its other Business Forms without modification.

47.    Based on the information above and in the Cash Management Motion, it is my belief that the relief requested in the Cash Management Motion is necessary and appropriate in light of the circumstances surrounding the Chapter 11 Case.

## B.    Motion to Pay Employee Wages and Benefits

48.    The Debtor filed a motion (the "Wage and Benefit Motion") requesting entry of an order (i) authorizing, but not directing, the Debtor to (a) pay its employees' prepetition wages, salaries, other compensation and reimbursable expenses and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto; and (ii) granting related relief.

49.    The Debtor employs approximately fifty (50) individuals on a full-time basis (collectively, the "Employees").  The majority of the Debtor's Employees are sales representatives operating in twenty-nine (29) states.  None of the Employees are represented by a union or collective bargaining unit.

58448/0001-16602728v14

50.     The Debtor seeks to minimize the personal hardship that Employees would suffer if employee obligations are not paid when due or as expected.  Therefore, by the Wage and Benefit Motion the Debtor seeks authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, expense reimbursements and other compensation, payroll services, payroll withholding taxes and other amounts withheld (including the Employees' share of insurance premiums, taxes and 401(k) contributions), health insurance, workers' compensation benefits, paid time off, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, short- and long-term disability coverage and other benefits that the Debtor has historically directly or indirectly provided to the Employees in the ordinary course of business (collectively, the "Employee Compensation and Benefits").  In addition, the Debtor also seeks to pay all costs incident to the Employee Compensation and Benefits.

51.     As of the Petition Date, the Debtor estimates the total amount outstanding on account of the Employee Compensation and Benefits is approximately $515,000, the majority of which relates to commissions owed to its sales force.

**1.      Compensation and Withholding Obligations**

**a.      Employee Compensation**

52.     The Debtor's Employees are all paid on a salaried basis, and their wages, salaries and other compensation, including an automobile allowance as referenced below, (collectively, the "Employee Compensation") are paid semi-monthly.  On average, the Debtor pays Employee Compensation of approximately $168,000 semi-monthly in the aggregate. Because the majority of Employees are paid in arrears, certain Employees will be owed accrued but unpaid wages as of the Petition Date.  Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the

amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees.

53.     As of the Petition Date, the Debtor estimates that Employees are owed an aggregate amount of approximately $15,300 on account of accrued wages, salaries, overtime and other compensation (excluding reimbursable expenses, amounts related to the 401(k) Plan (as defined below) and Commissions (as defined below)) earned before the Petition Date (the "Unpaid Wages").  Accordingly, by the Wage and Benefit Motion, the Debtor seeks authority to pay its Employees any Unpaid Wages in the ordinary course of business and consistent with past practice, and to continue its wage practices on a postpetition basis in the ordinary course of the Debtor's business.  None of the Debtor's Employees are owed more than $12,850 on account of prepetition wages and salaries.

**b.      Unpaid Commissions**

54.     In addition to the wage and salary obligations, many of the Employees are entitled to receive commissions or other additional pay related to special events on top of their base salary (collectively, the "Commissions").  These Employees receive the Commissions in variable amounts based on each such Employee's periodic sales performance.  Commissions are a critical component of certain Employees' overall compensation.

55.     As of the Petition Date, the Debtor estimates that Employees are owed approximately $345,000 on account of accrued but unpaid Commissions (the "Unpaid Commissions").  Prior to the Petition Date, the Debtor's sales representatives performed services both for the Debtor and, pursuant to a contract, another pharmaceutical company (*i.e.*, the Debtor serves as a contract sales organization for another pharmaceutical company).  The Employees' commissions relating to their work performed for this other entity are reimbursed by that entity.

21

The Debtor expects that approximately $135,000 of the Unpaid Commissions will be reimbursed pursuant to the contract.

