## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x
                                                         :
In re:                                                   :   Chapter 11
                                                         :
NOVUM PHARMA, LLC,                                       :   Case No. 19-10209 (BLS)
                                                         :
                                   Debtor.¹              :   Hrg. Date: 7/24/19 at 11:00 a.m. (ET)
                                                         :   Obj. Deadline: 7/17/19 at 4:00 p.m. (ET)
                                                         :
------------------------------------------------------- x
```

## DEBTOR'S MOTION FOR ENTRY OF FINAL ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION SECURED FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (III) MODIFYING THE AUTOMATIC STAY; AND (IV) GRANTING RELATED RELIEF

Novum Pharma, LLC, the debtor and debtor-in-possession (the "Debtor") in the

above-captioned chapter 11 case (the "Chapter 11 Case"), hereby moves (the "Motion"),

pursuant to sections 105(a), 362 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"), for entry of a final order (the "DIP Order"), substantially in the form attached hereto:[2]

    (a)    authorizing the Debtor to obtain postpetition financing (the "DIP Financing") consisting of a first-lien superpriority term loan multi-draw financing facility in an aggregate principal amount not to exceed $3.0 million (the "DIP Facility") from Cardinal Health 105, Inc. or a designated affiliate (the "DIP Lender");

    (b)    authorizing the Debtor to execute and deliver, and incur all liabilities and obligations under:

---

[1]    The last four digits of the Debtor's federal tax identification number are 7895. The mailing address for the Debtor is 200 South Wacker Drive, 31st Floor, Chicago, IL 60606.

[2]    All capitalized terms used but not otherwise defined in the Motion shall have the meanings set forth in the DIP Term Sheet (as defined herein).

(i) that certain Debtor-In-Possession Financing Term Sheet, dated as of July 3, 2019 (as amended, supplemented or otherwise modified in accordance with the terms thereof, the "DIP Term Sheet"), a copy of which is attached to the DIP Order as Exhibit 1, and perform all such other and further acts as may be required in connection with the respective DIP Documents;[3] and

(ii) all other agreements, documents, notes or instruments as may be required, necessary or desirable (including all collateral documents) and which are executed or delivered in connection with the DIP Term Sheet;

(c) authorizing the Debtor to use proceeds of the DIP Loans (as defined below) solely as expressly permitted in the DIP Documents, including the payment of: (i) professional fees and expenses incurred by the Debtor, RGP Pharmacap, LLC (the "Prepetition Secured Lender") and the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case (the "Committee") as such fees and expenses become due and payable (the "Accrued Professional Fees") pursuant to the terms of the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals [Docket No. 142] or the Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtor [Docket No. 324] (as may be amended, supplemented or otherwise modified, the "Plan"), (ii) amounts required to be paid pursuant to section 365(b)(1) of the Bankruptcy Code upon the assumption of contracts in connection with confirmation of the Plan ("Cure Amounts"), (iii) administrative expenses required to be paid pursuant to section 1129(a)(9)(A) of the Bankruptcy Code ("Administrative Claims") on the effective date (the "Effective Date") of the Plan and (iv) other expenses of the Debtor's dermatology products business as agreed by the DIP Lender;

(d) granting automatically perfected security interests in and liens on all of the DIP Collateral (as defined below) to the DIP Lender, and granting superpriority administrative expense status to the DIP Obligations (as defined in the DIP Term Sheet), in each case on the terms and subject to the relative priorities set forth in the DIP Documents;

(e) authorizing the Debtor to pay the principal, interest, fees, expenses, disbursements and other amounts payable under the DIP Documents as such amounts become due and payable;

---

[3] "DIP Documents" shall mean, collectively, the DIP Term Sheet, any collateral documents, and all such instruments and documents as may be executed and delivered in connection with or relating to the DIP Facility.

    (f)       vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Order and the DIP Documents; and

    (g)       granting the Debtor such other and further relief as is just and proper.

In support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2. Venue of this case and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief sought herein are sections 105(a), 362 and 364 of the Bankruptcy Code. Such relief also is warranted under Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## BACKGROUND

### A.   The Chapter 11 Case

4. On February 3, 2019 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a petition for relief under chapter 11 of the Bankruptcy Code. The factual background regarding the Debtor, including its business operations, its capital and debt structure, and the events leading to the filing of the Chapter 11 Case, is set forth in the

58448/0001-17269371v5

Declaration of Thomas S. O'Donoghue, Jr. in Support of Chapter 11 Petition and First Day

Pleadings [Docket No. 3] (the "First-Day Declaration").

5.      The Debtor continues to manage and operate its business as a debtor-in-

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      On February 12, 2019, the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed the Committee pursuant to section 1102(a) of the

Bankruptcy Code [Docket No. 39].  No trustee or examiner has been appointed in the Chapter 11

Case.