56.     The Commissions are earned every quarter and typically are paid within forty-five (45) days of the following quarter.  Accordingly, the Debtor seeks authority to pay its Employees their Unpaid Commissions in the ordinary course of business and consistent with past practice, and to continue its commissions practices on a postpetition basis in the ordinary course of the Debtor's business.  I believe that the Debtor's failure to pay the Unpaid Commission when due likely would lead to a significant number of Employee departures, thereby limiting the Debtor's ability to perform under its contract to provide CSO support, and ultimately jeopardizing this contract and the revenues derived from the Debtor's performance thereunder. If this critical contract were lost, the Debtor would not have sufficient funding to complete its anticipated sales process, thereby harming the Debtor, its creditors and all parties in interest in the Chapter 11 Case.

### c.     Withholding Obligations

57.     During each applicable pay period, the Debtor routinely deducts certain amounts from Employees' paychecks, including, garnishments, child support and other pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions").  All of the Deductions are forwarded to various third-party recipients.

58.     By the Wage and Benefit Motion, the Debtor seeks authority to continue making Deductions and remitting such amounts to the appropriate third parties in a manner consistent with historical practice.

### d.　　Payroll Taxes

59.　　The Debtor is required to withhold certain amounts from Employee Compensation and Commission payments related to, among other things, various income taxes, health and welfare programs, and various governmental social programs (collectively, the "Employee Payroll Taxes") for remittance to the appropriate taxing authorities.

60.　　In addition, applicable law requires the Debtor to remit certain funds to the appropriate taxing authorities on account of various taxes and fees for, among other things, unemployment insurance and Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes"). Historically, the Debtor's Payroll Tax liability has totaled approximately $22,500 per month.

61.　　As of the Petition Date, the Debtor estimates that the aggregate amount of accrued but unpaid Payroll Taxes is approximately $27,000, which includes Payroll Taxes on account of Unpaid Wages and the Commissions (the "Unpaid Payroll Taxes"). Accordingly, the Debtor seeks authority to remit any Unpaid Payroll Taxes in the ordinary course of business through payroll processing or to the appropriate taxing authority and to continue to honor and process the Unpaid Payroll Taxes on a postpetition basis in the ordinary course of business, consistent with past practices.

### e.　　Payroll Processing

62.　　As noted previously, the Debtor utilizes Namely, a third-party payroll service, to process and administer its Payroll Taxes. The Debtor calculates the Payroll Taxes for each Employee and transfers funds sufficient to satisfy such obligations to Namely in advance of each applicable pay period. Namely pays the Payroll Taxes on behalf of the Debtor.

63.     On average, the Debtor pays approximately $3,000 per month to Namely for the payroll-related services that it provides to the Debtor and related administrative costs (the "Payroll Fees").  As of the Petition Date, the Debtor believes that no amounts are currently due to Namely on account of Payroll Fees.  However, to the extent a balance exists to Namely with respect to the Payroll Fees, the Debtor seeks authority to pay those amounts.  Failure to pay the Payroll Fees in the future could lead to delayed disbursement of Payroll Taxes to the appropriate third parties to the detriment of the Employees and the Debtor's operations.  As a result, the Debtor seeks authority to remit the Payroll Fees to Namely and to continue administering payroll in the ordinary course of business.

**f.      Expense Reimbursements**

64.     The Debtor reimburses Employees for certain expenses that such Employees personally incur in the scope of their employment (the "Expense Reimbursements").  Expense Reimbursements typically include expenses associated with travel, lodging, purchases made on behalf of the company and other business-related expenses related to the discharge of an Employee's duties.  Expense Reimbursements are incurred by Employees through the use of personal credit cards and the Employees may be held personally liable for any unpaid obligations.  Thus, the Debtor's inability to reimburse such expenses could impose severe hardship on such individuals where the obligations were incurred for the Debtor's benefit.

65.     On average, the Debtor pays Expense Reimbursements of approximately $85,000 per month in the aggregate.  As of the Petition Date, and based on reimbursement requests to date, the Debtor estimates that it owes at least $52,000 in outstanding prepetition Expense Reimbursements.  The Debtor expects that the prepetition Expense Reimbursements will total approximately $67,000 after Employees submit expenses in the ordinary course.