**B.      The Prepetition Loan and the Debtor's Authority to Use Cash Collateral**

7.      The Debtor is a borrower under that certain Loan Agreement, dated as of

August 1, 2017 (as amended from time to time, the "Prepetition Loan Agreement"), with the

Prepetition Secured Lender, which provided the Debtor with a term loan in the amount of $15

million.  In connection with the Prepetition Loan Agreement, the Debtor entered into that certain

Security Agreement, dated as of August 1, 2017 (the "Security Agreement") in favor of the

Prepetition Secured Lender, pursuant to which the Prepetition Secured Lender was granted

security interests and liens on the Debtor's Collateral (as defined in the Security Agreement),

including substantially all of the Debtor's assets, including cash and cash collateral, as such term

is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral").

8.      On March 6, 2019, the Court entered an order [Docket No. 112]

authorizing the Debtor to use the Cash Collateral on a final basis and granting certain adequate

protection to the Prepetition Secured Lender, among other related relief.

C.      **The Sale Process**

9.      Prior to the filing of the Chapter 11 Case, on January 23, 2019, the Debtor retained the investment banking firm of Teneo Capital LLC ("Teneo") to assist the Debtor in the marketing and sale of its dermatology products business.  On March 5, 2019, the Court entered an order [Docket No. 98] authorizing Teneo's retention in the Chapter 11 Case.  The Debtor, assisted by Teneo and the Debtor's other advisors, and with regular input from the Committee, aggressively marketed the Debtor's dermatology assets for more than four months during the Chapter 11 Case prior to concluding the sale process and requiring parties to submit bids for such assets.

10.     On February 13, 2019, the Debtor filed a motion [Docket No. 42] seeking entry of (i) an order (the "Bidding Procedures Order") (a) approving bidding procedures for the sale of substantially all of the Debtor's assets (the "Assets"), (b) approving bid protections, (c) scheduling an auction for, and a hearing to approve, the sale of substantially all of the Debtor's assets, (d) approving the form and manner of notices of the sale, auction and sale hearing, (e) approving assumption and assignment procedures and (f) granting related relief; and (ii) an order (a) approving the sale of the Debtor's assets free and clear of liens, claims, interests and encumbrances, (b) authorizing the assumption and assignment of unexpired leases and executory contracts and (c) granting related relief.

11.     On March 6, 2019, the Court entered the Bidding Procedures Order [Docket No. 111] establishing, among other things, an April 22, 2019 bid deadline, an April 24, 2019 auction date and an April 26, 2019 sale hearing date.

12.     On April 18, 2019, after receiving funding for the month of May 2019 from Cardinal Health 105, Inc. ("CH 105"), as required under the term sheet between the parties

5

(as described below), the Debtor determined that it would extend the bid deadline and adjourn

the auction and sale hearing for approximately one month to enable the Debtor, CH 105 and

other case constituents to continue to negotiate a plan term sheet, plan support agreement and,

ultimately, plan of reorganization.  In particular, on April 23, 2019, the Debtor filed a notice

[Docket No. 236] extending the bid deadline until May 24, 2019, and adjourning the auction and

sale hearing until May 28, 2019 and May 30, 2019, respectively.[4]  At the time of the

adjournment, the Debtor had not received any Qualified Bids (as defined in the Bidding

Procedures Order).

13.     The Debtor received a single Qualified Bid on May 24, 2019, and

proceeded to conduct an auction on May 29, 2019.[5]  The Prepetition Secured Lender was the first

bidder at the Auction, and submitted a bid comprised of $500,000 in cash, plus a credit bid in the

amount of $500,000.  The sole party submitting a Qualified Bid declined to improve its bid and

top the bid submitted by the Prepetition Secured Lender at the Auction, leaving the Prepetition

Secured Lender as the high bidder.  At the conclusion of the Auction, the Debtor, in consultation

with the Committee, determined that the Prepetition Secured Lender's high bid did not provide

sufficient value to deem it the Successful Bid (as defined in the Bidding Procedures Order).

Accordingly, the Debtor did not seek approval of such bid at the May 30, 2019 hearing in the

Chapter 11 Case.

14.     In short, after a thorough market test for the value of the Debtor's

dermatology assets, the Debtor determined that such assets were worth just a small fraction of

---

[4]     The auction subsequently was adjourned until May 29, 2019.  See Docket No. 268.

[5]     As set forth in the Bidding Procedures Order, the Prepetition Secured Lender was deemed a Qualified
        Bidder (as defined in the Bidding Procedures Order) without the need to submit a bid.

the amount of the secured debt burdening the Debtor—and indeed would fetch no more than $1 million in a competitive auction process.

**D.     The Plan Process**

15.     Concurrently with the sale process being conducted by the Debtor and its advisors during the Chapter 11 Case, the Debtor was pursuing an alternative plan process in its efforts to maximize value.  In particular, several weeks after the Petition Date, the Debtor and CH 105 began discussing the framework of a potential chapter 11 plan of reorganization (the "Plan") to address, among other things, the Debtor's need for funding to operate its business on a go-forward basis and CH 105's need to exchange certain of its soon-to-expire dermatology products inventory.