24

66.     Although the Debtor asks that reimbursement requests be submitted promptly, sometimes submission delays occur.  Accordingly, Employees may submit reimbursement requests for prepetition expenses after the Petition Date.  Expense Reimbursements are incurred with the understanding that they will be reimbursed.  Without continued reimbursement of the Expense Reimbursements, Employees relying on these benefits would be saddled with additional costs, potentially causing personal financial hardship.  Accordingly, to avoid harming Employees who are entitled to Expense Reimbursements, the Debtor seeks authority to satisfy any unpaid prepetition Expense Reimbursements and to continue to pay the Expense Reimbursements on a postpetition basis in the ordinary course of business and consistent with past practice.

    **2.**       **Employee Benefit Programs**

        **a.**       **Health and Welfare Programs**

67.     The Debtor offers several insurance policies to eligible Employees for medical, dental and vision care coverage and certain other benefits (each as defined herein, and collectively, the "Health and Welfare Programs"), including health insurance, life insurance, disability benefits and workers' compensation.

68.     By the Wage and Benefit Motion, the Debtor seeks authority to pay any unpaid amounts due under the Health and Welfare Programs and to continue the Health and Welfare Programs postpetition in the ordinary course of business and consistent with past practices.

        **(i)**       **Health Insurance Program**

69.     The Debtor historically has offered its Employees the opportunity to participate in a number of health benefit plans, including the Medical Plans, the FSA, the

COBRA Program and the Dental Plan (each as defined below, and collectively, the "Health Insurance Programs").

70.     The Debtor offers medical, prescription drug benefit and vision insurance programs (the "Medical Plans"), which generally are available to Employees who work at least thirty (30) hours per week (the "Eligible Employees").  The Debtor offers Eligible Employees and their dependents the opportunity to participate in group health insurance (the "Medical Insurance") provided through BlueCross BlueShield of Illinois.  As of the Petition Date, forty-four (44) Employees participated in the Debtor's Medical Insurance program.  Premiums for the Medical Insurance are paid, in part, by the Debtor and, in part, through premiums collected from Eligible Employees enrolled in the Medical Insurance program.  The Debtor pays approximately 99% of the cost of this benefit.  The Debtor estimates that there are no amounts currently due with respect to premiums allocable to the prepetition period for the Medical Insurance.  However, to the extent amounts are owed or adjustments are made through an account reconciliation, the Debtor seeks authority to pay any outstanding prepetition amounts on account of the Medical Insurance in a manner consistent with historical practice.

### (ii)     Dental Plan

71.     The Debtor offers a dental benefit (the "Dental Plan") to Eligible Employees and their dependents, which is provided by Lincoln Financial ("Lincoln").

72.     The cost of this plan is shared between the Employees and the Debtor. The total cost of the Dental Plan is approximately $3,056.20 per month, exclusive of Employee contributions.  The Debtor believes it is current to Lincoln with respect to the Dental Plan. However, to the extent a balance exists to Lincoln with respect to the Dental Plan, the Debtor

58448/0001-16602728v14

seeks authority to pay such amounts to ensure the continuous availability of coverage and administration needed for that plan.

### (iii)    Vision Plan

73.    Employees also are offered the opportunity to obtain vision benefits (the "Vision Plan") through Lincoln VisionConnect.  Premiums for the Vision Plan are paid entirely by Employees that participate in the Vision Plan, through Deductions from their paychecks, and the Debtor pays Lincoln VisionConnect approximately $497.18 per month to administer the Vision Plan.  To the extent there is any balance due Lincoln VisionConnect, the Debtor requests authority to pay such amounts.