16.     After several months of good faith, arm's-length negotiations between the Debtor and CH 105, the parties agreed upon the material terms of the Plan, and embodied those terms in a chapter 11 plan term sheet (the "Plan Term Sheet") and related plan support agreement (the "PSA").  As set forth in the Plan Term Sheet, the Plan contemplates a reorganization pursuant to which, among other things, the Debtor's dermatology business will continue to be operated by its existing management after the effective date of the Plan and CH 105 will provide funding to the Debtor through a combination of loans and inventory purchases.  The Plan Term Sheet also contemplates, among other things, the creation and funding of a litigation trust for the benefit of the Debtor's general unsecured creditors, which litigation trust will be funded by, among other things, recoveries from litigation actions and cash and non-cash consideration contributed by the Debtor's members.

17.     After the Debtor and CH 105 finalized the terms of the agreement between the parties, as memorialized in the Plan Term Sheet, the Debtor began to negotiate the Plan Term

7

Sheet with other key case constituents, including the Committee, the Debtor's prepetition

secured lender, the Debtor's members, AmerisourceBergen Drug Corporation and McKesson

Corporation.  On June 12, 2019, the Plan Term Sheet and PSA were finalized and, on June 14,

2019, the Debtor filed a motion to approve the Debtor's entry into the PSA.  See Docket No.

311.  Just a week later, on June 21, 2019, the Debtor filed the Plan, the related disclosure

statement (the "Disclosure Statement") and a motion for approval of the Disclosure Statement

and solicitation procedures [Docket No. 326].

18.    Pursuant to the Plan Term Sheet, the DIP Lender agreed to provide the

Debtor with the DIP Financing, to be "loaned as first position, senior secured debt, consistent

with the provisions of section 364(d) of the Bankruptcy Code."  See Plan Term Sheet at p. 6.

Additionally, pursuant to the Plan Term Sheet, the Prepetition Secured Lender agreed to, among

other things, subordinate its liens to those being provided to the DIP Lender in connection with

the DIP Financing.  See id. at pp. 1-3, and 7.

## SUMMARY OF DIP FINANCING TERMS

19.    In accordance with Bankruptcy Rule 4001(c) and (d), summarized below

are the significant terms of the DIP Documents and the DIP Order.  Included in this summary is

a description of each of the provisions required to be highlighted by Bankruptcy Rule 4001(c)

and Local Rule 4001-2.[6]

| Borrower: | Novum Pharma, LLC |
|---|---|
| DIP Lender: | Cardinal Health 105, Inc. or a designated affiliate |

---

[6]    The descriptions of the terms of the proposed DIP Order provided in the Motion are intended only as a summary.  In the event of any inconsistency between the descriptions set forth herein and the terms of the DIP Order, the terms of the DIP Order shall govern.  Local Rule 4001-2 requires the Debtor to highlight certain provisions in the Motion.  Sections that must be highlighted for the Court under either Bankruptcy Rule 4001(c) or Local Rule 4001-2 are shown in bold and references to the DIP Term Sheet and DIP Order are provided.

| | |
|---|---|
| Commitment and Availability: | The DIP Lender will make loans (the "DIP Loans") to the Debtor under a debtor-in-possession term loan multi-draw financing facility in an aggregate principal amount not to exceed $3.0 million pursuant to the terms of the DIP Term Sheet (such amount, the "Principal Amount").  Upon entry of the DIP Order, the Debtor will be permitted to borrow an amount not to exceed the full amount of the DIP Facility, subject to the terms and conditions set forth in the DIP Term Sheet and in the DIP Order. |
| Interest Rate: | Interest on the DIP Loans will be equal to [9.0]% per annum (the "Base Rate") and will be payable in kind and added to the Principal Amount on the Maturity Date (as defined below). |
| Default Interest Rate: | Base Rate of [9.0]%, plus 3.0 % (the "Default Interest Rate"). |
| Maturity Date: | The DIP Facility maturity date (the "Maturity Date") will be the earlier of (a) the Effective Date or (b) the date of an occurrence of a Termination Event (as defined below); provided, however, that the Maturity Date may be extended by the DIP Lender in its sole discretion pursuant to a writing with the Debtor.  The DIP Facility will be paid in full in cash on the Maturity Date; provided, however, that if the Maturity Date occurs on the Effective Date, all indebtedness under the DIP Facility will become indebtedness under the exit financing facility to be provided by the DIP Lender and will become subject to the terms thereof. |
| Purpose: | The proceeds of the DIP Loans will be used by the Debtor to fund the payment of (i) Accrued Professional Fees, (ii) Cure Amounts, (iii) Administrative Claims, and (iv) other expenses of the Debtor's dermatology products business as agreed by the DIP Lender. |
| Liens, Security and Priority: | **A grant of priority or a lien on property of the estate under section 364(c).  Bankruptcy Rule 4001(c)(1)(B)(i).  See DIP Term Sheet, pp. 4; DIP Order, ¶¶ 10-12; 16.**<br><br>**The DIP Obligations pursuant to sections 364(c)(1) and 364(d)(1) of the Bankruptcy Code will (i) constitute allowed superpriority administrative expense claims and (ii) be secured by first priority, perfected liens on and security interests in all the DIP Collateral (as defined below).**<br><br>**The property of the Debtor that is subject to the aforesaid perfected liens and/or security interests in favor of the DIP Lender will include, but not be limited to, substantially all assets and property of the Debtor and its estate, whether now owned or** |

|   | |
|---|---|
|   | existing or hereafter acquired, created or arising and wherever located (collectively, the "**DIP Collateral**"); **provided, however,** that "DIP Collateral" will not include (i) actions arising under chapter 5 of the Bankruptcy Code or any related state law claims of the Debtor's estate or its members (collectively, the "**Causes of Action**"); (ii) the proceeds of such Causes of Action; or (iii) assets and property of the Debtor subject to valid, enforceable and non-avoidable Permitted Liens (as used in the Prepetition Loan Agreement) on the DIP Collateral that were perfected prior to the Petition Date (or perfected thereafter to the extent permitted by section 546(c) of the Bankruptcy Code). |
| Borrowing Conditions: | Availability of the DIP Facility will be subject to the following conditions precedent, all of which will be for the benefit of the DIP Lender and must be satisfied on occasion of each drawdown under the DIP Facility, unless waived in writing in advance by the DIP Lender: |

1. The Court will have entered the DIP Order approving the DIP Facility on a final basis, including, without limitation, the grant of, pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable and fully perfected DIP Liens (as defined in the DIP Term Sheet) upon all DIP Collateral with the priority as set forth in the section entitled "Priority and Liens" in the DIP Term Sheet and superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code referred to therein, to secure the DIP Obligations of the Debtor under the DIP Facility in accordance with the terms of the DIP Term Sheet, effective as of the granting of the DIP Order, without the need for any further action on the part of the DIP Lender, the Debtor or any other person (including, without limitation, the execution or delivery of any further documents or agreements or the recording, filing, indexing, entering or registering of any financing statements or other similar instruments or documents).