### (iv)    Health Reimbursement Account, Flexible Spending Account and COBRA Program

74.    The Debtor provides Employees with access to a health reimbursement account (a "HRA") administered by Envision Healthcare ("Envision") to help defray costs of eligible healthcare expenses.  At the beginning of each calendar year, Envision makes a deposit into each HRA to pay eligible medical expenses until certain in-network out-of-pocket maximums have been reached.  The Debtor deposits up to $3,750 per calendar year into each HRA to pay for certain approved out-of-pocket expenses incurred in-network throughout the plan year.  In addition, the Debtor deposits $4,000 per calendar year into each HRA to pay for any uncovered dental and/or vision expenses incurred by Eligible Employees throughout the plan year.

75.    The Debtor also provides each Employee with access to a flexible spending account (the "FSA"), administered by Envision.  All contributions are funded by Employees through payroll deductions.  Employees can contribute up $5,000 yearly to a FSA to

pay for qualified dependent care services.  The Debtor pays Envision $400 per month to maintain this program.

76.     The Debtor also provides Employees with access to a commuter plan that allows qualified Employees to set aside pretax dollars to use for certain work-related commuting purposes up to the statutory limits.

77.     In addition, the Debtor maintains a Consolidated Omnibus Budget Reconciliation Act program (the "COBRA Program") through Discovery Benefits to provide insurance to eligible former employees.  The cost of the program is $0.55 per eligible plan employee per month, totaling less than $1,000 per month overall.

78.     The Debtor pays approximately $60,000 per month in the aggregate for its contributions to and the administrative and premium payments for the Health Insurance Programs.  As of the Petition Date, the Debtor believes it is generally current with respect to the Health Insurance Programs.  However, to the extent prepetition amounts are due with respect to the Health Insurance Programs, the Debtor seeks authority to pay those amounts.  Accordingly, by the Wage and Benefit Motion, the Debtor seeks authority to pay in a manner consistent with historical practice any unpaid amounts on account of the Health Insurance Programs and to continue administering the Health Insurance Programs in the ordinary course of business and consistent with past practice.

**b.     Insurance, Disability and Workers' Compensation Programs**

**(i)     Life and AD&D Insurance Programs**

79.     The Debtor provides life and accidental death and dismemberment insurance ("Life and AD&D Insurance") to Employees through Lincoln.  Lincoln provides Life and AD&D Insurance with a guarantee issue amount of $50,000, up to $200,000.  The Debtor

28

pays approximately $423.75 per month with respect to its portion of the premiums for the Life and AD&D Insurance.

80.     As of the Petition Date, the Debtor does not believe it owes any outstanding amounts on account of Life and AD&D Insurance.  However, to the extent amounts are owed, the Debtor seeks authority to pay any unpaid prepetition amounts on account of the Life and AD&D Insurance in a manner consistent with historical practice and to continue providing Life and AD&D Insurance postpetition in the ordinary course of business and consistent with past practice.

### (ii)     Disability Benefits

81.     The Debtor provides Employees with short- and long-term disability benefits (the "Disability Benefits") through Lincoln.  Under the short-term disability benefits program, Employees are entitled to, among other things, continuation of sixty percent (60%) of their base pay with a maximum of $2,500 per week for up to twelve (12) weeks, in the event of qualified non-work related illness or injury (the "Short-Term Disability Benefits").  The Short-Term Disability plan is a self-funded plan.  The Debtor pays a fee to Lincoln to administer the plan, but the Debtor is responsible for the payment of all claims.  The Debtor pays Lincoln approximately $950 per month in administrative fees on account of the Short-Term Disability Benefits.

82.     Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of sixty percent (60%) of their base salary, up to a monthly maximum of $7,500, for up to 24 months, in the event of qualified non-work related illness or injury (the "Long-Term Disability Benefits").  Short Term Disability Benefits must be exhausted prior to Long Term Disability benefits being payable.  Employees are offered the opportunity to

29

buy additional supplemental coverage, at the employee's cost, for themselves or their spouse and dependents.  Long-Term Disability Benefits are fully insured through Lincoln.  The Debtor pays Lincoln approximately $500 per month in premiums with respect to Long-Term Disability Benefits.