2. The DIP Lender will have been granted, and hold, a perfected first priority lien on, and security interest in, substantially all of the property of the Debtor and the proceeds thereof.

3. All representations and warranties of the Debtor set forth in the DIP Term Sheet and in the other DIP Documents will be accurate in all material respects, on and as of such date as if made on and as of such date, and after giving effect to the DIP Loans to be made on such date.

4. The DIP Order will be in full force and effect and will not have been reversed, stayed, modified or amended without the

10

<table>
<tr>
<td></td>
<td>express written consent of the DIP Lender, and no application or motion will have been made to the Court for any stay, modification or amendment of the DIP Order and no stay, appeal or leave to appeal with respect to same will be pending.<br><br>5.    No event has occurred and is continuing that constitutes an Event of Default (as defined below) or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.</td>
</tr>
<tr>
<td><u>Events of Default:</u></td>
<td>The occurrence of any one or more of the following events (each such event and the expiry of the cure period, if any, provided in connection therewith, referred to as an "<u>Event of Default</u>") will constitute a default under the DIP Term Sheet:<br><br>1.    The failure by the Debtor to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in the DIP Term Sheet or in the DIP Order, on its part to be performed or complied with where any such failure to perform or comply is not remedied within five (5) business days from written notice of default.<br><br>2.    The cessation of the DIP Term Sheet to be in full force and effect, or the DIP Facility being declared by the Court to be null and void, or the validity or enforceability of the DIP Facility being contested by the Debtor or the Debtor denying in writing that it has any further liability or obligation under the DIP Facility, or the DIP Lender ceasing to have the benefit of the DIP Liens granted by the DIP Order.<br><br>3.    Except as permitted in the DIP Order, the entry of any order of the Court granting to any third party a superpriority claim or lien <u>pari passu</u> with or senior to that granted to the DIP Lender under the DIP Term Sheet.<br><br>4.    The entry of an order converting the Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the Debtor filing a motion or not opposing a motion seeking such relief.<br><br>5.    The entry of an order dismissing the Debtor's Chapter 11 Case, or the Debtor filing a motion or not opposing a motion seeking such relief, unless consented to by the DIP Lender.<br><br>6.    The entry of any order in the Debtor's Chapter 11 Case or any successor case, which order constitutes the stay, modification, appeal or reversal of the DIP Order or which otherwise affects</td>
</tr>
</table>

11

| | |
|---|---|
| | the effectiveness of the DIP Order. |
| | 7. The entry of an order in the Debtor's Chapter 11 Case appointing any examiner having expanded powers or a trustee to operate all or any part of the Debtor's business. |
| | 8. Any judgment or order with respect to a postpetition event is rendered against the Debtor which does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtor or (ii) have a material adverse effect on the rights and remedies of the DIP Lender under the DIP Term Sheet, and there will be a period of ten (10) consecutive business days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, will not be in effect. |
| | 9. The DIP Order being amended or modified without the consent of the DIP Lender. |
| | 10. The commencement of any claim or cause of action by or on behalf of the Debtor, its estate or the Committee against the DIP Lender. |
| | 11. The failure by the Debtor to comply in all material respects with the Plan Support Agreement and Plan Term Sheet (as filed at Docket No. 311). |
| <u>Remedies:</u> | If any Event of Default occurs and is continuing, the DIP Lender may take any or all of the following actions: |
| | 1. If such Event of Default occurs prior to the making of the DIP Loans, declare the commitment of the DIP Lender to make the DIP Loans to be terminated, whereupon such commitment will be terminated. |
| | 2. Declare interest on the DIP Obligations to accrue at the Default Interest Rate, whereupon the interest on the DIP Obligations will automatically accrue at such default rate. |
| | 3. Subject to expiration of the Default Notice Period (as defined below), declare the outstanding unpaid Principal Amount of the DIP Facility, all interest accrued and unpaid thereon, and all other amounts owing or payable thereunder, under the DIP Term Sheet or under the DIP Order to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtor in |

|  | the DIP Term Sheet. |