83.    As of the Petition Date, the Debtor estimates that there are no amounts currently due with respect to Disability Benefits.   However, the Debtor owes approximately $350 in payroll taxes on a single claim.  Accordingly, by the Wage and Benefit Motion, the Debtor seeks authority to pay the amounts related to the claim and, to the extent a balance exists with respect to Disability Benefits, the Debtor seeks authority to pay those amounts in the ordinary course of business and consistent with past practice.

(iii)    <b>Workers' Compensation Program</b>

84.    Under the laws of the states in which the Debtor operates, the Debtor must maintain workers' compensation insurance for its Employees for claims arising from or related to employment by the Debtor.  The Debtor provides this coverage (the "Workers' Compensation Insurance") through insurance policies currently provided by Chubb Indemnity Insurance Company ("Chubb").  The Workers' Compensation Insurance covers (i) workers' compensation and (ii) employer liability for accident and disease.

85.    Under the Debtor's current Workers' Compensation Insurance, workers compensation claims are administered and paid by Chubb up to statutory limits for workers compensation and employer liability limits of $1,000,000.  The policies are "guaranteed cost" policies and, therefore, do not have a deductible.  The coverage period under the current policy runs from March 26, 2018 through March 26, 2019.  The annual premium for the policy totals approximately $38,350.

30

86.     The Debtor seeks authority to continue to administer its Workers'

Compensation Insurance during the Chapter 11 Case in the ordinary course of business and

consistent with past practice.

### c.     Retirement Plans

87.     The Debtor provides all eligible Employees with the ability to participate

in a 401(k) employee stock ownership program (the "401(k) Plan").  Employees generally are

eligible to participate in the 401(k) Plan after ninety (90) days of continuous employment with

the Debtor.  The 401(k) Plan generally provides for pre-tax deductions of compensation up to

limits set by the Internal Revenue Code, as well as for certain post-tax deductions.  Each

Employee's 401(k) contributions are deducted automatically from each paycheck and transferred

to a trust established under the 401(k) Plan on a quarterly basis (collectively, the "401(k)

Deductions").  The Debtor matches the Employees' 401(k) Plan contributions on a dollar for

dollar basis up to the first four percent of the Employees' contributions (the "Matching

Contributions").  As of the Petition Date, the Debtor estimates that it is obligated to remit

approximately $2,000 on account of the 401(k) Deductions and Matching Contributions.

88.     The 401(k) Plan currently is administered by Novos Growth LLC, which

is an affiliate of the Debtor.   Fees related to the administration of the 401(k) Plan are

approximately $4,000 per quarter (the "401(k) Administrative Fees").  The Debtor does not

believe that any amount is outstanding on account of the 401(k) Administrative Fees as of the

Petition Date.

89.     Many Employees' retirement savings consist solely of the funds in their

401(k) Plans.  Thus, the Debtor believes that continuing the 401(k) Plan and Matching

Contributions is essential to maintaining Employee morale and protecting Employee

expectations.  In addition, the Debtor believes that the 401(k) Deductions generally are held in trust by the Debtor and are not property of its estate.

### d.       Paid and Unpaid Leave

90.       The Debtor maintains several paid leave benefit programs for Employees, providing paid leave for PTO, Holidays and Other Paid Leave (each as defined below, and together, the "Paid Leave").

91.       In the ordinary course of business, the Debtor provides paid time off ("PTO") to the Employees as a Paid Leave benefit.  PTO accrues at a specified rate based on the Employee's years of service and date of hire.  Employees may accrue fifteen (15) working days of PTO per year.  Employees may carry over a portion of their unused PTO into the next calendar year.  As of the Petition Date, the Debtor does not believe it owes any amounts on account of PTO.  Out of an abundance of caution, however, and to the extent any amounts become due on account of PTO, the Debtor seeks authority to continue paying amounts due related to PTO in the ordinary course of business and consistent with past practice.

92.       In addition, the Debtor offers Employees approximately nine (9) paid holidays throughout the year and one (1) floating holiday (each, a "Holiday").  Generally, eligible Employees are not required to work on a designated Holiday and are paid for Holiday time at their base rate of pay.