|  | 4.    Subject to expiration of the Default Notice Period, (i) enter upon any premises on or in which any of the DIP Collateral may be located and take possession of the DIP Collateral or complete processing, manufacturing and repair of all or any portion of the DIP Collateral, (ii) collect, foreclose, receive, appropriate, setoff and realize upon any and all DIP Collateral, (iii) remove any DIP Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose, (iv) exercise its unqualified right to credit bid up to the full amount of the outstanding DIP Obligations in any sale of the DIP Collateral (or any part thereof) without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, and (v) take whatever other action the DIP Lender may deem necessary or desirable for the protection of the DIP Lender's interests. |
|  | 5.    Exercise all rights and remedies available to the DIP Lender (whether as a secured creditor or otherwise) under the DIP Facility, the DIP Term Sheet, the other DIP Documents, the DIP Order or applicable law (including in respect of the DIP Collateral). |
| Waiver / Modification: | **Waiver or modification of provisions of the Bankruptcy Code or applicable rules relating to the automatic stay or an entity's request to obtain credit under section 364 of the Bankruptcy Code.  Bankruptcy Rules 4001(c)(1)(B)(iv) and 4001(c)(1)(B)(v). See DIP Term Sheet, pp. 10-11; DIP Order, ¶¶ 7(j), 19.**<br><br>**At all times during the Chapter 11 Case, and whether or not an Event of Default has occurred, the Debtor irrevocably waives any right that it may have to (i) challenge the application of any payments authorized by the DIP Order pursuant to section 506(b) of the Bankruptcy Code; (ii) seek authority to grant liens on the DIP Collateral, or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise; or (iii) seek authority to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than from the DIP Lender, or as may be otherwise expressly permitted under the DIP Documents, unless the Debtor uses the proceeds of such postpetition loans or other financial accommodations to pay in full in cash all DIP Obligations or the DIP Lender has provided its prior written** |

13

| | |
|---|---|
| | consent to such action.<br><br>**Subject to the DIP Order, upon the occurrence of a Termination Event,[7] the automatic stay provisions of section 362 of the Bankruptcy Code will be automatically vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies provided in the DIP Order and the DIP Documents, as applicable, and to take any or all of the following actions without further order of or application to the Court, including without limitation:  (i) immediately terminate the availability of the DIP Facility to the Debtor; (ii) immediately declare all DIP Obligations to be immediately due and payable; (iii) immediately set off any and all amounts held on account of or owed to the Debtor against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of, or subject to a lien in favor of the DIP Lender for application toward the DIP Obligations; and (iv) take any other actions or exercise any other rights or remedies permitted under the DIP Order and the DIP Documents or applicable law to effect the repayment of the DIP Obligations; <u>provided</u> <u>that</u> notwithstanding anything in the DIP Term Sheet to the contrary, the DIP Lender will not enforce any DIP Liens against the DIP Collateral or exercise any other remedies prior to the expiration of the Default Notice Period.  Additionally, pursuant to the DIP Order, (a) any party in interest's sole recourse with respect to opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code will be to contest the occurrence and/or continuance of an Event of Default, (b) during the Default Notice Period, the Debtor will (x) have no right to request extensions of credit under the DIP Facility, other than with the consent of the DIP Lender, and (y) be entitled to an emergency hearing before the Court, with proper notice to the DIP Lender, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, (c) the rights and remedies of the DIP Lender specified in the DIP Order are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under the DIP Term Sheet or otherwise, and (d) the Debtor will cooperate fully with the DIP Lender in any permitted exercise of rights and remedies, whether against the DIP Collateral or otherwise.** |
| <u>Release from Lending</u> | **Release and limitation on claims and causes of action.**<br>**Bankruptcy Rule 4001(c)(1)(B)(viii).  <u>See</u> DIP Term Sheet, pp. 11;** |

---

[7]     "Termination Event," means the expiration of five (5) business days (the "<u>Default Notice Period</u>") following the provision of written notice to the Debtor (with a copy of such notice provided to counsel for the Debtor, the Committee, the Prepetition Secured Lender and the U.S. Trustee) upon the occurrence of an Event of Default.