93.       The Debtor also permits its Employees to take certain other paid and unpaid leaves of absence for personal reasons, many of which are required by law.  The Debtor pays Employees for certain missed work time in the ordinary course of business for bereavement leave or jury duty (the "Other Paid Leave").  The Debtor also permits Employees to take unpaid

leaves of absence for family medical leaves and military leaves (the "Unpaid Leave").

Employees are not entitled to cash payments for Other Paid Leave or unused Unpaid Leave.

94.     The Debtor believes that the continuation of the Paid Leave, Other Paid

Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining

Employee morale during the Chapter 11 Case.  Further, the policies are broad-based programs

upon which all Employees have come to depend.

95.     By the Wage and Benefit Motion, the Debtor seeks authority to allow

eligible Employees to use and accrue their Paid Leave, Other Paid Leave and Unpaid Leave in

the ordinary course of business on a postpetition basis.

### e.     Other Employee Benefit Programs

96.     The Debtor provides approximately 41 Employees with an automobile

allowance.   The majority of Employees are paid approximately $725 per month for the

automobile allowance.  A few Employees are paid $775 per month for the automobile allowance.

In addition, the Debtor provides sale representatives with pre-funded fuel cards.  The fuel cards

are funded every two weeks in the amount of $200 per card.

97.     I believe that payment of the Employee Compensation and Benefits is

warranted under the facts of the Chapter 11 Case.  The majority of the Employees rely

exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses.

Consequently, Employees will be exposed to significant financial difficulties if the Debtor is not

permitted to honor its obligations for unpaid Employee Compensation and Benefits.

Additionally, continuing ordinary course benefits will help maintain Employee morale and

minimize the adverse effect of the commencement of the Chapter 11 Case on the Debtor's

ongoing business operations.

98.     Moreover, the Employees provide the Debtor with services necessary to conduct the Debtor's business, and I believe that absent the payment of the Employee Compensation and Benefits, the Debtor may experience turnover and instability at this critical time in the Chapter 11 Case.  I believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees would face.  Such Employees may then seek alternative employment opportunities.  Additionally, a significant portion of the value of the Debtor's business is tied to its workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of the Chapter 11 Case.  I therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtor's efforts to preserve value and will give the Debtor the greatest likelihood of retention of its Employees as the Debtor seeks to operate its business in the Chapter 11 Case.  Accordingly, the Debtor respectfully requests that the Court authorize the Debtor to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practices.

**C.     Motion to Pay Prepetition Taxes**

99.     The Debtor filed a motion (the "Taxes Motion") seeking entry of an order (i) authorizing, but not directing, the Debtor to pay certain prepetition Taxes and Fees (as defined below) in the ordinary course of business, as the Debtor, in its sole discretion, deems necessary; (ii) authorizing the Debtor's banks to honor and process check and electronic fund transfer requests related to the foregoing; and (iii) granting related relief.

100.     In the ordinary course of business, the Debtor incurs or collects and remits certain taxes including, among others, sales and use taxes, state and local income taxes and

franchise taxes, as well as business license, compliance and regulatory fees and other similar assessments (collectively, the "Taxes and Fees").  The Debtor remits the Taxes and Fees to various federal, state and local taxing, regulatory and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (collectively, the "Applicable Authorities") in connection with the operation of its business.  The Taxes and Fees are paid monthly, quarterly, semi-annually or annually to the respective Applicable Authorities, depending on the given Tax or Fee and the relevant Applicable Authorities to which it is paid.  As of the Petition Date, the Debtor estimates that it owes approximately $2,000 in unremitted Taxes and Fees, which are comprised entirely of current obligations, and are not in respect of "catch-up" payments.

101.    By the Taxes Motion, the Debtor seeks authority, but not direction, to pay all prepetition Taxes and Fees owed to the Applicable Authorities as they come due in the ordinary course of business.  The Debtor estimates that the amount of accrued and unpaid Taxes and Fees payable should not exceed $10,000—and likely will be far less.