58448/0001-17269371v5

| | |
|---|---|
| Obligations: | **DIP Order, ¶ 18.**<br><br>**Upon the repayment of all DIP Obligations owed to the DIP Lender by the Debtor and termination of the rights and obligations arising under the DIP Documents, the DIP Lender, solely in its capacity as such, will be released from any and all obligations, liabilities, actions, duties and responsibilities arising or occurring in connection with or related to the DIP Term Sheet, the other DIP Documents or the DIP Order.  Notwithstanding anything to the contrary in the DIP Term Sheet, the Debtor's releases do not extend to the DIP Lender's obligations to make the DIP Loans and otherwise comply with the terms of the DIP Term Sheet, the other DIP Documents and the DIP Order.** |
| Indemnification: | **The indemnification of any entity.  Bankruptcy Rule 4001(c)(1)(B)(ix).  See DIP Term Sheet, p. 11; DIP Order, ¶ 17.**<br><br>**The DIP Lender, solely in its capacity as such, will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Term Sheet or the use or the proposed use of proceeds thereof, except to the extent found by a final, non-appealable judgment of a court to arise from the gross negligence, willful misconduct or fraud of the DIP Lender.** |
| Governing Law and Jurisdiction: | Delaware |

## **RELIEF REQUESTED**

20. The Debtor seeks entry of the DIP Order granting the following relief:

    a.    authorizing the Debtor to obtain secured postpetition financing in an aggregate principal amount not to exceed $3.0 million pursuant to the DIP Term Sheet, the other DIP Documents and the DIP Order;

    b.    granting an allowed superpriority claim to the DIP Lender pursuant to section 364(c)(1) of the Bankruptcy Code;

    c.    granting the DIP Lender security interests in, and liens on, all of the DIP Collateral pursuant to section 364(d) of the Bankruptcy Code; and

15

　　　　d.　　modifying the automatic stay to the extent necessary to effectuate
　　　　　　　the provisions of the DIP Order.

**BASIS FOR RELIEF**

21.　　Since May 2019, the Debtor has been relying on funding from CH 105 to

operate it dermatology business.  In particular, CH 105 provided the Debtor $900,000 to fund its

dermatology business for the month of May, and approximately $1.7 million to fund its

dermatology business for the month of June.  Pursuant to the Plan Term Sheet, CH 105 has

agreed to provide up to an additional $2.4 million in funding for the months of July and August,

which should provide the Debtor sufficient funding to conclude the Plan confirmation process.[8]

The approximately $5 million in funding provided (and to be provided) by CH 105 to the Debtor

for the months of May-August (the "Plan Term Sheet Funding") is structured as a prepayment

for dermatology products inventory to be delivered at a later date.  Without the Plan Term Sheet

Funding, the Debtor would not have been able to continue to operate its dermatology products

business beyond early May 2019.[9]

22.　　Although after significant negotiation CH 105 was willing to provide the

Plan Term Sheet Funding on an unsecured basis to ensure the continued operation of the

Debtor's business through the confirmation of the Plan, such funding is not sufficient to pay the

professional fees being incurred by the Debtor as it pursues confirmation of the Plan—and it is

not sufficient to pay certain administrative costs and cure costs that must be paid in connection

---

[8]　　The Debtor anticipates that the hearing to consider confirmation of the Plan will be held on August 29, 2019.

[9]　　The Debtor receives revenues from its contract sales organization (CSO) and consulting businesses, but these businesses provide only a small fraction of the revenues that would be required to sustain the Debtor's dermatology business.  Although the Debtor historically has earned revenue selling its dermatology products to CH 105, CH 105 currently has significant dermatology products inventory and has not purchased any dermatology products from the Debtor since the Petition Date.  Indeed, given CH 105's existing dermatology products inventory, it would not need to purchase additional inventory from the Debtor for approximately another year.

16

with confirmation of the Plan.  CH 105 was only willing to fund the payment of professional fees and certain other costs as a first-lien superpriority term loan that would prime the Debtor's existing financing provided by the Prepetition Secured Lender.  Without access to the proposed DIP Facility, the Debtor would be unable to pay the Accrued Professional Fees, Cure Amounts or Administrative Claims, payment of which amounts is necessary to confirm the Plan.  Moreover, there currently are Accrued Professional Fees due and payable, and the Debtor's only source of funds for payment of such professional fees is the DIP Facility.  Because the Plan provides the best opportunity for the Debtor to maximize recoveries for its creditors, and currently is the only alternative to conversion of the Chapter 11 Case to one under chapter 7 of the Bankruptcy Code, the relief requested herein is critical to the success of the Chapter 11 Case.

23.     The Debtor and its professionals negotiated the DIP Term Sheet in good faith and at arm's-length with the DIP Lender.  The Debtor believes that the terms of the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration.  Thus, the Debtor submits that the DIP Financing is in the best interests of the Debtor's estate, creditors and all other stakeholders and, therefore, that the relief requested herein should be granted.

A.     **The Debtor Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

24.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c).

25.     In evaluating proposed postpetition financing under section 364(c) of the

Bankruptcy Code, the Debtor has the burden of proving that:

(1)     It is unable to obtain unsecured credit pursuant to section 364(a) and (b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code;

(2)     The credit transaction is necessary to preserve the assets of the estate; and

(3)     The terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Los Angeles Dodgers, LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011).

26.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a

debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor

on an unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n

(In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  The statute does not, however,

impose "a duty to seek credit from every possible lender" before concluding that such credit is

unavailable.  In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (citing

Snowshoe, 789 at 1088).  When few lenders are likely to be able and willing to extend the

necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113

(Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R.

117 (N.D. Ga. 1989); see also In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y.

1990) (approving financing facility and holding that the debtor made reasonable efforts to satisfy

the standards of section 364(c) where it approached four lending institutions, was rejected by

two, and selected the most favorable of the two offers it received).