102.    I believe that the Debtor's payment of the Taxes and Fees is justified because certain of these amounts are not property of the Debtor's estate pursuant to section 541(d) of the Bankruptcy Code.  Certain of the prepetition taxes, such as sales and use taxes, are "trust fund taxes" that, by definition, are held by the Debtor in trust for the benefit of those third parties to whom payment is owed or on behalf of whom such payment is being made.

103.    Moreover, any regulatory dispute or delinquency that impacts the Debtor's ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's operations as a whole.  Specifically, the Debtor's failure to remit the Taxes and Fees could adversely affect the Debtor's business operations because, among other things:

(i) the Applicable Authorities could initiate audits of the Debtor or seek to prevent the Debtor from continuing its business and administering its estate, which, even if unsuccessful, would unnecessarily divert the Debtor's attention from the process of maximizing the value of its estate; (ii) the Applicable Authorities could attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estate; (iii) some of the Applicable Authorities may seek to collect penalties, cancel franchises or other licenses or undertake other unfavorable enforcement actions if the Debtor does not pay the Taxes and Fees; and (iv) certain of the Debtor's managers, officers and Employees might be subject to personal liability, even if such a failure to remit such Taxes and Fees was not a result of malfeasance on their part, which would undoubtedly distract these key people from their duties related to the Debtor's restructuring.

104.    Further, I believe that authorizing the payment of the Taxes and Fees is in the best interests of the Debtor's estate and creditors because many of the Taxes and Fees likely constitute priority claims under section 507(a)(8) of the Bankruptcy Code.  As such, payment of the Taxes and Fees will not prejudice the rights of general unsecured creditors.

105.    Here, I believe the Debtor's payment of the Taxes and Fees is an exercise of sound business judgment and is necessary to preserve the value of the Debtor's estate for the benefit of its creditors.  If the Debtor does not continue paying the Taxes and Fees when they come due on a timely basis, I believe it is likely that the Applicable Authorities, or those parties who ordinarily collect the Taxes and Fees, may interfere with the Debtor's business and the efficient administration of the estate.  Accordingly, I believe the Debtor's payment of the relatively small amounts of outstanding Taxes and Fees would benefit the Debtor's estate, creditors and other parties in interest.

58448/0001-16602728v14

D.      **Application to Retain Claims and Noticing Agent**

106.    The Debtor filed an application (the "Claims and Noticing Agent Application") seeking entry of an order authorizing the Debtor to retain and appoint Kurtzman Carson Consultants LLC ("KCC") as its claims and noticing agent ("Claims and Noticing Agent") to, among other things, (i) distribute required notices to parties in interest, (ii) receive, maintain, docket and otherwise administer the proofs of claim filed in the Debtor's Chapter 11 Case and (iii) provide such other administrative services, as required by the Debtor and approved by the Court, that would fall within the purview of services to be provided by the Clerk's office.

107.    The Debtor anticipates that there will be more than 400 entities listed in its creditor matrix.  In view of the number of potential creditors and the anticipated day-to-day activities in the Chapter 11 Case, I believe that the appointment of a Claims and Noticing Agent is warranted.

108.    I understand that KCC specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, balloting and other related services critical to the effective administration of chapter 11 cases.  I further understand that KCC has developed efficient and cost-effective methods to properly handle the voluminous mailings associated with the noticing, claims processing and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all other parties in interest.  Finally, I understand that KCC has experience working with, and will continue to work with, the Clerk to ensure that the services provided conform to all of the Court's procedures, the Local Rules and the provisions of any orders entered by the Court.

109.    In accordance with the Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), instituted by the Clerk of Court on February 1, 2012,

58448/0001-16602728v14

prior to the selection of KCC, the Debtor obtained, reviewed and compared engagement proposals from four other court-approved claims and noticing agents to ensure selection through a competitive process.  Based on all engagement proposals obtained and reviewed, KCC's rates are competitive and reasonable given its quality of services and expertise.