27.     For the reasons discussed below, the Debtor submits that it has satisfied the standards required to access postpetition financing on a secured superpriority basis under section 364(c) of the Bankruptcy Code.

**(i)     The Debtor is Unable to Obtain Unsecured Credit Pursuant to Sections 364(a) and (b) of the Bankruptcy Code**

28.     As discussed above, the Debtor has no collateral available to secure an extension of credit,[10] and the Debtor's business does not generate even close to enough revenue to service its existing debt and pay its operating expenses.  Moreover, because CH 105 is holding such a large stock of dermatology products inventory, absent CH 105's agreement memorialized in the Plan Term Sheet to buy additional inventory from the Debtor prior to exhausting its existing inventory, the Debtor would receive no revenue from its dermatology products business for approximately another year.[11]  As such, the Debtor currently has no ability to obtain asset-based or cash-flow-based loans in the marketplace.[12]

29.     Indeed, even CH 105 would not be willing to provide funding to the Debtor if such funding would not facilitate the ultimate reduction in CH 105's dermatology

---

[10]     As set forth in the First-Day Declaration, on the Petition Date the Debtor owed the Prepetition Secured Lender approximately $15.2 million under the Prepetition Loan Agreement, which obligation was secured by liens and security interests on substantially all of the Debtor's assets.  Because, as demonstrated by the outcome of the Debtor's sale process, the value of the Prepetition Secured Lender's collateral is no more than a million dollars, there is no way to provide the Prepetition Secured Lender with "adequate protection" as required by section 364(d)(1)(B).  Thus, the only way for the Debtor to obtain financing under section 364(d) of the Bankruptcy Code is with the consent of the Prepetition Secured Lender—and the Secured Lender is only willing to consent to such priming in the context of the global resolution between and among the parties to the PSA memorialized in the Plan Term Sheet.

[11]     CH 105 will not have sold all of its existing dermatology products inventory within the next year; however, because all of its dermatology products inventory will have expired by June 2020, CH 105 would need to begin purchasing new dermatology products inventory from the Debtor at that time.

[12]     It should be noted that even the Debtor's co-pay vendors required security in order to continue doing business with the Debtor during the Chapter 11 Case.  See Docket No. 72 (requesting that PSKW, LLC d/b/a ConnectiveRx be granted adequate protection and security in the form of pre-payments for its services going forward and senior administrative expense priority pursuant to section 364(c)(1) for such entity's claims that accrued during the Chapter 11 Case); Docket No. 144 (providing McKesson Corporation and its corporate affiliates with adequate protection and security in the form of pre-payments for their services going forward).

products inventory.  In other words, but for the particular set of facts that exist here—where CH

105 seeks to avoid a large writeoff of the value of its dermatology products inventory—no

rational lender would advance funds to the Debtor.  In short, there is one and only one lender that

has the incentive to lend to the Debtor—and that lender is CH 105.

30.    Finally, as noted above, CH 105 is only willing to fund the payment of

Accrued Professional Fees, Cure Amounts and Administrative Claims pursuant to a first-lien

superpriority term loan that will prime the Debtor's existing financing provided by the

Prepetition Secured Lender.  As such, the Debtor submits that it would not be possible for it to

obtain unsecured credit pursuant to sections 364(a) or (b) of the Bankruptcy Code to fund the

Accrued Professional Fees, Cure Amounts or Administrative Claims to be paid pursuant to the

DIP Facility.

### (ii)    The DIP Financing is Necessary to Preserve the Assets of the Debtor's Estate

31.    As a debtor-in-possession, the Debtor has a fiduciary duty to protect and

maximize its estate's assets.  See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325,

339 (3d Cir. 2004).  Here, where the proposed Plan will provide a materially greater recovery for

creditors than either a sale under section 363 of the Bankruptcy Code or a conversion of the

Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, and the proposed DIP

Financing is necessary to facilitate consummation of the Plan, the Debtor submits that approval

of the DIP Financing is necessary to preserve and maximize the value of the Debtor's assets for

the benefit of the Debtor's creditors and all parties in interest.

### (iii)    The Terms of the DIP Financing are Fair, Reasonable and Adequate Given the Circumstances

32.    In considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender.  In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (stating that a debtor may have to enter into "hard" bargains to acquire funds).

33.    Here, the Debtor and its professionals negotiated the DIP Term Sheet in good faith and at arm's-length with the DIP Lender, resulting in a DIP Term Sheet and DIP Order that the Debtor believes are objectively well balanced and do not impose unreasonable burdens on the Debtor.  That said, under these circumstances where the Debtor must confirm the Plan to maximize value, the DIP Facility is necessary to finance the confirmation and consummation of the Plan, and CH 105 is the only lender available to the Debtor, the Debtor submits that even much more onerous terms would be "fair and reasonable" under the circumstances.