110.     Accordingly, I believe that the Debtor's retention of KCC as its Claims and Noticing Agent is in the best interests of the Debtor's estate, creditors and all parties in interest.

**E.      Motion to Use Cash Collateral**

111.     The Debtor filed a motion (the "Cash Collateral Motion") requesting entry of interim (the "Interim Order") and final orders (i) authorizing the Debtor's use of the cash held in its Bank Accounts (the "Cash Collateral"); (ii) granting adequate protection to the Prepetition Secured Lender (as defined in the Cash Collateral Motion) for any diminution in value of its interests in its collateral; (iii) subject to entry of a final order, waiving the Debtor's right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; (iv) vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor and the Prepetition Secured Lender to implement and effectuate the terms and provisions of the proposed Interim Order; and (v) scheduling a final hearing to consider the relief requested in the Cash Collateral Motion on a final basis.

112.     The ability of the Debtor to finance its operations and complete a successful chapter 11 sale process requires immediate continued use of the Debtor's assets, including Cash Collateral.  In the absence of the use of Cash Collateral, the continued operation of the Debtor's business would not be possible and immediate and irreparable harm to the Debtor, its estate and its creditors would occur.  The Debtor does not have sufficient available sources of

working capital and financing to operate its businesses in the ordinary course of business or to maintain its property without the use of Cash Collateral.  The relief requested in the Cash Collateral Motion is therefore necessary for the continued operation of the Debtor's business and the preservation of its property, and thus is in the best interests of the Debtor, its estate, its creditors and all parties in interest.

113.     The Debtor and the Prepetition Secured Lender have negotiated at arm's-length and in good faith regarding the Debtor's use of Cash Collateral to fund the continued operation of the Debtor's business during the period (the "Specified Period") from the Petition Date through the date which is the earliest to occur of (i) the expiration of the Remedies Notice Period (as defined in the Cash Collateral Motion), (ii) the date that is forty-five (45) days from the Petition Date if the Court has not entered an order granting the Cash Collateral Motion on a final basis and (iii) the date that is six (6) months after the Petition Date.  The Prepetition Secured Lender has agreed not to object to, conditioned on the entry of the Interim Order, the Debtor's proposed use of Cash Collateral, on the terms and conditions set forth in the Interim Order, and the terms of the adequate protection provided for therein.

114.     As further set forth in the Cash Collateral Motion, the Interim Order provides adequate protection in the form of superpriority claims and adequate protection liens to protect the Prepetition Secured Lender against any diminution in value arising from the Debtor's use of Cash Collateral or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  The Debtor further proposes to make disbursements pursuant to a 13-week cash flow forecast, including the anticipated uses of the Cash Collateral, attached to the Interim Order as Exhibit A, subject to permitted variances.

58448/0001-16602728v14

115.    Access to existing Cash Collateral on an interim basis will provide the Debtor with the liquidity necessary to continue to operate its business and thus preserve and maintain the going concern value of the Debtor's estate during its chapter 11 sale process. Without access to such liquidity, the Debtor's ability to navigate through chapter 11 would be jeopardized, to the detriment of the Prepetition Secured Lender and all of the Debtor's other stakeholders.  As a result, the Debtor has an immediate need to use Cash Collateral to ensure access to sufficient working capital throughout the Specified Period.  As such, I believe approval of the Cash Collateral Motion on an interim (an ultimately final) basis is in the best interests of the Debtor's estate, creditors and all parties in interest.

## CONCLUSION

116.    The Debtor's ultimate goal in this Chapter 11 Case is to sell substantially all of its assets in order to maximize the value of the Debtor's estate for the benefit of all the Debtor's constituents.  In the immediate term, however, the Debtor's most pressing objective is to minimize the disruption to the Debtor's operations to the greatest extent possible as it enters chapter 11.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving this objective and, in turn, its overriding goal in the Chapter 11 Case, will be substantially increased.

58448/0001-16602728v14

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: February 3, 2019

Thomas S. O'Donoghue, Jr.
Chief Restructuring Officer
Novum Pharma, LLC