**(iv)    Entry Into the DIP Financing Reflects the Debtor's Sound Business Judgment**

34.    A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); Ames Dep't Stores, 115 B.R. at 38-41 (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

35.    Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  See, e.g., U.S. Bank Trust Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.), 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013) ("In

21

determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment."); In re DB Capital Holdings, LLC, 454 B.R. 804, 822-23 (Bankr. D. Colo. 2011) (stating that a debtor must demonstrate, among other things, that the proposed financing is an exercise of sound and reasonable business judgment).  Further, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

36.    Bankruptcy courts generally will defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  See In re Curlew Valley Assocs., 14 B.R. 506, 514 n. 11a (Bankr. D. Utah 1981).  Generally, a court will not second-guess a debtor-in-possession's business decisions as long as, as a whole, the decisions are within the debtor's sound business judgment.  See In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990); cf. Ames Dep't Stores, 115 B.R. at 37–38 (noting that courts, in passing upon arrangements for postpetition financing under section 364(b)-(d), consider, inter alia, whether the terms would tilt the conduct of the bankruptcy case in a manner inconsistent with chapter 11, or merely reflect a debtor's business judgment).

37.    As described above, the Debtor has exercised sound business judgment in determining the appropriateness of the DIP Financing and submits that it has satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Term Sheet.  The Debtor believes that the DIP Financing contains terms that are the best available under the

circumstances.  Moreover, the DIP Financing will facilitate (and indeed is required for) the

confirmation and consummation of the Plan, which the Debtor believes will provide a materially

greater recovery to creditors than any plan alternative.  Accordingly, the Debtor submits that this

factor is satisfied as well.

**B.**    **The Priming Liens Should be Approved Pursuant to Section 364(d) of the Bankruptcy Code**

      38.    Section 364(d) of the Bankruptcy Code provides that a debtor may obtain

credit secured by a senior or equal lien on property of the estate already subject to a lien, after

notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is

adequate protection of the interest of the holder of the lien on the property of the estate on which

such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).

      39.    Courts consider several factors in considering whether to approve

priming-lien financing under section 364(d) of the Bankruptcy Code, including: (i) whether the

proposed financing is necessary to preserve estate assets and necessary and appropriate for

continued operation of the debtor's business; (ii) whether the terms of the financing are

reasonable under the circumstances of both the debtor and the proposed lender; and (iii) whether

the proposed financing was negotiated in good faith and at arm's length and is the subject of the

debtor's reasonable business judgment and in the best interest of the estate and creditors.  See,

e.g., Ames Dep't Stores, 115 B.R. at 37-39; Bland v. Farmworker Creditors, 308 B.R. 109, 113-

14 (S.D. Ga. 2003).  As discussed above, the DIP Facility satisfies each of these criteria.

      40.    Moreover, as noted above, the Prepetition Secured Lender has consented

to the priming of its liens in the DIP Collateral in favor of the DIP Lender, which obviates the

need to show adequate protection.  See Anchor Savs. Bank, 99 B.R. at 122 ("[B]y tacitly

consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

41.     Accordingly, the granting of "priming" liens under the DIP Facility is permissible under section 364(d)(1) of the Bankruptcy Code, and appropriate under the present circumstances.

**C.     Modification of the Automatic Stay is Warranted**

42.     The proposed DIP Order describes certain circumstances under which the automatic stay would be vacated without further order of the Court.  Specifically, the proposed DIP Order provides that upon the occurrence of an Event of Default or upon a default of the terms of the DIP Order, but subject to five (5) business days prior written notice, the automatic stay will be modified or vacated to allow the DIP Lender to terminate the commitments under the DIP Term Sheet, declare all DIP Obligations immediately due and payable and/or take any actions necessary to foreclose or otherwise enforce the DIP Lender's security interests in or liens on any or all of the DIP Collateral.

43.     The Debtor submits that such stay modification is an essential element of the DIP Term Sheet and the terms of the DIP Facility negotiated with the DIP Lender, and that the DIP Order provisions modifying the automatic stay provide sufficient protection to the Debtor and other parties in interest.  Accordingly, the Debtor submits that the Court should modify the automatic stay to the extent contemplated by the DIP Financing and the proposed DIP Order.

**WAIVER OF BANKRUPTCY RULE 6004(h)**

44.     To implement the foregoing successfully, the Debtor seeks a waiver of the fourteen (14) day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

**NO PRIOR REQUEST**

45.    No prior motion for the relief requested herein has been made to this or any other court.

**NOTICE**

46.    Notice of the Motion will be provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the Prepetition Secured Lender; (d) counsel to the DIP Lender; (e) the PSA Parties (as defined in the Plan); and (f) all parties entitled to notice pursuant to Local Rule 2002-1.  The Debtor submits that, under the circumstances, no other or further notice is required.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of the DIP Order, substantially in the form attached hereto, granting the relief requested in the Motion and such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
       July 3, 2019

                         COLE SCHOTZ P.C.

                         /s/ David R. Hurst
                         David R. Hurst (I.D. No. 3743)
                         500 Delaware Avenue, Suite 1410
                         Wilmington, Delaware 19801
                         Telephone: (302) 652-3131
                         Facsimile: (302) 652-3117

                         – and –

                         Jacob S. Frumkin
                         25 Main Street
                         Hackensack, New Jersey 07601
                         Telephone: (201) 489-3000
                         Facsimile: (201) 489-3479

                         *Counsel for Debtor and*
                         *Debtor-in-Possession*