<u>EXHIBIT A</u>

<u>July 22 Disclosure Statement</u>

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------- x
                                                        :
In re:                                                  :        Chapter 11
                                                        :
NOVUM PHARMA, LLC,                                      :        Case No. 19-10209 (BLS)
                                                        :
                                    Debtor.[1]          :
                                                        :
------------------------------------------------------- x
```

**DISCLOSURE STATEMENT WITH RESPECT TO
PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11
OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR**

**COLE SCHOTZ P.C.**
David R. Hurst (I.D. No. 3743)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware  19801
Telephone: (302) 652-3131

– and –

Jacob S. Frumkin
25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000

*Counsel for the Debtor and
Debtor-in-Possession*

Dated: Wilmington, Delaware
       July 22, 2019

---

[1] The last four digits of the Debtor's federal tax identification number are 7895.  The mailing address for the Debtor is 200 South Wacker Drive, 31st Floor, Chicago, IL 60606.

# DISCLAIMER[2]

THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXHIBITS ANNEXED HERETO, IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE DEBTOR'S PROPOSED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN HOW TO VOTE ON THE PLAN.  NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO, INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED AND ENCOURAGED TO (I) READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETIES; (II) CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING, IMPORTANTLY, THE RISK FACTORS DESCRIBED IN ARTICLE VIII OF THIS DISCLOSURE STATEMENT; AND (III) CONSULT WITH THEIR OWN ADVISORS WITH RESPECT TO REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND ALL DOCUMENTS THAT ARE ATTACHED TO THE PLAN AND DISCLOSURE STATEMENT BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN ARE QUALIFIED IN THEIR ENTIRETIES BY REFERENCE TO THE PLAN, THE EXHIBITS ATTACHED TO THE PLAN AND ANY PLAN SUPPLEMENT(S).  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAWS.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), AND THE SEC HAS NOT PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT

---

[2] Terms used in this Disclaimer that are not otherwise defined shall have the meanings ascribed to such terms elsewhere in this Disclosure Statement.

**CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO CONSTITUTE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR.**

## TABLE OF CONTENTS

ARTICLE I
INTRODUCTION ...............................................................................................1
    A.    Purpose of the Disclosure Statement .............................................1
    B.    Disclosure Statement Enclosures ....................................................2
        1.    Order Approving the Disclosure Statement .........................2
        2.    Ballot .....................................................................................2
        3.    Notice ....................................................................................2
    C.    Final Approval of the Disclosure Statement and Confirmation of the Plan ...........2
        1.    Requirements .........................................................................2
        2.    Approval of the Plan and Confirmation Hearing ..................2
        3.    Effect of Confirmation .........................................................2
        4.    Only Impaired Classes Vote ..................................................2
    D.    Treatment and Classification of Claims and Interests; Impairment ........................3
    E.    Voting Procedures and Voting Deadline .........................................7
    F.    Confirmation Hearing ......................................................................8

ARTICLE II
GENERAL INFORMATION REGARDING THE DEBTOR ............................9
    A.    The Debtor's Business .....................................................................9
        1.    General Overview ..................................................................9
        2.    Overview of the Managed Care Environment .......................9
        3.    The Debtor's Response: The Enhanced Patient Access Model ...............11
    B.    The Debtor's Corporate Structure ..................................................12
    C.    The Debtor's Prepetition Capital Structure .....................................12
    D.    Summary of Events Leading to the Chapter 11 Filing .....................13

ARTICLE III
THE CHAPTER 11 CASE ...............................................................................16
    A.    Commencement of the Chapter 11 Case .........................................16
    B.    "First Day" Motions .......................................................................17
    C.    Retention of Professionals and Appointment of the Committee ...........................17
        1.    Retention of Debtor's Professionals .....................................17
        2.    Retention of Claims and Noticing Agent and Administrative Agent ........17
        3.    Appointment of Committee and Retention of Committee Professionals ................18
    D.    Significant Events During the Chapter 11 Case ...............................18
        1.    The Sale Process ...................................................................18
        2.    Co-Pay Vendor Stipulations .................................................19
        3.    Lease Assignment Motion .....................................................19
        4.    The Claims Process ...............................................................19
            a.    Schedules and Statements ...........................................19
            b.    Bar Date Order .............................................................20
            c.    Claims Objections .......................................................20
        5.    Procedures For the Sale and Abandonment of De Minimis Assets ..........20
        6.    The Plan Support Agreement .................................................20

58448/0001-17147920v10

ARTICLE IV
SUMMARY OF PLAN ...........................................................................................................22
    A.    Classification and Treatment of Claims and Interests .................................22
        1.    Unclassified Claims ......................................................................24
            a.    DIP Facility Claim .....................................................24
            b.    Administrative Claims.................................................24
            c.    Priority Tax Claims....................................................24
        2.    Unimpaired Claims .......................................................................25
            a.    Class 1:  Miscellaneous Secured Claims .....................25
            b.    Class 2:  Priority Non-Tax Claims..............................25
        3.    Impaired Claims............................................................................26
            a.    Class 3: Prepetition Secured Lender Claim .................26
            b.    Class 4: Cardinal Claims.............................................26
            c.    Class 5: General Unsecured Claims.............................27
            d.    Class 6:  Subordinated 510(c) Claims.........................27
            e.    Class 7:  Subordinated 510(b) Claims.........................27
        4.    Interests .......................................................................................28
            a.    Class 8:  Member Interests..........................................28
            b.    Class 9:  Other Interests .............................................28
        5.    Special Provision Regarding Unimpaired Claims ........................28
        6.    Allowed Claims ............................................................................29
    B.    Acceptance or Rejection of the Plan...........................................................29
        1.    Acceptance by an Impaired Class .................................................29
        2.    Presumed Acceptances by Unimpaired Classes ..........................29
        3.    Classes Deemed to Reject Plan....................................................29
        4.    Impaired Classes of Claims Entitled to Vote...............................29
        5.    Vacant Classes .............................................................................29
        6.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code.........30
    C.    Means for Implementation...........................................................................30
        1.    Corporate Action..........................................................................30
            a.    Continued Corporate Existence ...................................30
            b.    Cancellation of Existing Securities and Agreements....................30
            c.    Limited Liability Company Agreement ........................30
            d.    Managers and Officers of Reorganized Debtor ............31
            e.    No Further Action .......................................................31
        2.    Exit Facility.................................................................................31
        3.    Restructuring Transactions ...........................................................31
            a.    Substantial Contribution by Members .........................31
            b.    Treatment of Short-Dated Inventory............................32
            c.    Post-Effective Date Business Funding..........................32
            d.    Reorganized Debtor Reporting Obligations..................33
            e.    Variance Testing .........................................................33
            f.    Post-Termination Date Business Support ......................34
            g.    Restriction on Profit Distributions and Asset Transfers ...............34
            h.    Winddown Financial Obligations .................................34
            i.    Employee Incentive Plan .............................................35

|   |   | j. | Third-Party Equity Investment | 35 |
|   |   | k. | Proceeds of Sales of Quinja and Novacort | 35 |
|   |   | l. | CH 105 Sale Support | 35 |
|   |   | m. | Notice of Inventory Levels and Termination Date | 35 |
|   | 4. |   | Books and Records; Privilege Matters | 36 |
|   |   | a. | Access to Debtor's Books and Records | 36 |
|   |   | b. | Transfer of Evidentiary Privileges; Document Requests | 36 |
|   | 5. |   | Creditors' Committee and Litigation Trust Committee | 36 |
|   |   | a. | Dissolution of the Committee | 36 |
|   |   | b. | Creation of Litigation Trust Committee and Procedures Related Thereto | 37 |
|   |   | c. | Standing of the Litigation Trust | 37 |
|   |   | d. | Function and Duration of the Litigation Trust Committee | 37 |
|   |   | e. | Indemnification of Litigation Trustee and Litigation Trust Committee | 37 |
|   |   | f. | Recusal of Litigation Trust Committee Members | 38 |
|   | 6. |   | The Litigation Trust | 38 |
|   |   | a. | Establishment and Administration of the Litigation Trust | 38 |
|   |   | b. | Assets of the Litigation Trust | 38 |
|   |   | c. | Rights and Powers of the Litigation Trust and the Litigation Trustee | 39 |
|   |   | d. | Litigation Trust Interests | 39 |
|   |   | e. | Appointment of a Litigation Trustee | 40 |
|   |   | f. | Distributions to Holders of Allowed General Unsecured Claims | 40 |
|   | 7. |   | Vesting of Assets; Release of Liens | 41 |
|   | 8. |   | Accounts and Reserves | 41 |
|   |   | a. | Professional Fee Reserve | 41 |
|   |   | b. | Administrative Claims Reserve | 42 |
|   |   | c. | Other Reserves | 42 |
|   | 9. |   | Contract Sales Organization Business | 42 |
|   | 10. |   | Exemption from Certain Transfer Taxes | 43 |
|   | 11. |   | Applicability of Section 1145 of the Bankruptcy Code | 43 |
|   | 12. |   | Preservation of Causes of Action | 43 |
| D. |   |   | Provisions Governing Distributions | 44 |
|   | 1. |   | Distributions on Allowed Claims | 44 |
|   | 2. |   | Disbursing Agent | 45 |
|   | 3. |   | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 45 |
|   |   | a. | Delivery of Distributions in General | 45 |
|   |   | b. | Undeliverable and Unclaimed Distributions | 45 |
|   | 4. |   | Means of Cash Payment | 46 |
|   | 5. |   | Interest on Claims | 46 |
|   | 6. |   | Withholding and Reporting Requirements | 47 |
|   | 7. |   | Procedure for Treating and Resolving Disputed, Contingent and/or Unliquidated Claims | 47 |

|  |  | a. | Objection Deadline; Prosecution of Objections | 47 |
|  |  | b. | No Distributions Pending Allowance | 48 |
|  |  | c. | Disputed Claims Reserve | 48 |
|  |  | d. | Distributions After Allowance | 48 |
|  |  | e. | De Minimis Distributions | 48 |
|  |  | f. | Fractional Dollars | 49 |
|  |  | g. | Allocation of Plan Distributions Between Principal and Interest | 49 |
|  |  | h. | Distribution Record Date | 49 |
| E. | Treatment of Executory Contracts and Unexpired Leases | | | 49 |
|  | 1. | Assumption of Contracts and Leases | | 49 |
|  |  | a. | Establishment and Payment of Cure Amounts | 49 |
|  |  | b. | Confidentiality Obligations Owed to Debtor | 50 |
|  |  | c. | Treatment of Insurance Policies | 50 |
|  |  | d. | Assumption and Treatment of Particular Contracts and Leases | 50 |
|  | 2. | Rejection of Contracts and Leases | | 52 |
|  |  | a. | Rejection Damages Bar Date | 52 |
|  |  | b. | Rejection of Mirada Agreement | 52 |
|  | 3. | Indemnification Obligations | | 53 |
| F. | Conditions Precedent to Consummation of the Plan | | | 53 |
|  | 1. | Conditions to Confirmation | | 53 |
|  | 2. | Conditions to Occurrence of the Effective Date | | 54 |
|  | 3. | Waiver of Conditions | | 54 |
|  | 4. | Consequences of Non-Occurrence of Effective Date | | 55 |
| G. | Allowance and Payment of Certain Administrative Claims | | | 55 |
|  | 1. | Professional Fee Claims | | 55 |
|  |  | a. | Final Fee Applications | 55 |
|  |  | b. | Employment of Professionals after the Effective Date | 55 |
|  | 2. | Substantial Contribution Compensation and Expenses Bar Date | | 55 |
|  | 3. | Other Administrative Claims | | 55 |
| H. | Effects of Confirmation | | | 56 |
|  | 1. | Compromise and Settlement of Claims and Controversies | | 56 |
|  | 2. | Binding Effect | | 56 |
|  | 3. | Discharge of the Debtor | | 56 |
|  | 4. | Releases and Exculpation | | 57 |
|  |  | a. | Releases by the Debtor | 57 |
|  |  | b. | Releases by the PSA Parties | 57 |
|  |  | c. | Releases by Certain Debtor Release Parties | 58 |
|  |  | d. | Releases by Holders of Claims and Interests | 58 |
|  |  | e. | Mutual Releases by Debtor and Cardinal | 58 |
|  |  | f. | *Exculpation and Limitation of Liability* | 59 |
|  | 5. | Injunction | | 60 |
| I. | Retention of Jurisdiction | | | 60 |
|  | 1. | Retention of Jurisdiction by the Court | | 60 |
|  | 2. | Failure of Court to Exercise Jurisdiction | | 62 |

iv

| | | |
|---|---|---|
| J. | Miscellaneous Provisions | 63 |
| | 1. Modifications and Amendments | 63 |
| | 2. Severability of Plan Provisions | 63 |
| | 3. Successors and Assigns | 63 |
| | 4. Payment of Statutory Fees | 63 |
| | 5. Revocation, Withdrawal or Non-Consummation | 64 |
| | 6. Plan Supplement(s) | 64 |

**ARTICLE V**
**VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN** 65

| | | |
|---|---|---|
| A. | General | 65 |
| B. | Parties in Interest Entitled to Vote | 65 |
| C. | Classes Impaired and Entitled to Vote under the Plan | 65 |
| D. | Voting Procedures and Requirements | 66 |
| | 1. Ballots | 66 |
| | 2. Returning Ballots | 66 |
| | 3. Voting | 66 |
| E. | Acceptance of Plan | 67 |
| F. | Confirmation Without Necessary Acceptances; Cramdown | 68 |
| | 1. No Unfair Discrimination | 68 |
| | 2. Fair and Equitable Test | 68 |

**ARTICLE VI**
**FEASIBILITY AND BEST INTERESTS OF CREDITORS** 69

| | | |
|---|---|---|
| A. | Best Interests Test | 69 |
| B. | Feasibility | 70 |

**ARTICLE VII**
**EFFECT OF CONFIRMATION** 71

| | | |
|---|---|---|
| A. | Binding Effect of Confirmation | 71 |
| B. | Good Faith | 71 |

**ARTICLE VIII**
**CERTAIN RISK FACTORS TO BE CONSIDERED** 71

| | | |
|---|---|---|
| A. | Plan May Not Be Accepted | 71 |
| B. | Certain Bankruptcy Law Considerations | 72 |
| C. | Distributions to Holders of Allowed Claims Under the Plan | 72 |
| D. | Conditions Precedent to Consummation of the Plan | 72 |
| E. | Certain Tax Considerations | 72 |

**ARTICLE IX**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** 73

| | | |
|---|---|---|
| A. | Tax Consequences to Creditors | 74 |
| | 1. Holders of Claims | 74 |
| | 2. Non-United States Persons | 74 |
| B. | Tax Treatment of the Litigation Trust | 75 |
| | 1. Classification of the Litigation Trust | 75 |

58448/0001-17147920v10

2. General Tax Reporting by the Trust and Beneficiaries ............................75
3. Allocations of Taxable Income and Loss...................................................76
C. Importance of Obtaining Professional Tax Assistance .........................................77

ARTICLE X
RECOMMENDATION AND CONCLUSION............................................................................78

## TABLE OF EXHIBITS

| Exhibit | Title |
| --- | --- |
| A | Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtor |
| B | Hypothetical Class 5 Distribution Analysis |
| C | Financial Projections |

# ARTICLE I

## INTRODUCTION

### A.      Purpose of the Disclosure Statement

On February 3, 2019 (the "<u>Petition Date</u>"), Novum Pharma, LLC ("<u>Novum</u>" or the "<u>Debtor</u>") filed a voluntary petition for relief (the "<u>Chapter 11 Case</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

The Debtor has filed the Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code Proposed By the Debtor (including all exhibits thereto, and as may be amended, altered, modified or supplemented from time to time, the "<u>Plan</u>") with the Court.  A copy of the Plan is attached hereto as <u>Exhibit A</u>.

**Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan; <u>provided</u>, <u>however</u>, that any capitalized term used herein that is not defined herein or in the Plan, but is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") will have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.**

The Debtor submits this disclosure statement (as may be amended, altered, modified or supplemented from time to time, the "<u>Disclosure Statement</u>") pursuant to section 1125 of the Bankruptcy Code to Holders of certain Claims against the Debtor in connection with (i) the solicitation of acceptances of the Plan and (ii) the Confirmation Hearing.

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide certain information, as required under section 1125 of the Bankruptcy Code, to Creditors who will have the right to vote on the Plan so they can make informed decisions in doing so. Creditors entitled to vote to accept or reject the Plan will receive a Ballot (as defined herein) together with this Disclosure Statement to enable them to vote on the Plan.

This Disclosure Statement includes, among other things, information pertaining to the Debtor's prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Case.  This Disclosure Statement also contains information regarding significant events that have occurred during the Chapter 11 Case.  In addition, an overview of the Plan is included, which overview sets forth certain terms and provisions of the Plan, the effects of Confirmation of the Plan, certain risk factors associated with the Plan and the manner in which Distributions will be made under the Plan.  This Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan for their votes to be counted.

B.    **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are:

1.    Order Approving the Disclosure Statement.  A copy of the Court's order (the "Solicitation Procedures Order") approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, setting the deadline for objecting to the Plan and scheduling the Confirmation Hearing.

2.    Ballot.  A ballot (the "Ballot") for voting to accept or reject the Plan, if you are the record Holder of a Claim in a Class entitled to vote on the Plan (each, a "Voting Class").

3.    Notice.  A notice setting forth: (i) the deadline for casting Ballots either accepting or rejecting the Plan; (ii) the deadline for filing objections to Confirmation of the Plan; and (iii) the date, time and location of the Confirmation Hearing (the "Notice").

C.    **Final Approval of the Disclosure Statement and Confirmation of the Plan**

1.    Requirements.  The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

2.    Approval of the Plan and Confirmation Hearing.  Before entering an order confirming the Plan (the "Confirmation Order"), the Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

3.    Effect of Confirmation.  Confirmation serves to make the Plan binding upon the Debtor and all Creditors, Interest Holders and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.

4.    Only Impaired Classes Vote.  Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if a holder's legal, equitable or contractual rights are changed under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders do not need to vote on such plan.

Under the Plan, Holders of Claims in Classes 1 and 2 and Interest Holders in Class 8 are Unimpaired and therefore deemed to accept the Plan; Holders of Claims in Classes 3, 4 and 5 are Impaired and are entitled to vote on the Plan; and Holders of Claims in Classes 6 and 7 and Interest Holders in Class 9 are deemed to reject the Plan and are not entitled to vote on the Plan.

**Accordingly, a Ballot for acceptance or rejection of the Plan is being provided only to Holders of Claims in Classes 3, 4 and 5.**

2

**D.      Treatment and Classification of Claims and Interests; Impairment**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  For a summary of the treatment of each Class of Claims and Interests, see Article IV, "Summary of Plan," below.

| Class Description | Status | Proposed Treatment |
|---|---|---|
| DIP Facility Claims<br>Estimated Recovery: 100% | Unclassified | On the Effective Date, (i) all indebtedness under the DIP Facility will become indebtedness under the Exit Facility and will become subject to the terms thereof; (ii) the Reorganized Debtor will enter into and execute such documents, instruments and agreements reasonably requested by the Term Credit Facility Lender to confirm, affirm or grant to the Term Credit Facility Lender a duly perfected first priority lien on and security interest in all of the assets of the Reorganized Debtor; and (iii) the Reorganized Debtor will enter into and execute such other documents, instruments and agreements as will be reasonably requested by the Term Credit Facility Lender. |
| Administrative Claims<br>Estimated Claims Pool: Less than $200,000<br>Estimated Recovery: 100% | Unclassified | On or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim (other than a Professional) will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Administrative Claim or (b) such other treatment as to which such Holder and the Reorganized Debtor will have agreed upon in writing; provided, however, that Allowed Administrative Claims (other than those asserted by Professionals) with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.  Allowed Professional Fee Claims will be paid from the Professional Fee Reserve pursuant to Article V.H.1 of the Plan. |

58448/0001-17147920v10

| | | |
|---|---|---|
| Priority Tax Claims<br>Estimated Claims Pool: Less than $35,000<br>Estimated Recovery: 100% | Unclassified | On or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, a Holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Tax Claim or (b) such other treatment as to which such Holder and the Reorganized Debtor will have agreed upon in writing. |
| Class 1: Miscellaneous Secured Claims<br>Estimated Claims Pool: $0<br>Estimated Recovery: 100% | Unimpaired | On or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date such Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, at the option of the Reorganized Debtor, a Holder of an Allowed Miscellaneous Secured Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Miscellaneous Secured Claim, (a) Cash from the Reorganized Debtor equal to the value of such Allowed Miscellaneous Secured Claim, (b) a return of the Holder's Collateral securing the Miscellaneous Secured Claim, (c) such treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be rendered Unimpaired or (d) such other treatment as to which such Holder and the Reorganized Debtor will have agreed upon in writing. |
| Class 2: Priority Non-Tax Claims<br>Estimated Claims Pool: Less than $5,000<br>Estimated Recovery: 100% | Unimpaired | On or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, a Holder of an Allowed Priority Non-Tax Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Non-Tax Claim or (b) such other treatment as to which such Holder and the Reorganized Debtor will have agreed upon in writing. |

58448/0001-17147920v10

| Class 3: Prepetition Secured Lender Claim<br>Estimated Claims Pool: In excess of $15.2 million<br>Estimated Recovery: Undetermined | Impaired | The Prepetition Secured Lender will not receive a distribution under the Plan on account of its Prepetition Secured Loan, which loan and the liens securing the Prepetition Secured Loan will remain in full force and effect after the Effective Date; provided, however, that (i) the maturity date under the Prepetition Secured Loan will be extended through and including the date that the Exit Facility has been repaid (the "Repayment Date"), (ii) the Prepetition Secured Lender's liens and security interests will be subordinated to the liens and security interests being granted to CH 105 in connection with the DIP Facility and the Exit Facility, and (iii) the Prepetition Secured Lender will forebear from enforcing its rights as to the Debtor under the Prepetition Secured Loan through and including the Repayment Date, but the Prepetition Secured Lender's rights as to any other party to the Prepetition Secured Loan will not be impaired by the Plan's extension of the maturity date of the Prepetition Secured Loan solely as to the Reorganized Debtor. Until the Repayment Date, payments to the Prepetition Secured Lender will be limited to interest only calculated at 100% of the contract rate of interest. The fees and expenses of the Prepetition Secured Lender will be paid in full on or before the Effective Date. The Reorganized Debtor will execute and deliver amendments to the Prepetition Secured Loan documents to reflect the treatment set forth in the Plan.<br><br>The Prepetition Secured Lender is a party to the PSA and, therefore, has agreed to support Confirmation of the Plan. |
| Class 4: Cardinal Claims<br>Estimated Claims Pool: In excess of $44.8 million<br>Estimated Recovery: Undetermined | Impaired | In lieu of Distributions Cardinal would otherwise be entitled to receive, Cardinal will receive no cash distribution under the Plan on account of the Cardinal Claims or otherwise, but benefits from the Plan by, among other things, (i) having CH 105's claims for potential return liability reduced as its Dermatology Products inventory is pulled through the Distribution Channel and (ii) being released by the Debtor pursuant to Article X.D.5 of the Plan and Cardinal will accept such benefits as of the Effective Date in full satisfaction of the Cardinal Claims.<br><br>Cardinal is a party to the PSA and, therefore, has agreed to support Confirmation of the Plan. |

5

| Class 5: General Unsecured Claims<br>Estimated Claims Pool: $5.6-$10.7 million<br>Estimated Recovery: 21.2%-100% | Impaired | On or as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, a Holder of an Allowed General Unsecured Claim will be deemed to have received, on account of such Allowed General Unsecured Claim, its Pro Rata share of the Litigation Trust Interests, after giving effect to the agreements with 42 North, LLC ("42 North"), AmerisourceBergen Drug Corporation ("ABDC"), Biopharma Operations LLC ("Biopharma"), McKesson Corporation ("McKesson"), Mirada Pharmaceuticals, LLC ("Mirada"), Novos Growth, LLC ("Novos") and Sonexus Health, LLC ("Sonexus") set forth in Article VII of the Plan; ; provided, however, that except with respect to the 42 North Claim and the Novos Net Claim, both of which will be subordinated to all other General Unsecured Claims, the Debtor Release Parties will not be entitled to nor shall they receive Litigation Trust Interests or Distributions from the Litigation Trust on account of their Claims against the Debtor, if any. |
| Class 6: Subordinated 510(c) Claims<br>Estimated Claims Pool: $0<br>Estimated Recovery: 0% | Impaired | On or after the Effective Date, all Subordinated 510(c) Claims will be deemed eliminated, cancelled and/or extinguished and each Holder thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such Claims.<br><br>The Debtor does not believe that there are any creditors in Class 6. |
| Class 7: Subordinated 510(b) Claims<br>Estimated Claims Pool: $0<br>Estimated Recovery: 0% | Impaired | On or after the Effective Date, all Subordinated 510(b) Claims will be deemed eliminated, cancelled and/or extinguished and each Holder thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such Claims.<br><br>The Debtor does not believe that there are any creditors in Class 7. |
| Class 8: Member Interests<br>Estimated Recovery: 100% | Unimpaired | The Members will retain their Member Interests in exchange for their Substantial Contribution. |
| Class 9: Other Interests<br>Estimated Recovery: 0% | Impaired | On the Effective Date, all Other Interests will be deemed automatically cancelled, released and extinguished without further action by the Debtor or the Reorganized Debtor, and the obligations of the Debtor thereunder will be discharged, and each Holder of an Other Interest will not be entitled to, and will not receive or retain, any property or interest in property on account of such Other Interests. |

58448/0001-17147920v10

E.      **Voting Procedures and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  To ensure your vote is counted, you must (i) complete the Ballot, (ii) indicate your decision either to accept or reject the Plan in the boxes provided and (iii) sign and return the Ballot(s) in the envelope provided.

If you are a Holder of a Class 5 General Unsecured Claim, your Ballot also permits you to opt out of the consensual third party releases set forth in Article X.D.4 of the Plan (the "Opt-Out Election").  **If you are a Holder of a Class 5 General Unsecured Claim and you choose to exercise the Opt-Out Election you must affirmatively indicate so by checking the "opt-out" box on your Ballot.**

**Any Holder of a Class 5 General Unsecured Claim that does not check the "opt-out" box on the Ballot will be deemed to accept and agree to be bound by the consensual third party releases contained in Article X.D.4 of the Plan.**  Those consensual third party releases provide for a release by Holders of General Unsecured Claims of all Claims or Causes of Action relating to the Debtor, the Chapter 11 Case or the Plan that they may hold against the Debtor, Todd Smith, Ben Bove, Gavin Toepke, Robert Previdi, Ronald Nordman, Thomas J. Allison, Thomas S. O'Donoghue, Jr., 42 North, 42 North Investments, LLC, Athilio Pharma, LLC ("Athilio"), Athilio Pharma Holdings, LLC, Avondale Investments Rx, LLC, Bryzzo, LLC, Champion Investments, LLC ("Champion"), Novos, Novos Patient Access, LLC, RGP Pharmacap, LLC ("RGP Pharmacap") and Underhill Pharma, LLC (collectively, the "Debtor Release Parties").

**To be counted, your Ballot with your original signature indicating your acceptance or rejection of the Plan (and Opt-Out Election, if applicable) must be received no later than 4:00 p.m. (Pacific Time) on August 23, 2019 (the "Voting Deadline").**

The following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected and/or the Opt-Out Election exercised:

(i)      any Ballot received after the Voting Deadline (unless extended by the Debtor);

(ii)     any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

(iii)    any Ballot cast by a Person or Entity that does not hold a Claim or Interest in a Class that is entitled to vote to accept or reject the Plan;

(iv)     any Ballot cast for a Claim scheduled as Contingent, unliquidated or Disputed or as zero or unknown in amount and for which no Rule 3018(a) Motion has been filed by the Rule 3018(a) Motion Deadline (as such terms are defined in the Solicitation Procedures Order);

(v)     any Ballot that indicates neither an acceptance nor a rejection, or indicates both an acceptance and a rejection, of the Plan;

(vi)    any Ballot that casts part of its vote in the same Class to accept the Plan and part to reject the Plan;

(vii)   any form of Ballot other than the official form sent by the Voting Agent, or a copy thereof;

(viii)  any Ballot received that the Voting Agent cannot match to an existing database record;

(ix)    any Ballot that does not contain an original signature;

(x)     any Ballot that is submitted by facsimile, email or by other electronic means; or

(xi)    any Ballot sent to the Chief Restructuring Officer or the Debtor's professionals.

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan. Because the Holder of Class 3 Prepetition Secured Lender Claim is an insider, its vote will not be counted for purposes of satisfying this requirement.

**You are urged to complete, date, sign and promptly mail the Ballot enclosed with the notice. Please be sure to complete the Ballot properly and legibly, and identify the exact amount of your Claim and the name of the Creditor. If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, you received a damaged Ballot or you lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or procedures for voting on the Plan, please contact the Voting Agent, Kurtzman Carson Consultants LLC, at (877) 725-7523 or at novuminfo@kccllc.com. The Voting Agent is not authorized to and will not provide legal advice.**

F.     **Confirmation Hearing**

The Court has scheduled a hearing to consider confirmation of the Plan for August 29, 2019 at 10:00 a.m. (Eastern Time) in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 1, Wilmington, Delaware 19801 (the "Confirmation Hearing"). The Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before August 22, 2019 at 4:00 p.m. (Eastern Time) in the manner described in the Notice accompanying this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by way of announcement of such continuance in open Court or otherwise, without further notice to parties in interest.

**The Debtor urges all Holders of Claims entitled to vote on the Plan to vote to accept the Plan.**

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTOR[3]

### A.    The Debtor's Business

#### 1.    General Overview

The Debtor is a global specialty pharmaceutical company which owns a portfolio of topical dermatology products that it purchased from Primus Pharmaceuticals, Inc. ("Primus") in March 2015.  The Debtor's dermatology products are marketed under the names Alcortin®, Alcortin A®, Quinja® (formerly Aloquin®) and Novacort® (collectively, the "Dermatology Products").  Each Dermatology Product is a fungicidal gel used to treat a variety of skin conditions.

Since acquiring the Dermatology Products, the Debtor has focused on developing a business model which would ensure no-hassle access to, and reduced patient out-of-pocket costs for, its branded therapies.  Through significant investment in commercial support and a unique business model, the Debtor has significantly reduced the hassles associated with filling Dermatology Product prescriptions, so that health care professionals ("HCPs") are able to prescribe the best clinical option, and patients have confidence that they will be able to obtain and afford the exact medication prescribed by their HCPs.

In addition to manufacturing and selling its Dermatology Products, the Debtor historically has provided consulting and sales support for several other pharmaceutical companies.  Indeed, the Debtor's sales representatives currently provide sales support for a non-affiliated company in the pharmaceutical industry, Assertio Therapeutics, Inc. ("Assertio") (*i.e.*, the Debtor serves as a contract sales organization, or CSO, for this company).

#### 2.    Overview of the Managed Care Environment

In today's managed care environment, numerous barriers exist to patients receiving the medications that their HCPs deem appropriate for treatment.  These barriers stem in large part from the "traditional" distribution channel for pharmaceutical products, through which pharmaceutical manufacturers sell their products directly to wholesalers,[4] which, in turn, sell the products to retail pharmacies.  Critical to this distribution channel are pharmacy benefit managers ("PBMs"),[5] which are third-party administrators of prescription drug programs for commercial health insurance plans, self-insured employer plans, Medicare Part D plans, the Federal Employees Health Benefits Program and state government employee plans (*i.e.*,

---

[3]    The information herein is solely for informational purposes and nothing herein shall be deemed an admission by the Debtor in any Cause of Action.

[4]    The wholesale industry is dominated by three companies: ABDC, Cardinal Health, Inc. ("Cardinal") and McKesson.

[5]    The three largest PBMs in the United States are CVS Health (Caremark), Express Scripts, Inc. ("ESI") and OptumRx (UnitedHealth).

58448/0001-17147920v10

healthcare payors).  Among other things, PBMs process prescription transactions, negotiate drug discounts and determine which pharmacies and drugs will be included in a particular health plan's benefits.

Wholesalers often have exclusive relationships with particular pharmacies, thereby requiring pharmaceutical manufacturers to contract with the wholesalers in order to move their products through the distribution channel to patients.  The wholesalers charge manufacturers a shipping fee for transmitting the product to a pharmacy, which is billed to the manufacturer regardless of whether the product ultimately is sold to a consumer.  If a wholesaler ultimately is unable to sell a pharmaceutical product that is has purchased, it generally has a contractual right to return that product to the manufacturer from whom the product initially was purchased.  When a pharmacy sells a prescription drug to a patient, the pharmacy will receive payment from one or more of the following sources: (i) a PBM, which in turn is being reimbursed by a healthcare payor (*e.g.*, a health insurance plan); (ii) the patient, in the form of an insurance co-payment; and/or (iii) the drug manufacturer through an intermediary referred to as a "co-pay vendor."[6]

PBMs have significant leverage in negotiating with manufacturers because the PBMs determine whether or not particular drugs are covered by healthcare payors' prescription drug programs.  As such, PBMs can extract administrative fees and rebates from manufacturers to reduce the ultimate the cost of a drug to the PBMs.  If a PBM and a manufacturer do not agree on the pricing of a particular drug, the PBM likely will exclude that drug from its formulary (*i.e.*, the list of drugs covered by a prescription drug plan), which will reduce availability to patients of the manufacturer's drug because the drug will not be covered by the prescription drug programs administered by that PBM.  In this scenario, the only way that a patient would be able to obtain the excluded drug would be to seek "prior authorization" from the patient's health insurance company.  This prior authorization process requires the HCP to complete onerous and varied paperwork to justify the use of the excluded drug.  For instance, the HCP may be required to establish that the drug is "medically necessary" or that the patient already has tried a less expensive drug that was not effective.

If a drug is listed on a PBM's formulary, a patient can obtain that drug either through a PBM-run mail order system, if available, or through a pharmacy.  Even in this case, however, the patient is not guaranteed that she will receive the drug prescribed by her HCP—or that the drug will be affordable.  For example, if a HCP does not indicate that no substitutions are permitted when writing a prescription, the filling pharmacy can substitute a generic or a lower-priced alternative drug for the HCP's preferred medication.  Moreover, a PBM can set certain restrictions on a pharmacy's ability to fill a prescription, such as setting geographic limits for where the drug can be shipped (*e.g.*, limiting distribution to a 90-mile radius of the pharmacy).  Additionally, PBMs can make the determination to place a drug on a "specialty tier" of a formulary,[7] which can increase a patient's insurance co-payment.  Finally, retail pharmacies can

---

[6]     The cost of prescriptions may be offset by co-pay programs established by drug manufacturers that lower the out-of-pocket costs of prescription drugs by supplementing insurance payments.  The Debtor has co-pay agreements with NDCHealth Corporation d/b/a RelayHealth, Eversana f/k/a Triplefin LLC and McKesson Specialty Arizona Inc. (collectively, the "Co-Pay Vendors").

[7]     Drugs can fall within several formulary tiers, ranging from preferred generic to generic to preferred to non-preferred to specialty.

inflate the price of a drug, which benefits both pharmacies and co-pay vendors, but creates another barrier to drug access for patients.

### 3.    The Debtor's Response: The Enhanced Patient Access Model

In response to the foregoing distribution challenges, the Debtor has developed an enhanced patient access ("EPA") business model to ensure that, when a HCP writes a prescription for one of the Dermatology Products, the patient should receive that drug at no cost—whether or not the patient's insurance program covers the drug, and indeed whether or not the patient has health insurance.  HCPs are offered an option to send patients to a nationwide network of pharmacies which have agreed to comply with the Debtor's program guidelines ("Compliant Pharmacies"), thereby ensuring a "hassle free" experience by the patient when filling her prescription.  If a pharmacy in the Debtor's network cannot fill a prescription because a PBM denies coverage, that pharmacy will transfer the prescription to a "consignment hub," which is a specialty pharmacy that stocks the Debtor's products on a consignment or bailment basis and will fill a prescription for a nominal fee (paid by the Debtor).  Alternatively, if a patient seeks to fill her prescription at a pharmacy that does not participate in the Debtor's EPA programs and a PBM denies coverage, the patient will still receive the drug for free—but the patient will be required to work with the pharmacy to have the prescription transferred to the consignment hub.[8]

The Debtor does not sell its products directly to the traditional wholesalers (*i.e.*, ABDC, Cardinal and McKesson), but rather sells its products to Cardinal Health 105, Inc. ("CH 105"), part of Cardinal's specialty pharmaceutical division.  When the Debtor sells its products to CH 105, it earns revenue.[9]  In contrast, when a prescription is filled by a pharmacy, the Debtor expends funds to facilitate the transaction.  In particular, when a healthcare plan covers at least a predetermined minimum percentage of the cost of a Dermatology Product prescription (the "Minimum Percentage"),[10] the Debtor, through its Co-Pay Vendors, pays the amount that is not covered by the healthcare plan.  Alternatively, when a healthcare plan is not willing to pay at least the Minimum Percentage or rejects a Dermatology Product prescription entirely, the Debtor facilitates the transfer of that prescription to one of the consignment hubs so that the prescription can be filled and mailed to the patient, at no cost to the patient.

In order to conduct its business and implement its EPA business model, the Debtor relies on services provided by certain affiliated companies with common ownership.  First, pursuant to a services agreement with Novos Growth, the Debtor is provided with analytical and operational support.  These services are necessary because nearly all of the Debtor's employees are sales

---

[8]    HCPs prescribing Dermatology Products are encouraged to provide their patients with a patient hotline phone number provided by the Debtor which is staffed with personnel familiar with dealing with pharmacies and facilitating the transfer of prescriptions to the consignment hub.

[9]    CH 105 has the contractual right to setoff certain fees and expenses against its accounts payable to the Debtor.  Historically, CH 105 also has setoff against amounts owed to the Debtor certain fees and expenses purportedly owed by the Debtor to Cardinal.  The Debtor does not believe that such setoffs were permitted under the terms of its agreements with CH 105.

[10]    The "Minimum Percentage" is established by the Debtor and can be changed over time.

11

representatives, so that the company requires a third party to provide the "back office" support that is necessary to operate its business and implement its business model.  Second, pursuant to a master services agreement with 42 North (together with Novos Growth, the "Service Affiliates"), the Debtor is provided with patient-related services necessary to implement the EPA model, including access to a network of Compliant Pharmacies and support for the consignment hub system.  The Service Affiliates provide similar services to other non-affiliated companies in the pharmaceutical industry.

## B.    The Debtor's Corporate Structure

The Debtor was formed on October 2, 2014 as an Illinois limited liability company, and was re-domiciled to the State of Delaware on February 20, 2015.  It operates pursuant to that certain Second Amended and Restated Limited Liability Company Agreement of Novum Pharma, LLC, dated March 16, 2015 (as amended).  The Debtor's equity is privately held and is represented by membership units falling into four classes with different contractual entitlements.  Since its inception, the Debtor's corporate headquarters has been located in Chicago, Illinois.

The Debtor is governed by a Board of Managers (the "Board"), which has the authority to manage the Debtor's business affairs.  On January 4, 2019, the Board appointed an independent manager, Mr. Thomas J. Allison, and formed a committee of the Board (the "Restructuring Committee") charged with, among other things, evaluating and investigating potential strategies for the Debtor's restructuring and refinancing, and implementing such strategies.[11]  On January 7, 2019, the Restructuring Committee appointed Thomas S. O'Donoghue, Jr. as the Company's Chief Restructuring Officer (the "CRO").  The CRO is subject to the supervision and control of the Restructuring Committee, and can only be removed from his position by resolution of such committee.

## C.    The Debtor's Prepetition Capital Structure

As of the Petition Date, the Debtor had assets of approximately $19.4 million and liabilities of approximately $53.1 million, consisting of approximately $35 million in current liabilities and approximately $18 million in long-term liabilities.

The Debtor's assets are comprised primarily of the intellectual property it owns related to the Dermatology Products, the contracts under which it provides consulting and sales support to other entities and accounts receivable.  Additionally, as of the Petition Date, the Debtor had approximately $3.1 million in cash and cash equivalents, including professional retainer amounts and security for a letter of credit with respect to one of the Debtor's leases (the "Letter of Credit").

As of the Petition Date, the Debtor's long-term liabilities related to: (i) approximately $15.2 million under that certain Loan Agreement, dated as of August 1, 2017 (the "Secured Loan"), by and between the Debtor and RGP Pharmacap, LLC ("RGP Pharmacap"); and (ii) approximately $2.8 million under that certain Office Lease, effective as of February 14, 2017

---

[11]    Mr. Allison is the sole member of the Restructuring Committee.

58448/0001-17147920v10

(the "North Riverside Lease") between the Debtor and 150 North Riverside Titleholder LLC.[12] RGP Pharmacap is owned by a member of the Debtor's Board, Mr. Robert Previdi, who owns approximately thirty percent (30%) of the Debtor's membership interests.

The Secured Loan bears interest at the greater of prime plus 9.75% or 14% for the life thereof, and is payable in 36 consecutive monthly principal installments commencing on September 1, 2019, with the last principal payment being made on August 1, 2022, the maturity date of the Secured Loan. As collateral for the Secured Loan, the Debtor granted RGP Finance LLC (together with RGP Pharmacap, the "Prepetition Secured Lender") a security interest in substantially all of its assets.

On April 30, 2018, the Debtor, the Service Affiliates and certain other affiliated companies (collectively with the Service Affiliates, the "Affiliates")[13] and RGP Pharmacap entered into that certain First Amendment and Joinder to Loan Agreement (the "Joinder"), pursuant to which Novos Growth (i) became a "New Loan Party" under the Secured Loan; (ii) guaranteed the Secured Loan; and (iii) pledged substantially all of its assets to RGP Pharmacap to secure the obligations under the Secured Loan. Additionally, pursuant to the Joinder, Athilio, 42 North and Champion provided unsecured guarantees of collection for the Debtor's obligations under the Secured Loan.

As of the Petition Date, the Debtor had approximately $35 million in unsecured debt in the form of accounts payable, accrued liabilities and other liabilities.

**D.     Summary of Events Leading to the Chapter 11 Filing**

The Debtor has faced a series of financial and operational difficulties since acquiring the Dermatology Products from Primus. As further described below, these challenges relate to, among other things: (i) manufacturing hurdles leading to production delays and product "stock-outs"; (ii) a dispute with Cardinal and CVS regarding the price at which the Dermatology Products can be returned to the Debtor; (iii) managed care actions leading to increased prescription rejection rates for the Dermatology Products; and (iv) market dilution and decreased total prescriptions due to unauthorized generic alternatives being introduced into the market.

Product Manufacturing Challenges. The Debtor has encountered a series of manufacturing issues since it purchased the Dermatology Products from Primus in 2015 which have led to significant lost revenues. At the time of the Primus transaction, the Dermatology Products were manufactured by Sonar Products, Inc. ("Sonar"). In order to avoid a gap in manufacturing, and to give the Debtor time to assess whether it was prudent to continue using Sonar as a manufacturer, the Debtor and Sonar entered into a manufacturing agreement pursuant to which Sonar agreed to continue manufacturing and selling the Dermatology Products to the Debtor for an initial term of five (5) years. Shortly thereafter, however, the Debtor uncovered

---

[12]     As described below, during the Chapter 11 Case the North Riverside Lease, along with all of the liabilities related thereto, was assigned to Novos Growth. See Docket Nos. 125, 186.

[13]     The Affiliates are Athilio, 42 North, Champion and Novos Growth, each of which shares common ownership with the Debtor.

various information about Sonar that was not disclosed during the Debtor's diligence process, including that Sonar had been selling the Debtor's products to certain institutions and generic manufacturers without the Debtor's authorization and that another pharmaceutical company claimed to have an exclusivity agreement with Sonar.  Moreover, although the Debtor had known that Sonar was facing Food and Drug Administration ("FDA") scrutiny when it entered into the manufacturing agreement with Sonar, the depth of the FDA's concerns was not fully disclosed by Sonar during the Debtor's diligence process.  Ultimately the FDA shuttered Sonar's operations and, as part of this action, held the Debtor's finished pharmaceutical products which already had been run through the appropriate quality and release processes—all of which had a significant financial and operational impact on the Debtor.

As a result, in early 2017, the Debtor was forced to transition its manufacturing operations to Sterling Pharmaceutical Services, LLC ("Sterling"), another contract manufacturing organization.  Relative to Sonar, Sterling appeared to have a better understanding of the manufacturing and control processes necessary to successfully produce the Debtor's products and a more committed management team.  However, throughout the parties' relationship, Sterling has struggled to keep pace with the Debtor's manufacturing volume requirements.  As a result, numerous manufacturing delays and stock-outs of Novacort, Quinja and Alcortin A product and samples have occurred.

Although Alcortin A has been the Debtor's most successful product to date, the Debtor does not believe that Alcortin A's full potential was ever realized due to persistent product shortages that continued into the fourth quarter of 2018.  In particular, the lack of Alcortin A samples significantly impacted the Debtor's ability to expand its market and increase script volume for this product (both of which are key to the Debtor's business model), and the stock-outs of product have led to lost sales and caused HCPs to move to alternative products, thereby inflicting significant long-term damage to the business.

The product shortages for Quinja and Novacort similarly have impacted the Debtor's sales of these products, but here the impact on the Debtor's business was even more destructive.  Indeed, the Debtor never has had sufficient Quinja or Novacort product or samples to properly launch these products.  The Debtor believes that both products could be very commercially successful—and perhaps could rival the success that the Debtor has been able to achieve with Alcortin A.  Although the Debtor has not yet conducted a detailed analysis to quantify the damage to the Debtor's business caused by Quinja and Novacort manufacturing delays and stock-outs, the Debtor believes that its lost revenues could easily exceed $15 million—and likely would be far greater.

Cardinal/CVS Return Dispute.  The Debtor's dispute with Cardinal and CVS regarding the price at which unsold Dermatology Products may be returned to the Debtor has materially reduced the Debtor's revenues over the course of its business.  In the past, the Debtor sold its Dermatology Products directly to Cardinal (a wholesaler), which in turn sold the Dermatology Products to CVS (a retail pharmacy), with which Cardinal has an exclusive distribution arrangement.  Pursuant to the applicable contract between the Debtor and Cardinal (the "Novum-Cardinal Agreement"), Cardinal was permitted to return the Dermatology Products to the Debtor at the price at which they initially were sold to Cardinal.  However, over a period of years, Cardinal purchased product from the Debtor, and then unilaterally setoff amounts owed to the

14

Debtor with its purported return liability (calculated at the current, rather than the historical, wholesale acquisition cost ("WAC")). Although these returns regularly were disputed by the Debtor, the Debtor ultimately was unsuccessful in preventing Cardinal's unilateral offsets. Cardinal's actions deprived the Debtor of as much as $15 million in payments over the course of the parties' relationship and significantly contributed to the Debtor's repeated working capital challenges.

The Debtor's challenges with the Cardinal relationship were not limited to those arising under the Novum-Cardinal Agreement. As noted above, the Debtor no longer sells its products directly to the Cardinal and the other traditional wholesalers, but rather sells its products exclusively to CH 105 pursuant to the terms of separate contracts. However, despite no longer doing business directly with Cardinal, in 2018 CH 105 setoff approximately $1.6 million owed to the Debtor against certain fees and expenses purportedly owed by the Debtor to Cardinal. The Debtor does not believe that such setoff was permitted under the terms of its agreements with CH 105. Cardinal disputes the allegations set forth above by the Debtor.

Managed Care Actions; Increased Prescription Rejection Rates. As described above, the Debtor's EPA business model was designed to counter the barriers present in the managed care environment preventing patients from gaining access to the Dermatology Products. The Dermatology Products, however, have continued to be added to the PBMs' exclusion lists (i.e., removed from formularies), which has significantly impacted the Debtor's profitability. Indeed, the overall prescription rejection rate for the Dermatology Products reached a point in January 2019 that made it impossible for the Debtor to sustain its business outside of chapter 11, given the significant and lasting damage to the business due to the manufacturing issues and Cardinal/CVS return dispute described above, the threat of additional unilateral (and unauthorized) setoffs by CH 105, and the secured debt and other liabilities that burdened the business. To counteract the increasing prescription rejection rates, the Debtor increased the WAC of the Dermatology Products several times since 2015. These price increases, although necessary to support patient access commitments and ensure a minimum level of profitability for the business, led to public scrutiny regarding the Debtor's business model and further increased prescription rejection rates.

In early August 2018, the Debtor learned that Alcortin A had been excluded from ESI's formulary, effective as of January 1, 2019.[14] Although the Debtor's management understood that the formal listing of Alcortin A on the exclusion list could result in a meaningful reduction in prescription approval rates, such a reduction was uncertain given the already low approval rates for the Dermatology Products at that time, and the likelihood that ESI already had taken certain actions to exclude the Debtor's products from its formulary. Ultimately sales data for 2019 confirmed that ESI had taken additional actions to exclude the Debtor's Dermatology Products from its formulary—which led to a further reduction in prescription approval rates.

Unauthorized Generic Competition. In mid-2017, the Debtor became aware that Seton Pharmaceuticals, LLC ("Seton") had caused a generic pharmaceutical product to be linked to the Debtor's primary product—Alcortin A—in certain drug pricing databases. Then, later in 2017,

---

[14]    In particular, Alcortin A was listed on ESI's 2019 National Preferred Formulary Exclusions.

Mesora Pharma, LLC ("Mesora" and, together with Seton, the "Generic Competitors") introduced another competing generic product. By introducing their generic products into the distribution channel, and representing their products as less-expensive and equivalent alternatives to the Debtor's product, the Generic Competitors deprived the Debtor of product sales and injured its business.

The Decision to Restructure. The Debtor's historically low prescription approval rates, compounded by (i) the Debtor's persistent manufacturing issues which directly damaged the Debtor's business because the Debtor's sales force was unable to distribute sample products during a critical product growth period and HCPs were forced to prescribe alternative medications, (ii) the Debtor's working capital shortages stemming in part from the Cardinal/CVS product return dispute and (iii) generic drug competition, led the Debtor to the inevitable conclusion that its business was no longer sustainable outside of chapter 11 and that a restructuring and refinancing of the business would be necessary.[15] Accordingly, on January 4, 2019, the Board formed the Restructuring Committee to assess strategic alternatives and appointed an independent manager to the Board, who also was appointed as the sole member of the Restructuring Committee. Thereafter, on January 7, 2019, Thomas S. O'Donoghue, Jr. was appointed by the Restructuring Committee as the Debtor's CRO.

After the CRO's appointment, the Restructuring Committee and the CRO moved swiftly to understand the Debtor's business and to determine what course of action to take given the financial and operational difficulties described above. In connection therewith, on January 23, 2019, the Restructuring Committee retained the investment banking firm of Teneo Capital LLC ("Teneo") to assist the Debtor in the marketing and sale of its Dermatology Products and all related intellectual property.

After carefully considering the alternatives, the Restructuring Committee, in consultation with the full Board, made the difficult decision to file for chapter 11 protection in order to preserve the Debtor's assets and conduct a bankruptcy sales process for the Company's Dermatology Products, all in an effort to maximize value for the benefit of the Debtor's creditors.

## ARTICLE III

## THE CHAPTER 11 CASE

### A.    Commencement of the Chapter 11 Case

As set forth above, on the Petition Date the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court. No trustee or examiner has been appointed in the Chapter 11 Case.

---

[15]    Although the Debtor began implementing a series of cost-saving measures beginning in early 2018, including outsourcing its "back office" activities, decreasing the size of its sales force and entering into a more cost-effective lease, the Debtor was not able to overcome the significant challenges facing its business.

Since the Petition Date, the Debtor has continued to operate its business and manage its property as a debtor and debtor-in-possession.

**B.     "First Day" Motions**

On the Petition Date, the Debtor filed four (4) "first-day" motions designed to ease its transition into chapter 11 and to minimize the effects of the commencement of the Chapter 11 Case.  On February 5, 2019, the Court entered orders providing the requested first-day relief, including:

        **(i)**     authorizing the Debtor to continue use of its existing bank accounts and business forms [Docket No. 23];

        **(ii)**     authorizing the Debtor to pay prepetition wages and continue certain employee benefit programs in the ordinary course [Docket No. 24];

        **(iii)**     authorizing the Debtor to pay certain prepetition taxes and related obligations [Docket No. 25]; and

        **(iv)**     authorizing the Debtor to use cash collateral of, and granting adequate protection to, the Prepetition Secured Lender (final order entered March  6, 2019 [Docket No. 112]).

**C.     Retention of Professionals and Appointment of the Committee**

**1.     Retention of Debtor's Professionals**

The Debtor was authorized to retain the following bankruptcy professionals in the Chapter 11 Case: (i) Cole Schotz P.C., as its bankruptcy counsel [Docket No. 96]; (ii) CR3 Partners, LLC, to provide chief restructuring officer and related services [Docket No. 97]; (iii) Teneo, as its investment banker [Docket No. 98]; and (iv) PricewaterhouseCoopers LLP, to provide tax compliance and consulting services [Docket No. 180].

The Debtor also was authorized to retain certain professionals utilized by the Debtor in the ordinary course of business prior to the Petition Date pursuant to an order [Docket No. 143] entered by the Court on March 18, 2019.

**2.     Retention of Claims and Noticing Agent and Administrative Agent**

By order entered on February 5, 2019 [Docket No. 28], the Court authorized the Debtor to retain Kurtzman Carson Consultants LLC ("KCC," the "Claims Agent" or the "Voting Agent") as its claims and noticing agent in the Chapter 11 Case.  By order entered March 5, 2019 [Docket No. 99], the Court also authorized the Debtor to retain KCC as its administrative agent in the Chapter 11 Case.

### 3.    Appointment of Committee and Retention of Committee Professionals

On February 12, 2019, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") pursuant to section 1102(a) of the Bankruptcy Code [Docket No. 39].  The members of the Committee are: (i) Cardinal Health; (ii) ABDC; (iii) McKesson; (iv) Mirada Pharmaceuticals, LLC; and (iv) Biopharma Operations LLC.

The Committee was authorized to retain the following bankruptcy professionals in the Chapter 11 Case: (i) Sills Cummis & Gross P.C., as its counsel [Docket No. 169]; (ii) Klehr Harrison Harvey Branzburg LLP, as its co-counsel [Docket No. 170]; and (iii) Goldin Associates, LLC, as its financial advisor [Docket No. 177].

### D.    Significant Events During the Chapter 11 Case

In addition to the first-day relief sought and received in the Chapter 11 Case, the Debtor has sought and received authority with respect to various matters designed to assist in the administration of the Chapter 11 Case and to maximize the value of the Debtor's Estate. Material events since the commencement of the Chapter 11 Case are summarized below and include:

### 1.    The Sale Process

On February 13, 2019, the Debtor filed a motion [Docket No. 42] seeking entry of (i) an order (the "Bidding Procedures Order") (a) approving bidding procedures for the sale of substantially all of the Debtor's assets (the "Assets"), (b) approving bid protections, (c) scheduling an auction for, and a hearing to approve, the sale of substantially all of the Debtor's assets, (d) approving the form and manner of notices of the sale, auction and sale hearing, (e) approving assumption and assignment procedures and (f) granting related relief; and (ii) an order (a) approving the sale of the Debtor's assets free and clear of liens, claims, interests and encumbrances, (b) authorizing the assumption and assignment of unexpired leases and executory contracts and (c) granting related relief.  On March 6, 2019, the Court entered the Bidding Procedures Order [Docket No. 111] establishing, among other things, an April 22, 2019 bid deadline, an April 24, 2019 auction and an April 26, 2019 sale hearing.

After receiving funding for the month of May 2019 from CH 105 on April 18, 2019, as required under the term sheet between the parties, the Debtor determined that it would extend the bid deadline and adjourn the auction and sale hearing for approximately one month to enable the Debtor, CH 105 and other case constituents to continue to negotiate a plan of reorganization.  In particular, on April 23, 2019, the Debtor filed a notice [Docket No. 236] extending the bid deadline until May 24, 2019, and adjourning the auction and sale hearing until May 28, 2019 and May 30, 2019, respectively.  At the time of the adjournment, the Debtor had not received any Qualified Bids (as defined in the Bidding Procedures Order).

The Debtor received a single Qualified Bid on May 24, 2019, and proceeded to conduct an auction on May 29, 2019.  At the conclusion of the auction, the Debtor, in consultation with the Committee, determined that the highest bid submitted at the auction did not provide sufficient value to deem it the Successful Bid (as defined in the Bidding Procedures Order).

58448/0001-17147920v10

Accordingly, the Debtor did not seek Court approval of such bid and continued the sale hearing until a future date.

### 2.    Co-Pay Vendor Stipulations

On February 22, 2019, the Debtor filed a motion [Docket No. 65] (the "McKesson Motion") seeking entry of an order approving a stipulation by and among the Debtor, McKesson and its affiliates, pursuant to which, among other things, McKesson agreed to continue providing critical co-pay services to the Debtor in exchange for the Debtor agreeing to provide adequate protection to McKesson in the form of pre-payments.  On March 18, 2019, the Court entered an order [Docket No. 144] granting the McKesson Motion.

On February 26, 2019, the Debtor filed a motion [Docket No. 72] (the "ConnectiveRx Motion") seeking entry of an order approving a stipulation by and among the Debtor, PSKW, LLC d/b/a ConnectiveRx ("ConnectiveRx"), and Robert Previdi, in his individual capacity ("Previdi"), pursuant to which, among other things, Previdi agreed to purchase ConnectiveRx's claim against the Debtor and ConnectiveRx agreed to continue providing critical co-pay services to the Debtor in exchange for the Debtor agreeing to provide adequate protection to ConnectiveRx in the form of pre-payments.  The hearing to consider approval of the ConnectiveRx Motion was adjourned several times to enable the parties to negotiate a consensual resolution of certain contentious issues.  Ultimately, after the parties failed to reach a global resolution, the Debtor determined that the continued prosecution of the ConnectiveRx Motion was no longer in the best interests of its estate and creditors and, consistent with its fiduciary duties, withdrew the ConnectiveRx Motion.

### 3.    Lease Assignment Motion

On March 12, 2019, the Debtor filed a motion [Docket No. 125] (the "Assignment Motion") seeking entry of an order authorizing it to assume and assign the North Riverside Lease to its affiliate Novos Growth.  On April 1, 2019, the Court entered an order [Docket No. 186] granting the Assignment Motion, pursuant to which, among other things, cash in the amount of approximately $500,000, which was being held as collateral for the Letter of Credit, was released to the Debtor to be used for general business purposes.

### 4.    The Claims Process

### a.    Schedules and Statements

On March 12, 2019, the Debtor filed its Schedules of Assets and Liabilities [Docket No. 123] (as amended, the "Schedules") and Statement of Financial Affairs [Docket No. 124] (the "Statement" and, together with the Schedules, the "Schedules and Statement"), each of which were amended on March 28, 2019 [Docket No. 175].  Among other things, the Schedules and Statement set forth the Claims of known Creditors against the Debtor as of the Petition Date, based upon the Debtor's books and records.  The Debtor retains the right to amend the Schedules and Statement during the pendency of the Chapter 11 Case.

### b.    Bar Date Order

On March 18, 2019, the Court entered an order [Docket No. 145] (the "Bar Date Order") establishing the deadlines for filing Claims against the Debtor (collectively, the "Bar Dates"), including the following:

> General Bar Date.  Each Person or Entity, except any Governmental Unit, holding or asserting a Claim against the Debtor that arose (or is deemed to have arisen) on or before the Petition Date, including any 503(b)(9) Claims, was required to file a Proof of Claim form so that it was actually received by the Claims Agent on or before April 22, 2019 at 5:00 p.m. (Eastern Time).

> Governmental Bar Date.  Each Governmental Unit holding or asserting a Claim against the Debtor that arose (or is deemed to have arisen) on or before the Petition Date is required to file a Proof of Claim form so that it is actually received by the Claims Agent on or before August 2, 2019 at 5:00 p.m. (Eastern Time).

### c.    Claims Objections

The Debtor and its professionals are investigating each of the Claims filed against the Debtor to determine the validity of such Claims and anticipate filing objections to Claims that are filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.  As of the filing of this Disclosure Statement the Debtor has not filed any objections to Claims.

### 5.    Procedures For the Sale and Abandonment of De Minimis Assets

To facilitate the sale and abandonment of assets and to minimize unnecessary administrative expenses, the Debtor filed a motion on April 5, 2019 [Docket No. 199] seeking to establish procedures for the sale and abandonment of certain non-core, obsolete or burdensome assets of the Debtor (the "De Minimis Assets").  The Court entered an order on April 23, 2019 [Docket No. 238] (the "De Minimis Asset Order") establishing procedures permitting the sale of the De Minimis Assets in any individual transaction or series of related transactions to a single buyer or group of related buyers with an aggregate selling price of $100,000 or less in accordance with the procedures set forth therein.  Additionally, pursuant to the De Minimis Asset Order, the sale of De Minimis Assets with a sale price equal to or less than $1,000 is permitted without following such procedures or providing notice or seeking further Court approval. Moreover, pursuant to the De Minimis Asset Order, the Debtor is authorized to abandon De Minimis Assets in accordance with the procedures set forth therein.  During the Chapter 11 Case the Debtor has yet to file any notices pursuant to the De Minimis Asset Order.

### 6.    The Plan Support Agreement

Several weeks after the Petition Date, the Debtor and CH 105 began discussing the framework of a potential chapter 11 plan of reorganization to address, among other things, the Debtor's need for cash to operate its business on a go-forward basis and CH 105's need to exchange certain of its "short-dated" or expired Alcortin A inventory.  After several months of

good faith, arm's-length negotiations between the Debtor and CH 105, which negotiations ultimately included the Committee, the Prepetition Secured Lender, the Debtor's existing members (the "Members"), 42 North, ABDC, Biopharma, CH 105, Cardinal Health 110, LLC (f/k/a Cardinal Health 110, Inc.) ("CH 110"), McKesson, Mirada, Novos, Sonexus and Teneo, the parties agreed upon the material terms of the Plan, and embodied those terms in a chapter 11 plan term sheet (the "Term Sheet") attached to a plan support agreement (the "PSA"). As set forth in the Term Sheet and described herein, the Plan contemplates a reorganization pursuant to which, among other things, the Debtor's dermatology business will be continued by its existing management after the Effective Date of the Plan and CH 105 will provide funding to the Debtor through a combination of loans and inventory purchases. The Plan also contemplates, among other things, the creation and funding of a Litigation Trust for the benefit of the Debtor's general unsecured creditors, which Litigation Trust will be funded by, among other things, recoveries from litigation actions and cash and non-cash consideration contributed by the Members.

In addition to providing funding to the Reorganized Debtor after the Effective Date, CH 105 has and will continue to provide the Debtor with funding during the Plan confirmation process. In particular, CH 105 provided the Debtor with $900,000 in funding for the month of May 2019 and approximately $1.7 million in funding for the month of June 2019, which funding was deemed prepayment for Alcortin A inventory. CH 105 has agreed to provide additional funding to the Debtor of up to approximately $2.4 million for the months of July and August 2019, which also will be deemed prepayment for Alcortin A inventory.

The Term Sheet also includes an agreement by CH 105, ABDC and McKesson to not return Existing Inventory to the Debtor, the Reorganized Debtor or CH 105, provided that the Debtor or the Reorganized Debtor, as applicable, exchanges all expired inventory or Short-Dated Inventory[16] held by CH 105, ADBC and McKesson for new Alcortin A or Quinja inventory, as the case may be, through the date upon which CH 105's inventory of Alcortin A drops to ten (10) Business Days of inventory on hand (the "Termination Date"). The exchange of such inventory will occur once within ten (10) Business Days after the Plan is filed and once within ten (10) Business Days after the Effective Date of the Plan. Additionally, at any time after the Effective Date but before the Termination Date that additional Dermatology Products inventory held by CH 105, ABDC or McKesson becomes Short-Dated Inventory, the Reorganized Debtor will exchange such Short-Dated Inventory for new Alcortin A or Quinja, as the case may be.

After the Termination Date, the Reorganized Debtor's dermatology business will continue to operate, but CH 105 will no longer be directly supporting the business. Rather, the Term Sheet provides that the Reorganized Debtor and CH 105 will continue to perform under the agreements between the parties after the Termination Date, with CH 105 buying its full demand of dermatology products inventory from the Reorganized Debtor. The Reorganized Debtor will use the proceeds of such sales to, among other things, operate its business and repay amounts outstanding under the Exit Facility.

---

[16]    "Short-Dated Inventory" is defined in the Plan to mean "Dermatology Products inventory that is scheduled to expire within six (6) months."

After thoroughly marketing its assets without success and recognizing that no other viable alternatives exist to converting the Chapter 11 Case to one under chapter 7, the Debtor determined that the proposed restructuring under the terms of the PSA and Term Sheet would provide a significantly greater recovery for the Debtor's Creditors than otherwise would be possible under the circumstances of the Chapter 11 Case. Accordingly, the Debtor determined to proceed with the restructuring transaction memorialized in the PSA and Term Sheet and, on June 14, 2019, the Debtor filed a motion for authority to enter into the PSA [Docket No. 311]. The Court entered an order granting that motion on July 11, 2019 [Docket No. 368].

## ARTICLE IV

## SUMMARY OF PLAN

**This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan. This section is qualified in its entirety by and is subject to the Plan as well as the exhibits thereto and definitions therein. The Plan is attached to this Disclosure Statement as <u>Exhibit A</u>.**

**The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein. Reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.**

**The Plan and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtor under the Plan. Upon occurrence of the Effective Date, the Plan and all such documents will be binding upon all Holders of Claims against and Interests in the Debtor and its Estate and all other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan or such other operative document will control**.

A.      **Classification and Treatment of Claims and Interests**

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than the DIP Facility Claim, Administrative Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtor also is required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtor (except for certain Claims classified for administrative convenience) into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable

treatment of its claim or interest.  The Debtor believes that it has complied with such standard.  If the Court finds otherwise, however, it could deny Confirmation of the Plan if the Claimholders and Interest Holders affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and that the Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtor intends, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect Holders of Claims or Interests by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.  **Unless such modification of classification materially adversely affects the treatment of a Holder of a Claim or Interest and requires resolicitation, acceptance of the Plan by any Holder of a Claim or Interest pursuant to this solicitation will be deemed to be a consent to the Plan's treatment of such Holder of a Claim or Interest regardless of the Class as to which such Holder ultimately is deemed to be a member**.

The amount of any Impaired Claim that ultimately is Allowed by the Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Court with respect to each Impaired Class of Claims also may vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of property that ultimately will be received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized below.  The Debtor believes that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests.  The Court must find, however, that a number of statutory tests are met before it may confirm the Plan.  Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Court.

1.      **Unclassified Claims**

    a.      **DIP Facility Claim**

A DIP Facility Claim is a Claim arising under or as a result of the DIP Facility.

On the Effective Date, (i) all indebtedness under the DIP Facility will become indebtedness under the Exit Facility and will become subject to the terms thereof; (ii) the Reorganized Debtor will enter into and execute such documents, instruments and agreements reasonably requested by the Term Credit Facility Lender to confirm, affirm or grant to the Term Credit Facility Lender a duly perfected first priority lien on and security interest in all of the assets of the Reorganized Debtor; and (iii) the Reorganized Debtor will enter into and execute such other documents, instruments and agreements as may be reasonably requested by the Term Credit Facility Lender.

    b.      **Administrative Claims**

On or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim (other than a Professional) will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Administrative Claim or (b) such other treatment as to which such Holder and the Reorganized Debtor will have agreed upon in writing; provided, however, that Allowed Administrative Claims (other than those asserted by Professionals) with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.  Allowed Professional Fee Claims will be paid from the Professional Fee Reserve pursuant to Article V.H.1 of the Plan.

The "Distribution Date" is defined as the Effective Date of the Plan or the date, occurring as soon as reasonably practicable after the Effective Date, on which the initial Distributions are made to Holders of Allowed Claims.

    c.      **Priority Tax Claims**

A Priority Tax Claim is a Claim accorded priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

On or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, a Holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Tax Claim or (b) such other treatment as to which such Holder and the Reorganized Debtor will have agreed upon in writing.

### 2.      Unimpaired Claims

#### a.      Class 1:  Miscellaneous Secured Claims

A Miscellaneous Secured Claim is a Claim (a) that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or (b) that is subject to setoff under section 553 of the Bankruptcy Code and such right of setoff has been asserted by the holder of such right prior to the Confirmation Date in a properly Filed motion for relief from the automatic stay, to the extent of the value of the Claimholder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

On or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date such Miscellaneous Secured Claim becomes an Allowed Miscellaneous Secured Claim, at the option of the Reorganized Debtor, a Holder of an Allowed Miscellaneous Secured Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Miscellaneous Secured Claim, (a) Cash from the Reorganized Debtor equal to the value of such Allowed Miscellaneous Secured Claim, (b) a return of the Holder's Collateral securing the Miscellaneous Secured Claim, (c) such treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be rendered Unimpaired or (d) such other treatment as to which such Holder and the Reorganized Debtor will have agreed upon in writing.

Any Holder of a Miscellaneous Secured Claim will retain its Lien in the Collateral or the proceeds of the Collateral (to the extent that such Collateral is sold free and clear of such Lien) to the same extent and with the same priority as such Lien held as of Petition Date until such time as (A) the Holder of such Miscellaneous Secured Claim (i) has been paid Cash equal to the value of its Allowed Miscellaneous Secured Claim, (ii) has received a return of the Collateral securing the Miscellaneous Secured Claim or (iii) has been afforded such other treatment as to which such Holder and the Reorganized Debtor will have agreed upon in writing; or (B) such purported Lien has been determined by an order of the Court to be invalid or otherwise avoidable.

#### b.      Class 2:  Priority Non-Tax Claims

A Priority Non-Tax Claim is a Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

On or as soon as reasonably practicable after the later of (i) the Distribution Date or (ii) the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, a Holder of an Allowed Priority Non-Tax Claim will receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Priority Non-Tax Claim or (b) such other treatment as to which such Holder and the Reorganized Debtor will have agreed upon in writing.

58448/0001-17147920v10

### 3.     Impaired Claims

#### a.     Class 3: Prepetition Secured Lender Claim

The Prepetition Secured Lender Claim is the claim asserted by the Prepetition Secured Lender in the Chapter 11 Case for amounts due under the Prepetition Secured Loan, pursuant to Claim No. 41, in the amount of $15,211,049.12, plus continuing interest and fees.

The Prepetition Secured Lender will not receive a distribution under the Plan on account of its Prepetition Secured Loan, which loan and the liens securing the Prepetition Secured Loan will remain in full force and effect after the Effective Date; provided, however, that (i) the maturity date under the Prepetition Secured Loan will be extended through and including the date that the Exit Facility has been repaid (the "Repayment Date"), (ii) the Prepetition Secured Lender's liens and security interests will be subordinated to the liens and security interests being granted to CH 105 in connection with the DIP Facility and the Exit Facility, and (iii) the Prepetition Secured Lender will forebear from enforcing its rights as to the Debtor under the Prepetition Secured Loan through and including the Repayment Date, but the Prepetition Secured Lender's rights as to any other party to the Prepetition Secured Loan will not be impaired by the Plan's extension of the maturity date of the Prepetition Secured Loan solely as to the Reorganized Debtor.  Until the Repayment Date, payments to the Prepetition Secured Lender will be limited to interest only calculated at 100% of the contract rate of interest.  The fees and expenses of the Prepetition Secured Lender will be paid in full on or before the Effective Date. The Reorganized Debtor will execute and deliver amendments to the Prepetition Secured Loan documents to reflect the treatment set forth in the Plan.

The Prepetition Secured Lender is a party to the PSA and, therefore, has agreed to support Confirmation of the Plan.

#### b.     Class 4: Cardinal Claims

The Cardinal Claims are, collectively, (i) the claim asserted by CH 105, pursuant to Claim No. 29, in the amount of $34,240,382.00; (ii) the claim asserted by CH 110, pursuant to Claim No. 31, in the amount of $10,638,779.60; and (iii) any other claim held by Cardinal arising before the Effective Date out of the business arrangements between Cardinal and the Debtor.

In lieu of Distributions Cardinal would otherwise be entitled to receive, Cardinal will receive no cash distribution under the Plan on account of the Cardinal Claims or otherwise, but benefits from the Plan by, among other things, (i) having CH 105's claims for potential return liability reduced as its Dermatology Products inventory is pulled through the Distribution Channel and (ii) being released by the Debtor pursuant to Article X.D.5 of the Plan and Cardinal will accept such benefits as of the Effective Date in full satisfaction of the Cardinal Claims.

Cardinal is a party to the PSA and, therefore, has agreed to support Confirmation of the Plan.

26

###### c.    Class 5: General Unsecured Claims

A General Unsecured Claim is a Claim against the Debtor that is not a DIP Facility Claim, Administrative Claim, Priority Tax Claim, Miscellaneous Secured Claim, Priority Non-Tax Claim, Prepetition Secured Lender Claim, Cardinal Claim, Subordinated 510(b) Claim or Subordinated 510(c) Claim.

On or as soon as reasonably practicable after the later of (i) the Effective Date or (ii) the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, a Holder of an Allowed General Unsecured Claim will be deemed to have received, on account of such Allowed General Unsecured Claim, its Pro Rata share of the Litigation Trust Interests, after giving effect to the agreements with 42 North, ABDC, Biopharma, McKesson, Mirada, Novos and Sonexus set forth in Article VII of the Plan; provided, however, that except with respect to the 42 North Claim and the Novos Net Claim, both of which will be subordinated to all other General Unsecured Claims, the Debtor Release Parties will not be entitled to nor shall they receive Litigation Trust Interests or Distributions from the Litigation Trust on account of their Claims against the Debtor, if any.

As set forth in the Litigation Trust Agreement, Distributions from the Litigation Trust on account of Litigation Trust Interests will be made from the Litigation Trust Assets and Litigation Trust Proceeds after paying, reserving against or satisfying, among other things, the operating and administrative expenses of the Litigation Trust, including but not limited to all costs, expenses and obligations incurred by the Litigation Trustee (or professionals who may be employed by the Litigation Trustee in administering the Litigation Trust) in carrying out their responsibilities under the Litigation Trust Agreement, or in any manner connected, incidental or related thereto.

**Holders of Class 5 General Unsecured Claims are subject to the consensual third party releases set forth in Article X.D.4 of the Plan, and will be deemed to accept, and agree to be bound by, such releases unless they affirmatively indicate their desire to "opt out" by checking the "opt out" box on the Ballot.**

###### d.    Class 6:  Subordinated 510(c) Claims

A Subordinated 510(c) Claim is a Claim that has been subordinated pursuant to section 510(c) of the Bankruptcy Code, including pursuant to a Final Order of the Court, or is for punitive or exemplary damages or for a fine or penalty, to the extent permitted by applicable law.

On or after the Effective Date, all Subordinated 510(c) Claims will be deemed eliminated, cancelled and/or extinguished and each Holder thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such Claims.

The Debtor does not believe that there are any parties in Class 6.

###### e.    Class 7:  Subordinated 510(b) Claims

A Subordinated 510(b) Claim is a Claim subordinated pursuant to section 510(b) of the Bankruptcy Code, including pursuant to a Final Order of the Court.

On or after the Effective Date, all Subordinated 510(b) Claims will be deemed eliminated, cancelled and/or extinguished and each Holder thereof will not be entitled to, and will not receive or retain, any property or interest in property on account of such Claims.

The Debtor does not believe that there are any parties in Class 7.

### 4.    Interests

#### a.    Class 8:  Member Interests

Member Interests are the membership units in the Debtor held by the Members who, collectively, are Robert G. Previdi, Todd Smith, Benjamin Bove and Avondale Investments Rx, LLC.

The Members will retain their Member Interests in exchange for their Substantial Contribution.

#### b.    Class 9:  Other Interests

Interests are the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Person or Entity in the Debtor, including all Restricted Stock Units, capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtor, partnership interests in the Debtor's stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of the Debtor or obligating the Debtor to issue, transfer or sell any shares of capital stock or other ownership interests whether or not certificated, transferable, voting or denominated stock or a similar security.

On the Effective Date, all Other Interests will be deemed automatically cancelled, released and extinguished without further action by the Debtor or the Reorganized Debtor, and the obligations of the Debtor thereunder will be discharged, and each Holder of an Other Interest will not be entitled to, and will not receive or retain, any property or interest in property on account of such Other Interests.

### 5.    Special Provision Regarding Unimpaired Claims

Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Court or any document or agreement enforceable pursuant to the terms of the Plan, nothing will affect the rights and defenses, both legal and equitable, of the Debtor, the Reorganized Debtor and/or the Litigation Trust with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

### 6.    Allowed Claims

Notwithstanding any provision of the Plan to the contrary, the Disbursing Agent will only make Distributions to Holders of Allowed Claims.  No Holder of a Disputed Claim will receive any Distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim.  The Litigation Trustee may, in its discretion, withhold Distributions otherwise due under the Plan to any Claimholder until the Claims Objection Deadline, to enable a timely objection thereto to be Filed.  Any Holder of a Claim that becomes an Allowed Claim after the Effective Date will receive its Distribution in accordance with the terms and provisions of the Plan and/or the Litigation Trust Agreement, as applicable.

## B.    Acceptance or Rejection of the Plan

### 1.    Acceptance by an Impaired Class

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims will have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

### 2.    Presumed Acceptances by Unimpaired Classes

Classes 1, 2 and 8 are Unimpaired by the Plan.  Under section 1126(f) of the Bankruptcy Code, such Claimholders and Interest Holders are conclusively presumed to accept the Plan, and the votes of such Claimholders and Interest Holders will not be solicited.

### 3.    Classes Deemed to Reject Plan

Holders of Claims in Classes 6 and 7 and Interest Holders in Class 9 are not entitled to receive or retain any property under the Plan.  Under section 1126(g) of the Bankruptcy Code, such Claim and Interest Holders are conclusively deemed to reject the Plan, and the votes of such Claimholders and Interest Holders will not be solicited.

### 4.    Impaired Classes of Claims Entitled to Vote

Because Claims in Classes 3, 4 and 5 are Impaired under the Plan and Holders of such Claims will receive or retain property under the Plan, Holders of Claims in Classes 3, 4 and 5 are entitled to vote and will be solicited with respect to the Plan.

### 5.    Vacant Classes

Any Class or sub-Class of Claims or Interests that is not occupied as of the date of the commencement of the Confirmation Hearing by at least one allowed Claim or allowed Interest, as applicable, or at least one Claim or Interest, as applicable, temporarily allowed under Bankruptcy Rule 3018, will not be included for purposes of (i) voting on the acceptance or rejection of the Plan and (ii) determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

58448/0001-17147920v10

6.        **Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

Because Classes 6, 7 and 9 are deemed to reject the Plan, the Debtor will (i) seek confirmation of the Plan from the Court by employing the "cramdown" procedures set forth in section 1129(b) of the Bankruptcy Code and/or (ii) modify the Plan in accordance with Article XII.A thereof.  The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit or schedule, including to amend or modify the Plan or such Exhibits or schedules to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

C.        **Means for Implementation**

1.        **Corporate Action**

a.        **Continued Corporate Existence**

The Debtor will continue to exist after the Effective Date as the Reorganized Debtor in accordance with Delaware law and pursuant to its certificate of formation and limited liability company agreement in effect prior to the Effective Date, except to the extent such certificate and limited liability company agreement are amended on the Effective Date.

b.        **Cancellation of Existing Securities and Agreements**

Except as otherwise provided in the Plan, and in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date, any and all Other Interests, including Restricted Stock Units, promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, other than a Claim that is being reinstated and rendered Unimpaired, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Interests will be deemed automatically canceled, retired, released and/or extinguished and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtor under the notes, share certificates and other agreements and instruments governing such Claims and Interests will be discharged.  The holders of or parties to such canceled notes, share certificates and other agreements and instruments will have no Claims or other rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

c.        **Limited Liability Company Agreement**

The limited liability company agreement of the Debtor will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code.  The Third Amended and Restated Limited Liability Company Agreement of Novum Pharma, LLC will be in substantially the form attached to the Plan as Exhibit A.

###### d.    Managers and Officers of Reorganized Debtor

The Debtor's current Board and officers will continue to serve after the Effective Date.

###### e.    No Further Action

Each of the matters provided for under the Plan involving the corporate structure of the Debtor or corporate action to be taken by or required of the Debtor will, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and will be authorized and approved in all respects without any requirement of further action by any Person or Entity, including but not limited to, Holders of Claims or Interests against or in the Debtor, or managers or officers of the Debtor.

##### 2.    Exit Facility

On the Effective Date, (i) the Exit Facility and all documents, instruments and agreements to be entered into, delivered or confirmed in connection therewith will become effective; and (ii) all indebtedness under the DIP Facility will become indebtedness under the Exit Facility and will become subject to the terms thereof.

##### 3.    Restructuring Transactions

###### a.    Substantial Contribution by Members

The Debtor's Members will contribute the following cash and non-cash consideration (the "Substantial Contribution") to facilitate the Consummation of the Plan:

(1)  On the Effective Date, the members will transfer Cash in the amount of $2.5 million to the Litigation Trust (*i.e.*, the Litigation Trust Funding Amount).

(2)  As and when requested by the Litigation Trust, the Members will transfer and assign to the Litigation Trust all of their right, title and interest in and to any or all of the Member Actions.

(3)  The Members will provide reasonable cooperation to the Litigation Trust in prosecuting the Causes of Action and Member Actions, including providing necessary Books and Records and making the necessary personnel available to support the investigation and prosecution of such causes of action.

(4)  Novos will facilitate the continued operation of the Debtor's business by providing operational support to the Reorganized Debtor as a rate below that prior to the Petition Date, as reflected under the terms of the amended Novos Service Agreement assumed under the Plan.

(5)  The Prepetition Secured Lender will (i) permit its first-priority security interest in all of the Debtor's assets to be primed by the DIP Facility and the Exit Facility, and (ii) agree to the deferral of payment of principal on the Prepetition Secured Loan until after repayment of the Exit Facility.

###### b.      Treatment of Short-Dated Inventory

The Wholesalers and CH 105 will not return Existing Inventory to the Debtor, the Reorganized Debtor or CH 105; provided, however, that (i) within ten (10) Business Days after the Effective Date, the Reorganized Debtor will exchange all Short-Dated Inventory or expired inventory held by CH 105 for new Alcortin A or Quinja inventory, as the case may be; (ii) within ten (10) Business Days after the Effective Date, the Reorganized Debtor will exchange all Short-Dated Inventory or expired inventory held by the Wholesalers for new Alcortin A inventory; (iii) at any time before the Termination Date that additional Dermatology Products inventory held by CH 105 becomes Short-Dated Inventory or expired inventory, the Reorganized Debtor will exchange such Short-Dated Inventory for new Alcortin A or Quinja inventory, as the case may be; and (iv) at any time before the Termination Date that additional Dermatology Products inventory held by the Wholesalers becomes Short-Dated Inventory or expired inventory, the Reorganized Debtor will exchange such Short-Dated Inventory for new Alcortin A inventory; provided further, however, that each tube of Quinja will be exchanged for one tube of Alcortin A, and each tube of Novacort will be exchanged for a comparable value of Alcortin A based on the WAC as of June 1, 2019.

###### c.      Post-Effective Date Business Funding

Subject to its right to suspend funding set forth in Article V.C.5 of the Plan, CH 105 will fund the Reorganized Debtor's Dermatology Products business (the "Business Funding") until the Termination Date has occurred, pursuant to the following procedures:

(1)      On the last Business Day of each month until the Termination Date has occurred, the Reorganized Debtor will send CH 105 its funding requirements (the "Incremental Funding Amount") for the following month; provided, however, that the request for the Incremental Funding Amount for September 2019 will be made on the last Business Day prior to the Effective Date; provided further, however, that the Incremental Funding Amount shall not exceed $10 million.

(2)      CH 105 will send the Incremental Funding Amount to the Reorganized Debtor by wire transfer within three (3) business days after receiving a funding request.

(3)      If payment of the Incremental Funding Amount requested by the Reorganized Debtor in a particular month would cause the balance of the Exit Facility to exceed $13 million (such amount in excess of $13 million, the "Exit Facility Overage"), prior to providing such funding CH 105 will (i) purchase a dollar amount of Quinja inventory equal to the Exit Facility Overage (the "Additional Inventory") and (ii) apply the proceeds from such sale to reduce the balance of the Exit Facility; provided, however, that CH 105 is not required to purchase more than an aggregate of 50 tubes of Additional Inventory pursuant to this provision.  CH 105 will hold its Additional Inventory until a month where payment of the Incremental Funding Amount requested by the Reorganized Debtor will not cause an Exit Facility Overage, and until this time will continue its ordinary course ordering of Quinja without reducing the quantity of Quinja ordered on account of the Additional Inventory (i.e., during this period, CH 105 will temporarily increase the days of inventory on hand it holds above ordinary course levels).

32

(4)    The Incremental Funding Amount provided by CH 105 to the Reorganized Debtor on each funding date until the occurrence of the Inventory Reduction Date will be provided as an advance under the Exit Facility.

(5)    On the first funding date after the occurrence of the Inventory Reduction Date and on each subsequent funding date until the occurrence of the Termination Date, CH 105 will pay the Incremental Funding Amount in exchange for the purchase of Alcortin A at WAC.

### d.    Reorganized Debtor Reporting Obligations

The Reorganized Debtor will provide CH 105 with (i) written monthly financial reporting and Variance Reports and (ii) quarterly in-person business reviews.  Separate financial reporting will be provided for the Dermatology Products business and the CSO Business.  The Reorganized Debtor will provide the Wholesalers with the reports specified in subparagraph (i) above at the same time that such reports are provided to CH 105.

### e.    Variance Testing

Within ten (10) Business Days after each Measurement Period, the Reorganized Debtor will provide CH 105 and the Wholesalers a Variance Report reflecting the difference between CH 105's actual Alcortin A unit sales to wholesalers and pharmacies during such Measurement Period and the Projected Sales for such Measurement Period; provided, however, that after the occurrence of the Termination Date, the Reorganized Debtor will not longer be required to test for variances or provide Variance Reports.

Beginning with the four-week period ending on November 29, 2019, if CH 105's actual Alcortin A unit sales to wholesalers and pharmacies during a Measurement Period are 20% or more below Projected Sales for such Measurement Period, then the Variance Report will indicate that the Reorganized Debtor is "out of compliance" for such Measurement Period.  If the Reorganized Debtor is "out of compliance" in any two (2) consecutive Measurement Periods, then CH 105 will be entitled, upon written notice to the Reorganized Debtor and the Wholesalers (the "Termination Notice") issued no more than ten (10) Business Days after the issuance of the Variance Report indicating that the Reorganized Debtor is "out of compliance" for the second consecutive month, to suspend Business Funding and terminate the CH 105 Agreements; provided, however, that if the Debtor is "out of compliance" during a particular Measurement Period due to a Force Majeure or the result of actions by Cardinal, that Measurement Period will be ignored for purposes of variance testing and will not serve as a basis for issuance of a Termination Notice.

If a Termination Notice has not been withdrawn by CH 105 within ten (10) Business Days after issuance of such notice, the Wholesalers will be entitled, upon written notice to the Reorganized Debtor, to terminate any or all agreements with the Reorganized Debtor.

### f.       Post-Termination Date Business Support

To facilitate (i) the continued operation of the Dermatology Products business after the Termination Date and (ii) the repayment of the amounts borrowed in connection with the Exit Facility, CH 105 and the Reorganized Debtor:

(a)  will continue to perform under the CH 105 Agreements after the Termination Date for a period of time sufficient to enable the Reorganized Debtor to repay the amounts borrowed under the Exit Facility;

(b)  will not terminate the CH 105 Agreements before the Reorganized Debtor has repaid the amounts borrowed under the Exit Facility; provided, however, that CH 105 and the Reorganized Debtor will retain their rights to terminate the CH 105 Distribution Agreement pursuant to Section 6.2(B) of such agreement if the other party materially breaches any of the provisions of the agreement; and

(c)  will temporarily alter the payment terms under the CH 105 Agreements to provide for net 5 payment terms by CH 105 until the Minimum Working Capital Reserve has been fully funded.

### g.       Restriction on Profit Distributions and Asset Transfers

The Reorganized Debtor will make no profit distributions to Members or other asset transfers on or before the Termination Date (except that the Reorganized Debtor may make profit distributions from and/or transfer the CSO Business as set forth in Article V.I of the Plan); provided, however, that the Reorganized Debtor is permitted to make tax distributions to Members for tax liability arising on account of business operations in calendar year 2019 and thereafter as necessary to satisfy the Members' tax obligations arising on account of their ownership interests in the Reorganized Debtor.

### h.       Winddown Financial Obligations

Following issuance of a Termination Notice, (i) CH 105 will be entitled to sell existing Dermatology Products inventory without regard to any restrictions imposed by the CH 105 Agreements and (ii) CH 105's financial obligations to the Reorganized Debtor will be limited to payment of the following amounts:

(1)  amounts accrued as of the date of the Termination Notice but not yet paid to the Reorganized Debtor's employees and vendors supporting the Dermatology Products business;

(2)  amounts required by law to be paid by the Reorganized Debtor in connection with the termination of the Reorganized Debtor's employees supporting the Dermatology Products business; and

(3)  amounts payable to vendors supporting the Dermatology Products business for goods and services provided during the termination notice periods under the applicable contracts with such vendors; provided, however, that the amounts provided by

CH 105 pursuant to this provision (3) will not include termination fees or any other such fees arising under the applicable contracts (if any).

### i.        Employee Incentive Plan

After the Effective Date, the Reorganized Debtor's Board will be permitted to adopt an Employee Incentive Plan granting employees of the Reorganized Debtor membership units in the Reorganized Debtor in an aggregate number of units that does not cause the dilution of existing equity holders by more than 15%.  All terms of any Employee Incentive Plan will be determined by the Board.

### j.        Third-Party Equity Investment

After the Effective Date, the Reorganized Debtor's Board will be permitted to cause the issuance of membership units in the Reorganized Debtor to one or more equity investors, in an aggregate number of units that does not cause the dilution of existing equity holders by more than 51% (each such issuance, an "Equity Raise").

To the extent that an Equity Raise occurs prior to the Termination Date, the proceeds of such Equity Raise will be used (i) first, to fund the Minimum Working Capital Reserve, and (ii) second, to repay amounts outstanding under the Exit Facility or, if no such amounts are owing, for general business purposes.

### k.        Proceeds of Sales of Quinja and Novacort

The proceeds of the sales of Quinja and Novacort made by the Debtor on or before the Termination Date, less any incremental costs incurred by the Debtor in connection with such sales, will be used (i) first, to fund the Minimum Working Capital Reserve, and (ii) second, to repay amounts outstanding under the Exit Facility or, if no such amounts are owing, for general business purposes.

### l.        CH 105 Sale Support

The Reorganized Debtor will promote the Dermatology Products using sales representatives and tele-sampling.  CH 105, at its discretion, may supplement the Reorganized Debtor's sales efforts using its own telesales personnel; provided, however, that the Reorganized Debtor and CH 105 will coordinate the activities of such telesales personnel to ensure that their efforts result in increased adjudicated Dermatology Product sales.

### m.        Notice of Inventory Levels and Termination Date

CH 105 will provide written notice to the Reorganized Debtor and the Wholesalers when CH 105's Alcortin A inventory level drops to ten (10) Business Days of inventory on hand (i.e., the Termination Date).

The Reorganized Debtor will provide written notice to the Wholesalers when CH 105's Alcortin A inventory level drops to approximately sixty (60) Business Days of inventory on hand.

4.      **Books and Records; Privilege Matters**

a.      **Access to Debtor's Books and Records**

The Reorganized Debtor will provide copies of non-privileged Books and Records relating to the Causes of Action and Member Actions to the Litigation Trust upon request.

b.      **Transfer of Evidentiary Privileges; Document Requests**

Upon the Effective Date, the Litigation Trustee will succeed to the evidentiary privileges (including attorney-client, joint-client, joint-defense, common interest and other privileges) formerly held by the Committee.  Privileged communications may be shared among the Litigation Trustee and the Litigation Trust Committee without compromising the privileged nature of such communications.

Accordingly, to the extent that documents are requested from current counsel to the Committee by any Person or Entity, after the Effective Date, only the Litigation Trustee will have the ability to waive such attorney-client or other privileges.  In addition, current counsel to the Committee will have no obligation to produce any documents currently in their possession as a result of or arising in any way out of their representation of the Committee unless (i) the Person or Entity requesting such documents serves its request on the Litigation Trustee; (ii) the Litigation Trustee consents in writing to such production and any waiver of the attorney-client privilege or other privilege such production might cause; and (iii) the Litigation Trustee, or the Person or Entity requesting such production, agrees to pay the reasonable costs and expenses incurred by current counsel for the Committee in connection with such production.  Subject only to applicable ethical and professional conduct rules, nothing in the Plan will preclude counsel for the Committee from representing the Litigation Trust.

5.      **Creditors' Committee and Litigation Trust Committee**

a.      **Dissolution of the Committee**

The Committee will continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and will perform such other duties as it may have been assigned by the Court prior to the Effective Date. On the Effective Date, the Committee will be dissolved and its members will be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Case or the Plan and its implementation, and the retention or employment of the Committee's attorneys, financial advisors and other agents will terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order.  All expenses of Committee members and the reasonable fees and expenses of their Professionals through the Effective Date will be paid in accordance with the terms and conditions of the Professional Fee Order and a Final Order of the Court approving such fees and expenses.  Professionals employed by the Creditors' Committee will be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, including the preparation, filing and prosecution of final fee applications.

36

### b.   Creation of Litigation Trust Committee and Procedures Related Thereto

The Litigation Trust Committee will consist of three members, the identities of which will be disclosed pursuant to a notice filed not less than ten (10) Business Days prior to the Confirmation Hearing.  Each member of the Litigation Trust Committee will be entitled to vote on certain matters related to Objections to General Unsecured Claims and the settlement, resolution or other disposition of Litigation Trust Assets, as provided for in the Litigation Trust Agreement.  Members of the Litigation Trust Committee will serve without compensation, but will be entitled to reimbursement of reasonable expenses.

### c.   Standing of the Litigation Trust

The Litigation Trust will have independent standing to appear and be heard in the Court as to any matter relating to the Plan, the Litigation Trust Agreement or the Estate, including any matter as to which the Court has retained jurisdiction pursuant to Article XI of the Plan.

### d.   Function and Duration of the Litigation Trust Committee

The Litigation Trust Committee will have the rights and responsibilities set forth in the Plan and the Litigation Trust Agreement.  The Litigation Trust Committee will remain in existence until such time as the final Distributions under the Litigation Trust Agreement have been made, as set forth more fully in the Litigation Trust Agreement.

### e.   Indemnification of Litigation Trustee and Litigation Trust Committee

The "Indemnified Persons" are, collectively, the Litigation Trustee and its current equity holders, including shareholders, partnership interest holders and limited liability company unit holders, Affiliates, partners, subsidiaries, members, officers, directors, managers serving on a board of managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, together with their respective predecessors, successors and assigns (in each case, solely in their capacity as such).

The Indemnified Persons will be held harmless and will not be liable for actions taken or omitted in their capacity as, or on behalf of, the Litigation Trust, Litigation Trust Committee or Litigation Trustee (as applicable), except those acts that are determined by Final Order of the Court to have arisen out of their own intentional fraud, willful misconduct or gross negligence. Each Indemnified Person will be entitled to be indemnified, held harmless and reimbursed for fees and expenses including, without limitation, reasonable attorney's fees, which such Persons and Entities may incur or may become subject to or in connection with any action, suit, proceeding or investigation that is brought or threatened against such Persons or Entities in respect of that Person's or Entity's actions or inactions regarding the implementation or administration of the Plan, or the discharge of their duties under the Plan or Litigation Trust Agreement, except for any actions or inactions that are determined by Final Order of the Court to have arisen from intentional fraud, willful misconduct or gross negligence.  Any Claim of the Indemnified Persons to be indemnified, held harmless or reimbursed will be satisfied solely from the Litigation Trust Assets, Litigation Trust Proceeds and any applicable insurance coverage.

###### f.      Recusal of Litigation Trust Committee Members

A Litigation Trust Committee member will recuse itself from any decisions or deliberations regarding actions taken or proposed to be taken by the Litigation Trust with respect to the Claims, Causes of Action or rights of such Litigation Trust Committee member, the entity appointing such Litigation Trust Committee member, or any affiliate of the foregoing.

### 6.      The Litigation Trust

###### a.      Establishment and Administration of the Litigation Trust

(a)      On the Effective Date, the Litigation Trust will be established pursuant to the Litigation Trust Agreement for the purpose of, among other things, (i) investigating and, if appropriate, pursuing the Causes of Action and Member Actions; (ii) holding and administering the Litigation Trust Assets; (iii) prosecuting any objections to Claims that the Litigation Trustee deems appropriate and resolving such objections; (iv) administering the Litigation Trust Assets, including filing any tax returns or other reports required under applicable law; (v) retaining professionals or other advisors to assist in the performance of its duties; and (vi) making Distributions from the Litigation Trust to Holders of Allowed General Unsecured Claims as provided for in the Plan and/or the Litigation Trust Agreement.

(b)      Upon execution of the Litigation Trust Agreement, the Litigation Trustee will be authorized to take all steps necessary to complete the formation of the Litigation Trust. The Litigation Trust will be administered by the Litigation Trustee in accordance with the Litigation Trust Agreement.

(c)      It is intended that the Litigation Trust be classified for federal income tax purposes as a "Litigation Trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code.  In furtherance of this objective, the Litigation Trustee, in its business judgment, will make continuing best efforts not to unduly prolong the duration of the Litigation Trust.  All Litigation Trust Assets held by the Litigation Trust on the Effective Date will be deemed for federal income tax purposes to have been distributed by the Debtor on a Pro Rata basis to Holders of Allowed General Unsecured Claims and then contributed by such Holders to the Litigation Trust in exchange for the Litigation Trust Interests.  All Holders of Allowed General Unsecured Claims have agreed to use the valuation of the Litigation Trust Assets transferred to the Litigation Trust as established by the Litigation Trustee for all federal income tax purposes. The beneficiaries under the Litigation Trust will be treated as the deemed owners of the Litigation Trust.  The Litigation Trust will be responsible for filing information on behalf of the Litigation Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

###### b.      Assets of the Litigation Trust

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtor will transfer and assign to the Litigation Trust all of its right, title and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, all such assets will automatically vest in the Litigation Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the Holders of Litigation Trust Interests as set forth in the

Plan and the expenses of the Litigation Trust as set forth in the Plan and in the Litigation Trust Agreement. Thereupon, neither the Debtor nor the Reorganized Debtor will have any interest in or with respect to the Litigation Trust Assets.

As and when requested by the Litigation Trust, the Members will transfer and assign to the Litigation Trust all of their right, title and interest in and to all of the Member Actions, which actions, upon transfer, will be subject to the terms of the Plan and the Litigation Trust Agreement.

### c.    Rights and Powers of the Litigation Trust and the Litigation Trustee

(a)    Except as otherwise provided in the Plan and without infringing or duplicating any of the rights and powers of the Reorganized Debtor, the Litigation Trustee will be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and will have all the rights and powers set forth in the Litigation Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, and the right to (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Litigation Trust Agreement; (ii) make Distributions contemplated by the Plan and the Litigation Trust Agreement; (iii) establish and administer any necessary reserves that may be required, including the Disputed Claims Reserve; (iv) object to Disputed Claims; and (v) employ and compensate professionals (including professionals previously retained by the Debtor and the Committee); provided, however, that any such compensation will be made only out of the Litigation Trust Assets and Litigation Trust Proceeds. Notwithstanding anything in the Plan to the contrary, the Litigation Trust will neither impair nor duplicate the rights, duties or powers of the Reorganized Debtor.

(b)    The Litigation Trustee will have full authority to take any steps necessary to administer and perform the Litigation Trust Agreement, including without limitation, the duty and obligation to make Distributions from the Litigation Trust Assets and the Litigation Trust Proceeds in accordance with the Plan.

### d.    Litigation Trust Interests

(a)    On the Effective Date, each Holder of an Allowed General Unsecured Claim will, by operation of the Plan, be deemed to have received its uncertificated Pro Rata share of the Litigation Trust Interests. Litigation Trust Interests will be reserved for Holders of Disputed General Unsecured Claims and issued by the Litigation Trust to, and held by the Litigation Trustee in, the Disputed Claims Reserve pending allowance or disallowance of such Claims. No other Entity will have any interest, legal, beneficial or otherwise, in the Litigation Trust Assets upon the assignment and transfer of such assets to the Litigation Trust.

As set forth in the Litigation Trust Agreement, Distributions from the Litigation Trust on account of Litigation Trust Interests will be made from the Litigation Trust Assets and Litigation Trust Proceeds after paying, reserving against or satisfying, among other things, the operating and administrative expenses of the Litigation Trust, including but not limited to all costs, expenses and obligations incurred by the Litigation Trustee (or professionals who may be

39

employed by the Litigation Trustee in administering the Litigation Trust) in carrying out their responsibilities to the Litigation Trust under the Litigation Trust Agreement, or in any manner connected, incidental or related thereto.

(b)     The Litigation Trust Interests will be uncertificated and will be nontransferable except upon death of the Holder or by operation of law.  Holders of Litigation Trust Interests, in such capacity, will have no voting rights or any authority over the activities of the Litigation Trust.  The Litigation Trust will have a term of five (5) years from the Effective Date, without prejudice to the rights of the Litigation Trust to request extension of such term from the Court for good cause shown.

### e.     Appointment of a Litigation Trustee

(a)     The identity of the Litigation Trustee will be disclosed pursuant to a notice filed not less than ten (10) Business Days prior to the Confirmation Hearing.  The appointment of the Litigation Trustee will be approved in the Confirmation Order, and such appointment will be effective as of the Effective Date.  The Litigation Trustee will have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and Litigation Trust Agreement.

(b)     The Litigation Trustee will not be obligated to obtain a bond but may do so, in its sole discretion, in which case the expense incurred by such bonding will be paid by the Litigation Trust.

(c)     The Litigation Trustee and its professionals will be exculpated and indemnified pursuant to and in accordance with the terms of the Plan and Litigation Trust Agreement.

### f.     Distributions to Holders of Allowed General Unsecured Claims

(a)     _Initial Distributions_.  On the Distribution Date, the Litigation Trustee will make, or will make adequate reserves in the Disputed Claims Reserve for, the Distributions required to be made under the Plan to Holders of Allowed General Unsecured Claims.  The Litigation Trustee will not make any Distributions of Litigation Trust Assets to the beneficiaries under the Litigation Trust unless the Litigation Trustee retains and reserves in the Disputed Claims Reserve such amounts as are required under Article VI.G.3 of the Plan.

(b)     _Periodic Distributions_.  The Litigation Trustee will make other Distributions of Cash on any Period Distribution Date to Holders of Litigation Trust Interests in accordance with the Plan and Article IV of the Litigation Trust Agreement.

(c)     _Final Distributions_.  The Litigation Trust will terminate and the Litigation Trustee will make the final Distributions upon the occurrence of the earlier of (a) the completion of all the Litigation Trustee's duties, responsibilities and obligations under the Litigation Trust Agreement, and (b) the fifth (5th) anniversary of the Effective Date; provided, however, that termination of the Litigation Trust will only be deemed effective upon the filing by the Litigation Trustee with the Court of a certification of termination of the Litigation Trust.  Notwithstanding the foregoing, on or prior to a date not less than six (6) months prior to such termination, the

40

term of the Litigation Trust may be extended for one or more finite terms based upon the particular facts and circumstances present at that time, if an extension is necessary to the liquidating purpose of the Trust.

Upon termination of the Litigation Trust, if the Litigation Trustee reasonably determines that any remaining Litigation Trust Assets and Litigation Trust Proceeds are insufficient to render a further Distribution practicable, or exceed the amounts required or permitted to be paid under the Plan, the Litigation Trustee will transfer such remaining funds to the Reorganized Debtor, to be used (i) first, to fund the Minimum Working Capital Reserve; and (ii) second, to repay amounts outstanding under the Exit Facility or, if no such amounts are owing, for general business purposes; provided, however, that if such remaining funds do not exceed $5,000, the Litigation Trust may donate such funds to a charitable organization rather than transfer such funds to the Reorganized Debtor..

7.      **Vesting of Assets; Release of Liens**

As of the Effective Date, the property of the Debtor's Estate (including, for the avoidance of doubt, all of the Debtor's intellectual property) and excluding the Litigation Trust Assets, together with any property of the Debtor that is not property of its Estate and that is not specifically disposed of pursuant to the Plan, will vest in the Reorganized Debtor on the Effective Date.  Thereafter, subject to the terms of the Plan and Confirmation Order, the Reorganized Debtor may operate it business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules and the Court.  As of the Effective Date, all property of the Reorganized Debtor will be free and clear of all Claims and Interests, except as specifically provided in the Plan or the Confirmation Order and in connection with the DIP Facility and Exit Facility for which all liens and security interest granted to CH 105 will remain in full force and effect.  Without limiting the generality of the foregoing, the Reorganized Debtor may, without application to or approval by the Court, pay fees that it incurs after the Effective Date for reasonable professional fees and expenses.

8.      **Accounts and Reserves**

a.      **Professional Fee Reserve**

On or before the Effective Date, the Debtor will fund the Professional Fee Reserve by transferring Cash in the Amount of the Professional Fee Estimate to Cole Schotz P.C., which will hold such Cash in escrow for the benefit of Holders of Allowed Professional Fee Claims.  Cole Schotz P.C. will, subject to the terms and conditions of the Plan, the Confirmation Order and any other orders entered by the Court, pay each Allowed Professional Fee Claim as soon as reasonably practicable after all Professional Fee Claims are Allowed or Disallowed by Final Order.  After all Professional Fee Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by Cole Schotz P.C., any remaining Cash in the Professional Fee Reserve will be transferred to the Reorganized Debtor to be used to repay amounts outstanding under the Exit Facility or, if no such amounts are owing, for general business purposes.

The Professionals employed by the Debtor and the Committee will be entitled to reasonable compensation and reimbursement of actual, necessary expenses in connection with

41

the preparation, filing and prosecution of Final Fee Applications, from the Professional Fee Reserve. Any time or expenses incurred in the preparation, filing and prosecution of Final Fee Applications will be disclosed by each Professional in its Final Fee Application and will be subject to approval of the Court. For the avoidance of doubt, the Reorganized Debtor and the Litigation Trustee will not be subject to liability for fees and expenses incurred for litigation regarding Professional Fee Claims.

### b.    Administrative Claims Reserve

On or before the Effective Date, the Debtor will fund the Administrative Claims Reserve by transferring Cash in the amount of the Administrative and Priority Claims Estimate to a segregated account. The Cash so transferred will not be used for any purpose other than to pay Allowed Administrative Claims (except Professional Fee Claims, which will be paid from the Professional Fee Reserve) and Allowed Priority Claims. The Reorganized Debtor (i) will segregate and will not commingle the Cash held in the Administrative Claims Reserve and (ii) subject to the terms and conditions of the Plan and the Confirmation Order, will pay each Administrative Claim (except Professional Fee Claims, which will be paid from the Professional Fee Reserve) and Priority Claim on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim. After all Administrative Claims (except Professional Fee Claims) and Priority Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Reorganized Debtor, any remaining Cash in the Administrative Claims Reserve will be used by the Reorganized Debtor to repay amounts outstanding under the Exit Facility or, if no such amounts are owing, for general business purposes.

### c.    Other Reserves

The Litigation Trust will be permitted to establish and administer any other necessary reserves that may be required under the Plan or Litigation Trust Agreement, including the Disputed Claims Reserve.

### 9.    Contract Sales Organization Business

After the Effective Date, the Debtor will continue to operate its contract sales organization business (the "CSO Business") and provide CSO services to Assertio. The CSO Business will be operated as a separate profit and loss business from the Dermatology Products business. The Business Funding provided by CH 105 will not be used to support the CSO Business, and the sales representatives hired to support the Dermatology Products business will not be used to support the CSO Business.

The Reorganized Debtor may (i) terminate the CSO Business; (ii) transfer the CSO Business to an affiliate after the Effective Date; and (iii) make profit distributions from the CSO Business after the Effective Date; provided, however, that any consideration from such a termination or transfer of the CSO business or profit generated from the CSO business will be used (i) first, to fund the Minimum Working Capital Reserve, and (ii) second, to repay amounts outstanding under the Exit Facility or, if no such amounts are owing, for general business purposes.

On July 2, 2019, Assertio provided notice that it was terminating the agreement between the parties in accordance with its terms.  On July 3, 2019, the Debtor filed a motion [Docket No. 353] to amend its agreement with Assertio pursuant to which, among other things, the agreement between the parties will be deemed terminated as of December 31, 2019.  After the Assertio contract has terminated, the Debtor does not intend to continue its CSO Business.

## 10.    Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents without the payment of any such tax or governmental assessment.

## 11.    Applicability of Section 1145 of the Bankruptcy Code

Under section 1145 of the Bankruptcy Code, the issuance of the Litigation Trust Interests under the Plan will be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities.  If the Litigation Trustee determines, with the advice of counsel, that the Litigation Trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Litigation Trustee will take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission.

## 12.    Preservation of Causes of Action

Except as otherwise provided in the Plan or the Confirmation Order, in accordance with section 1123(b) of the Bankruptcy Code, the Litigation Trust will retain and may enforce all rights to commence and pursue, as appropriate, the Causes of Action and the Member Actions, and the Litigation Trust's rights to commence, prosecute or settle such claims and causes of action will be preserved notwithstanding the occurrence of the Effective Date.  The Litigation Trust may pursue such claims and causes of action, as appropriate, in accordance with the best interests of the Litigation Trust beneficiaries.  No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Litigation Trust will not pursue any and all available claims and causes of action against them.  The Litigation Trust expressly reserves all rights to prosecute any and all claims and causes of action against any Entity, except as otherwise expressly provided in the Plan.  Unless any claims and causes of action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Court order, such claims and causes of action shall be preserved by the Debtor's Estate and not relinquished by or through the Confirmation or Consummation of the Plan or any other action undertaken therewith, and the Litigation Trust shall expressly reserve all Causes of Action and Member Actions for later adjudication.  No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppels (judicial, equitable or otherwise) or laches,

43

will apply to such Causes of Action and Member Actions upon, after or as a consequence of the Confirmation or Consummation.

To date, the Debtor has identified certain Causes of Action that will be transferred to the Litigation Trust.  The retention and preservation of known and unknown Causes of Action and Member Actions is an integral part of the Plan.

To date, the Debtors have identified the following potential Causes of Action:

1.      All claims and Causes of Action of the Debtor arising before the Effective Date (regardless of whether arising before or after the Petition Date) against any persons or entities, including but not limited to (a) claims and Causes of Action for breach of contract, negligence, professional negligence, breach of fiduciary duty or other duties, or fraud, against the Debtor's current and former members, managers, officers, accountants and/or auditors prior to the Petition Date; and (b) claims and Causes of Action against insurance companies and brokers arising in connection with directors and officers, fidelity, general liability, property, workers compensation and any other insurance coverages and policies, including but not limited to claims under the insurance coverages and policies, and claims and causes of action for breach of contract, fraud, negligent misrepresentation, professional negligence, and breach of the duty of good faith and fair dealing.

2.      Claims and Causes of Action, including but not limited to those based on avoidance actions and powers, against any and all parties listed on the Debtor's Schedules (including any amendments thereto) as receiving payments from the Debtor in the 90-day or the one-year period preceding the Petition Date.

3.      Claims and causes of action against Eversana (as successor in interest to Triplefin, LLC), Medical Products Laboratories, Inc., Mesora, Primus, ConnectiveRx, Pyramid Management, LLC and Seton.  The Debtor's Claims and Causes of Action against Eversana (as successor in interest to Triplefin, LLC) and ConnectiveRx arise on account of the preferential payments that the Debtor alleges such parties received prior to the filing of the Chapter 11 Case. The Debtor's Claims and Causes of Action against Seton, Medical Products Laboratories, Inc, Mesora and Pyramid Management, LLC relate to the introduction of unauthorized competing generic products by Seton and Mesora, as descried above.

4.      The Litigation Trust and the Litigation Trustee expressly reserve all rights, defenses and counterclaims against any person or entity that has asserted or could assert a claim against the Debtor.

## D.      Provisions Governing Distributions

### 1.      Distributions on Allowed Claims

Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date or become Allowed Claims thereafter will be made by the Disbursing Agent pursuant to the terms and conditions of the Plan and the Litigation Trust Agreement. Notwithstanding any other provision of the Plan to the contrary, no Distribution will be made on account of any Allowed Claim or portion thereof that (i) has been satisfied after the Petition

Date; (ii) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a Proof of Claim has not been timely Filed; or (iii) is evidenced by a Proof of Claim that has been amended by a subsequently Filed Proof of Claim.

## 2.    Disbursing Agent

The Disbursing Agent will make all Distributions required under the Plan, subject to the terms and provisions of the Plan and the Litigation Trust Agreement.  If the Disbursing Agent is an independent third party designated to serve in such capacity, such Disbursing Agent will receive, without further Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses.  No Disbursing Agent will be required to give any bond or surety or other security for the performance of its duties.  The Disbursing Agent will be authorized and directed to rely upon the Debtor's Books and Records in determining Allowed Claims entitled to Distributions under the Plan in accordance with the terms and conditions of the Plan.

## 3.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

### a.    Delivery of Distributions in General

Distributions to Holders of Allowed Claims will be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Debtor or Reorganized Debtor has been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, after sufficient evidence of such addresses as may be requested by the Disbursing Agent is provided, (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address, (d) at the addresses set forth in the other records of the Debtor or the Disbursing Agent at the time of the Distribution or (e) in the case of the Holder of a Claim that is governed by an agreement and is administered by an agent or servicer, at the addresses contained in the official records of such agent or servicer.

In making Distributions under the Plan, the Disbursing Agent may rely upon the accuracy of the Claims register maintained by the Claims Agent in the Chapter 11 Case, as modified by any Final Order of the Court disallowing Claims in whole or in part.

### b.    Undeliverable and Unclaimed Distributions

If the Distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or is otherwise unclaimed, no further Distributions will be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address and such Holder provides sufficient evidence of such address as may be requested by the Disbursing Agent, at which time all missed Distributions will be made to such Holder without interest, subject to the time limitations set forth below.  Amounts in respect of undeliverable Distributions made by the Disbursing Agent will be returned to the Disbursing Agent until such Distributions are claimed.  The Disbursing Agent will segregate and, with respect to Cash, deposit in a segregated account designated as an unclaimed Distribution reserve undeliverable

and unclaimed Distributions for the benefit of all such similarly-situated Persons or Entities until such time as a Distribution becomes deliverable or is claimed, subject to the time limitations set forth below.

Any Holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable or unclaimed Distribution within three (3) months after the date such Distribution was returned as undeliverable will be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and will be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution against the Debtor or its Estate, the Reorganized Debtor, the Litigation Trustee, the Litigation Trust, or their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its or their property.  In the case of undeliverable or unclaimed Distributions on account of Administrative Claims, Priority Tax Claims or Priority Non-Tax Claims, any Cash otherwise reserved for undeliverable or unclaimed Distributions will revert to the Reorganized Debtor to be used for general business purposes.  In the case of undeliverable or unclaimed Distributions on account of Litigation Trust Interests, any Cash otherwise reserved for undeliverable or unclaimed Distributions will revert to the Litigation Trust, and all title to and all beneficial interests in the Litigation Trust Assets represented by any such undeliverable Distributions will revert to and/or remain in the Litigation Trust and will be distributed in accordance with Article IV of the Litigation Trust Agreement and the Plan.  The reversion of such Cash to the Reorganized Debtor or the Litigation Trust, as applicable, will be free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and will be treated in accordance with the terms of the Plan and the Litigation Trust Agreement.  Nothing contained in the Plan or the Litigation Trust Agreement will require the Debtor, the Reorganized Debtor, the Litigation Trust, the Litigation Trustee or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

**4.      Means of Cash Payment**

Cash payments made pursuant to the Plan will be in U.S. dollars and will be made at the option and in the sole discretion of the Disbursing Agent by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Disbursing Agent.  In the case of foreign creditors, Cash payments may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular jurisdiction.

**5.      Interest on Claims**

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable law, postpetition interest will not accrue or be paid on any Claims or Litigation Trust Interests, and no Claimholder or Holder of Litigation Trust Interests will be entitled to interest accruing on or after the Petition Date on any Claim.  Interest will not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.  For the avoidance of doubt, this limitation on postpetition interest shall not apply to the DIP Facility or the Exit Facility.

### 6.    Withholding and Reporting Requirements

In accordance with section 346 of the Bankruptcy Code and in connection with the Plan and all Distributions under the Plan, the Disbursing Agent will, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local or foreign taxing authority.  The Disbursing Agent will be authorized to take any and all actions necessary and appropriate to comply with such requirements.

All Distributions under the Plan will be subject to withholding and reporting requirements.  As a condition of making any Distribution under the Plan, each Entity holding an Allowed Claim is required to provide any information necessary in writing, including returning W-9 statements, to effect the necessary information reporting and withholding of applicable taxes with respect to Distributions to be made under the Plan as the Disbursing Agent may request.  The Disbursing Agent will be entitled in its sole discretion to withhold any Distributions to a Holder of an Allowed Claim who fails to provide tax identification or social security information within the timeframe requested in writing by the Disbursing Agent to such Holder of an Allowed Claim, which timeframe will not be less than thirty (30) days.  The Distribution to any Holder of an Allowed Claim that fails to timely respond to the Disbursing Agent will be treated as an undeliverable or unclaimed Distribution pursuant to Article VI.C.2 of the Plan.

Notwithstanding any other provision of the Plan, each Person and Entity receiving a Distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such Distribution.

### 7.    Procedure for Treating and Resolving Disputed, Contingent and/or Unliquidated Claims

#### a.    Objection Deadline; Prosecution of Objections

Except as set forth in the Plan with respect to Professional Fee Claims and Administrative Claims, all objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline, as the same may be extended by the Court.  If (a) an objection has not been Filed to a Proof of Claim, or (b) the Schedules have not been amended with respect to a Claim (i) for which no timely Proof of Claim was filed and (ii) that was Scheduled by the Debtor but was not Scheduled as contingent, unliquidated and/or disputed, by the Claims Objection Deadline, as the same may be extended by order of the Court, the Claim to which the Proof of Claim or Scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been Allowed earlier.  Notice of any motion for an order extending the Claims Objection Deadline will be given only to those Persons or Entities that have requested notice in the Chapter 11 Case in accordance with Bankruptcy Rule 2002.

On and after the Effective Date, the Litigation Trust with respect to General Unsecured Claims and the Reorganized Debtor with respect to all other Claims will have the authority to: (1) File, withdraw or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Court; and (3) administer and adjust the Claims register to reflect any such

settlements or compromises without any further notice to or action, order or approval by the Court; provided, however, that the objection to and settlement of Professional Fee Claims will not be subject to Article VI.G of the Plan, but rather will be governed by Article IX.A of the Plan.

### b.    No Distributions Pending Allowance

Notwithstanding any other provision of the Plan or the Litigation Trust Agreement, no payments or Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

### c.    Disputed Claims Reserve

On the Distribution Date and on each subsequent Periodic Distribution Date, the Litigation Trust will withhold on a Pro Rata basis from property that would otherwise be distributed to Holders of General Unsecured Claims entitled to Distributions under the Plan on such date, in a separate Disputed Claims Reserve, such amounts or property as may be necessary to equal one hundred percent (100%) of Distributions to which Holders of such Disputed General Unsecured Claims would be entitled under the Plan if such Disputed Claims were allowed in their Disputed Claim Amount.  The Litigation Trust may request, if necessary, estimation for any Disputed General Unsecured Claim that is contingent or unliquidated, or for which the Litigation Trust determines to reserve less than the Face Amount.  If the Litigation Trust elects not to request such an estimation from the Court with respect to a Disputed General Unsecured Claim that is contingent or unliquidated, the Litigation Trust will withhold the applicable Disputed Claims Reserve based upon the good faith estimate of the amount of such General Unsecured Claim by the Litigation Trust.  If practicable, the Litigation Trust will invest any Cash that is withheld as the Disputed Claims Reserve in an appropriate manner to ensure the safety of the investment, in accordance with the Litigation Trust Agreement.  Nothing in the Plan, the Disclosure Statement or the Litigation Trust Agreement will be deemed to entitle the Holder of a Disputed General Unsecured Claim to postpetition interest on such Claim, however.

### d.    Distributions After Allowance

Payments and Distributions to Holders of Disputed Claims that ultimately become Allowed Claims will be made in accordance with provisions of the Litigation Trust Agreement that govern Distributions to Holders of Allowed General Unsecured Claims (Article IV of the Litigation Trust Agreement).

### e.    De Minimis Distributions

The Litigation Trust will not be required to make any Distributions to Holders of Allowed Claims aggregating less than twenty-five dollars ($50.00).  Cash that otherwise would be payable under the Plan to Holders of Litigation Trust Interests but for Article VI.G.5 of the Plan will remain Litigation Trust Assets to be used in accordance with the Litigation Trust Agreement.

### f.    Fractional Dollars

Any other provision of the Plan notwithstanding, the Disbursing Agent will not be required to make Distributions or payments of fractions of dollars.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

### g.    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution will, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

### h.    Distribution Record Date

The Disbursing Agent will have no obligation to recognize the transfer or sale of any participation in any Allowed Claim that occurs after the close of business on the Distribution Record Date.  Instead, the Disbursing Agent will be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims register or the Debtor's Books and Records, as applicable, as of the close of business on the Distribution Record Date.

## E.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Assumption of Contracts and Leases

As of the Effective Date, the Debtor will be deemed to have assumed each Executory Contract and Unexpired Lease identified on the Assumption Schedule and/or identified in Article VII of the Plan as an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan. The Confirmation Order will constitute an order of the Court approving the assumptions described in Article VII.A of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

"Assumption Schedule" means the schedule listing Executory Contracts and Unexpired Leases to be assumed by the Debtor pursuant to the Plan and the proposed cure amounts, if any, related thereto, which schedule is attached to the Plan as Exhibit B.

### a.    Establishment and Payment of Cure Amounts

The proposed Cure Amount for an Executory Contract or Unexpired Lease that is assumed pursuant to the Plan will be zero dollars unless otherwise indicated in the Assumption Schedule.  Cure obligations, if any, will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash within thirty (30) days after the Effective Date or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.  In the event of a dispute regarding (a) the amount of any Cure

Amount, (b) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (c) any other matter pertaining to assumption, any Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made thirty (30) days following entry of a Final Order resolving the dispute and approving the assumption; provided, however, that following the resolution of any such dispute, the Debtor or Reorganized Debtor, as applicable, will have the right to reject such Executory Contract or Unexpired Lease.

### b.    Confidentiality Obligations Owed to Debtor

Any confidentiality agreement entered into between the Debtor and any other party requiring such party to maintain the confidentiality of the Debtor's proprietary information will be deemed to be, and will be treated as though it is, an Executory Contract that is assumed pursuant to section 365 of the Bankruptcy Code under the Plan.  For the avoidance of doubt, the Reorganized Debtor will not have to pay any cure amounts or have any other obligations to effect the assumption thereof.

### c.    Treatment of Insurance Policies

The Debtor will assume under the Plan any and all insurance policies maintained by the Debtor that have not expired or terminated pursuant to their own terms on or before the Effective Date, including but not limited to policies issued by Allied World National Assurance Company, Arch Insurance Company, Berkley Insurance Company, Chubb Indemnity Insurance Company, Landmark American Insurance Company, Navigators Insurance Company, QBE Insurance Corporation, Syndicate 2623/623 at Lloyd's, or their respective affiliates providing directors and officers insurance coverage, crime liability insurance coverage, fiduciary liability insurance coverage, employment practices liability insurance coverage, products liability insurance coverage, business personal property insurance coverage, commercial general liability insurance coverage, employee benefits liability insurance coverage, commercial automobile insurance coverage, worker's compensation insurance coverage, cyber attack insurance coverage and other customary insurance coverages.  For the avoidance of doubt, the Reorganized Debtor will not have to pay any cure amounts or have any other obligations to effect the assumption thereof.

### d.    Assumption and Treatment of Particular Contracts and Leases

### (i)    42 North Agreements

The Confirmation Order will constitute an order of the Court approving the assumption of the 42 North Agreements  pursuant to section 365 of the Bankruptcy Code, as of the Effective Date; provided, however, that any amounts that otherwise would be required to be paid upon the assumption of the 42 North Agreements pursuant to section 365(b)(1) of the Bankruptcy Code will be treated as a General Unsecured Claim under the Plan in an amount not to exceed the amount of the 42 North Claim, but will be subordinated to all General Unsecured Claims that are not asserted by affiliates or insiders of the Debtor.

### (ii)    ABDC Agreements

The Confirmation Order will constitute an order of the Court approving the assumption of the ABDC Agreements pursuant to section 365 of the Bankruptcy Code, as of the Effective Date; provided, however, that (a) the Cure amounts required to be paid by the Reorganized Debtor upon assumption of the ABDC Agreements will be limited to the amount set forth on the Assumption Schedule; (b) any additional amounts that otherwise would be required to be paid upon the assumption of the ABDC Agreements pursuant to section 365(b)(1) of the Bankruptcy Code will be treated as a General Unsecured Claim under the Plan in an amount not to exceed the amount of the ABDC Claim; and (c) ABDC will cancel any pending deductions on account of (i) Short-Dated Inventory or expired Dermatology Products inventory that is exchanged by the Debtor pursuant to the terms of the Plan Support Agreement and (ii) distribution agreement fees, prompt pay fees or any other fee for which it has filed a Proof of Claim against the Debtor.

### (iii)    Biopharma Agreement

The Confirmation Order will constitute an order of the Court approving the assumption of the Biopharma Agreement pursuant to section 365 of the Bankruptcy Code, as of the Effective Date; provided, however, that (a) the Cure amount required to be paid by the Reorganized Debtor upon assumption of the Biopharma Agreement will be limited to the amount set forth on the Assumption Schedule; (b) any additional amounts that otherwise would be required to be paid upon the assumption of the Biopharma Agreement pursuant to section 365(b)(1) of the Bankruptcy Code will be treated as a General Unsecured Claim under the Plan in the amount set forth on the Assumption Schedule.

### (iv)    McKesson Agreements

The Confirmation Order will constitute an order of the Court (i) approving the assumption of the McKesson Agreements pursuant to section 365 of the Bankruptcy Code, as of the Effective Date, and (ii) terminating the McKesson Stipulation; provided, however, that (a) the Cure amounts required to be paid by the Reorganized Debtor upon assumption of the McKesson Agreements will be limited to the amounts set forth on the Assumption Schedule; (b) any additional amounts that otherwise would be required to be paid upon the assumption of the McKesson Agreements pursuant to section 365(b)(1) of the Bankruptcy Code will be treated as a General Unsecured Claim under the Plan in an amount not to exceed the amount of the McKesson Claim; and (c) McKesson will cancel any pending deductions on account of (i) Short-Dated Inventory or expired Dermatology Products inventory that is exchanged by the Debtor pursuant to the terms of the Plan Support Agreement and (ii) distribution agreement fees, prompt pay fees or any other fee for which it has filed a Proof of Claim against the Debtor.

### (v)    Novos Agreement

The Confirmation Order will constitute an order of the Court approving the assumption of the Novos Agreement  pursuant to section 365 of the Bankruptcy Code, as of the Effective Date; provided, however, that any amount that otherwise would be required to be paid upon the assumption of the Novos Agreement pursuant to section 365(b)(1) of the Bankruptcy Code will be treated as a General Unsecured Claim under the Plan in an amount not to exceed the amount

of the Novos Net Claim, but will be subordinated to all General Unsecured Claims that are not asserted by affiliates or insiders of the Debtor.  For the avoidance of doubt, confirmation of the Plan will constitute approval by the Bankruptcy Court of the setoff of the claims of the Debtor against Novos under section 553(a) of the Bankruptcy Code as reflected in the amount of the Novos Net Claim.

### (vi)    Sonexus Agreements

The Confirmation Order will constitute an order of the Court approving the assumption of the Sonexus Agreements pursuant to section 365 of the Bankruptcy Code, as of the Effective Date; provided, however, that any amounts that otherwise would be required to be paid upon the assumption of the Sonexus Agreements pursuant to section 365(b)(1) of the Bankruptcy Code will be treated as a General Unsecured Claim under the Plan in an amount not to exceed the amount of the Sonexus Claim.

### 2.    Rejection of Contracts and Leases

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases to which the Debtor is a party will be deemed automatically rejected by the Debtor as of the Effective Date, unless such contract or lease (i) previously has been assumed or rejected by the Debtor, (ii) expired or terminated pursuant to its own terms, (iii) is the subject of a motion to assume or reject pending before the Court as of the Confirmation Date or (iv) is identified on the Assumption Schedule or in Article VII.A of the Plan as a contract to be assumed; provided, however, that nothing contained in the Plan will constitute an admission by the Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that the Debtor or its successors and assigns has any liability thereunder; and, provided further, that the Debtor reserves its right, at any time before the Confirmation Date, to assume any Executory Contract or Unexpired Lease that was not already rejected prior to the Confirmation Date.  The Confirmation Order will constitute an order of the Court approving the rejections described in Article VII.B of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

### a.    Rejection Damages Bar Date

If the rejection of an Executory Contract or Unexpired Lease pursuant to Article VII.B of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the Debtor or its Estate, the Litigation Trust or their respective successors or properties unless a Proof of Claim is Filed with the Claims Agent and served on counsel for the Reorganized Debtor within thirty (30) days after service of notice of entry of the Confirmation Order.

### b.    Rejection of Mirada Agreement

The Confirmation Order will constitute an order of the Court (i) approving the rejection of the Mirada Agreement pursuant to section 365 of the Bankruptcy Code, as of the Effective Date, and (ii) reducing and allowing the Mirada Claim as a General Unsecured Claim in the amount of $1,750,000.

### 3. Indemnification Obligations

Subject to the last sentence of Article VII.C of the Plan, any obligations of the Debtor pursuant to its organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse or limit the liability of any Person pursuant to the Debtor's organizational documents, policy of providing employee indemnification, applicable state law or specific agreement in respect of any claims, demands, suits, causes of action or proceedings against such Persons based upon any act or omission related to such Persons' service with, for or on behalf of the Debtor prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtor will survive Confirmation of the Plan and except as set forth in the Plan, remain unaffected thereby, and will not be discharged, irrespective of whether such defense, indemnification, reimbursement or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; provided, however, that all obligations under Article VII.C of the Plan will be limited solely to available insurance coverage and neither the Reorganized Debtor, the Litigation Trust, the Litigation Trustee nor any of their assets will be liable for any such obligations, and the Holders of any such Claims will not be entitled to any Distribution from the Litigation Trust on account of any such Claim. Any Claim based on the Debtor's obligations set forth in Article VII.C of the Plan will not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code. This provision for indemnification, reimbursement and limitation of liability will not apply to or cover any Claims, suits or actions against a Person that result in a Final Order determining that such covered Person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

### F. Conditions Precedent to Consummation of the Plan

### 1. Conditions to Confirmation

The following are conditions precedent to confirmation of the Plan, each of which must be satisfied or waived in accordance with Article VIII.C of the Plan:

a) The Confirmation Order is in form and substance reasonably acceptable to the Debtor, the Committee and CH 105 and will, among other things:

    i. provide that the Debtor is authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the agreements or documents created under or in connection with the Plan; and

    ii. provide that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order will be immediately effective, subject to the terms and conditions of the Plan; and

b) the Confirmation Order will have been entered by the Court.

## 2.    Conditions to Occurrence of the Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Article VIII.C of the Plan:

a)    the Confirmation Order will not then be stayed, vacated or reversed and will not have been amended without the agreement of the Debtor, the Committee and CH 105;

b)    the Confirmation Order will not then be subject to a pending appeal, and the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending;

c)    the Litigation Trust will have been established and the Litigation Trust Assets will have been transferred to and vested in the Litigation Trust free and clear of all Claims and Liens, except as may be provided in the Plan and the Litigation Trust Agreement;

d)    the Professional Fee Reserve and the Administrative Claims Reserve will have been funded in Cash in full;

e)    the Litigation Trustee and the Litigation Trust Committee will have been appointed and assumed their rights and responsibilities under the Plan and the Litigation Trust Agreement, as applicable; and

f)    all actions, documents and agreements (including, but not limited to, the Plan, Disclosure Statement, Plan Supplement, Litigation Trust Agreement and Exit Facility documents) necessary to implement the provisions of the Plan to be effectuated on or prior to the Effective Date will be reasonably satisfactory to the Debtor, the Committee and CH 105, and such actions, documents and agreements will have been effected or executed and delivered.  The Litigation Trust Agreement will be completed and in final form and, as applicable, executed by the parties thereto and all conditions precedent contained in any of the foregoing will have been satisfied or waived.

## 3.    Waiver of Conditions

Each of the conditions to Confirmation and the Effective Date set forth in Articles VIII.A and VIII.B of the Plan, respectively, may be waived in whole or in part by the Debtor without any other notice to parties in interest or the Court, provided that the Debtor has received the prior written consent of the Committee and CH 105, which consent will not unreasonably be withheld. The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of any party to exercise any of its foregoing rights will not be deemed a waiver of any of its other rights, and each such right will be deemed an ongoing right that may be asserted thereby at any time.

4.      **Consequences of Non-Occurrence of Effective Date**

If the Effective Date does not occur within ninety (90) days following the Confirmation Date, or by such later date after notice and hearing, as is proposed by the Debtor, then upon motion by the Debtor and upon notice to such parties in interest as the Court may direct, (a) the Plan will be null and void in all respects; (b) any settlement of Claims will be null and void without further order of the Court; and (c) the time within which the Debtor may assume and assign or reject all Executory Contracts will be extended for a period of thirty (30) days after such motion is granted.

G.      **Allowance and Payment of Certain Administrative Claims**

1.      **Professional Fee Claims**

a.      **Final Fee Applications**

All final requests for payment of Professional Fee Claims (the "Final Fee Applications") must be Filed no later than thirty (30) days after the Effective Date, and served upon the Office of the U.S. Trustee, counsel to the Reorganized Debtor and counsel to the Litigation Trustee (collectively, the "Fee Application Objection Parties").  Objections, if any, to Final Fee Applications of such Professionals must be Filed and served on the requesting Professional and the Fee Application Objection Parties no later than twenty (20) days from the date on which each such Final Fee Application is served and Filed.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court, the Allowed amounts of such Professional Fee Claims will be determined by the Court.  The Prepetition Secured Lender's attorney's fees and expenses will not be subject to any application to the Court.

b.      **Employment of Professionals after the Effective Date**

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code or any order previously entered by the Court in seeking retention or compensation for services rendered or expenses incurred after such date will terminate.

2.      **Substantial Contribution Compensation and Expenses Bar Date**

Any Person or Entity that wishes to make a Substantial Contribution Claim based on facts or circumstances arising after the Petition Date must File an application with the Clerk of the Court, on or before the Administrative Claims Bar Date, and serve such application on the Fee Application Objection Parties and as otherwise required by the Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement.  Objections, if any, to the Substantial Contribution Claim must be Filed no later than the Administrative Claims Objection Deadline, unless otherwise extended by Order of the Court.

3.      **Other Administrative Claims**

All other requests for payment of an Administrative Claim arising after the Petition Date, other than 503(b)(9) Claims, Professional Fee Claims, fees and expenses subject to 28 U.S.C.

§ 1930 and claims of governmental entities subject to section 503(b)(1)(B) of the Bankruptcy Code, must be Filed with the Court and served on the Fee Application Objection Parties no later than the Administrative Claims Bar Date.  Unless the Reorganized Debtor, the Litigation Trust or any other party in interest objects to an Administrative Claim by the Administrative Claims Objection Deadline, such Administrative Claim will be deemed Allowed in the amount requested.  In the event that the Reorganized Debtor, the Litigation Trust or any other party in interest objects to an Administrative Claim, the Court will determine the Allowed amount of such Administrative Claim.

## H.    Effects of Confirmation

### 1.    Compromise and Settlement of Claims and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, Distributions, releases and other benefits provided pursuant to the Plan, on the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims, Interests and controversies of the PSA parties resolved pursuant to the Plan or relating to the contractual, legal and subordination rights that such parties have with respect to any Claim or Interest, or any Distribution to be made on account of such Claim or Interest.  The entry of the Confirmation Order will constitute the Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtor, its Estate and Holders of Claims and Interests and is fair, equitable and reasonable.

### 2.    Binding Effect

The Plan will be binding upon and inure to the benefit of the Debtor, all present and former Holders of Claims and Interests, whether or not such Holders will receive or retain any property or interest in property under the Plan, and their respective successors and assigns, including, but not limited to, the Litigation Trust and the Reorganized Debtor and all other parties in interest in the Chapter 11 Case.

### 3.    Discharge of the Debtor

Except as provided in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for, and in complete satisfaction, discharge and release of all Claims and termination of all Other Interests, regardless of whether any property will have been distributed or retained pursuant to the Plan on account of or in exchange for such Claims and Interests.  Except as provided in the Plan or the Confirmation Order, Confirmation will (a) discharge the Debtor from all Claims and other debts that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (iii) the Holder of a Claim based on such debt has accepted the Plan; and (b) terminate all Other Interests.

As of the Confirmation date, except as provided in the Plan or the Confirmation Order, all Persons and Entities will be precluded from asserting against the Debtor, the Reorganized

Debtor, the Litigation Trust, the Litigation Trustee, their successors or their assets and property, any other or further claims, debts, rights, causes of action, liabilities or equity interests based upon any act, omission, transaction or other activity of any nature that occurred prior to the Confirmation Date.  In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor and termination of Other Interests in the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

### 4.    Releases and Exculpation

#### a.    Releases by the Debtor

*As of the Effective Date, the Debtor, whether pursuing an action derivatively or otherwise, will be deemed to forever release, waive and discharge all liabilities, claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, right to equitable remedies, rights to payment, or Claims whatsoever (other than for fraud, willful misconduct or gross negligence) in connection with or related to the Debtor, the Chapter 11 Case or the Plan (other than the rights of the Debtor, the Reorganized Debtor and the Litigation Trust to enforce the Plan and the contracts, instruments, releases and other agreements embodied in the Plan and all other documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Confirmation Date, against (a) the Debtor's Professionals and Court-retained agents and the Debtor's members, managers, officers and employees employed by or serving the Debtor as of the Plan Filing Date, and (b) any of the successors or assigns of any of the parties identified in the foregoing clause (a); provided, however, that nothing in Article X.D.1 of the Plan will be a waiver of any defense, offset or objection to any Claim Filed against the Debtor and its Estate by any Person or Entity; provided, further, that the releases granted by the Debtor will not prevent any party from objecting to a Professional Fee Claim for any cause or reason.*

#### b.    Releases by the PSA Parties

*Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, the PSA Parties, and their successors and assigns, including the Litigation Trust, will be deemed to forever release, waive and discharge all liabilities, claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, right to equitable remedies, rights to payment, or Claims whatsoever in connection with or related to the Debtor, the Chapter 11 Case or the Plan (other than the rights of the PSA Parties and their successors and assigns to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise,*

*that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Confirmation Date, against the Debtor Release Parties.*

### c.      Releases by Certain Debtor Release Parties

*As of the Effective Date, the respective Debtor Release Parties will be deemed to withdraw their Indemnification Claims with prejudice; provided, however, that notwithstanding the withdrawal of such Proofs of Claim, the Debtor's obligation to indemnify, reimburse or limit the liability of any Debtor Release Party pursuant to the Debtor's organization documents or otherwise will be preserved and be treated solely in accordance with Article VII.C of the Plan. The Debtor Release Parties will not be deemed to withdraw their Subrogation Claims; provided, however, that such Claims may be asserted solely against the Reorganized Debtor, and may not be asserted until after the Repayment Date.*

*For the avoidance of doubt, except with respect to the 42 North Claim and the Novos Net Claim, both of which will be subordinated to all General Unsecured Claims that are not asserted by affiliates or insiders of the Debtor pursuant to Article VII.A.4 of the Plan, the Debtor Release Parties will not be entitled to nor shall they receive Litigation Trust Interests or Distributions from the Litigation Trust on account of their Claims against the Debtor, if any.*

### d.      Releases by Holders of Claims and Interests

*As of the Effective Date, to the maximum extent permitted by applicable law and to the extent a Releasing Party did not "opt out", each of the Releasing Parties, solely in its capacity as such, will be deemed to forever release, waive and discharge all liabilities, claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, right to equitable remedies, rights to payment, or Claims whatsoever in connection with or related to the Debtor, the Chapter 11 Case or the Plan (other than the rights of the Holders of Claims and Interests to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Confirmation Date, against the Debtor Release Parties.*

### e.      Mutual Releases by Debtor and Cardinal

*As of the Effective Date, the Debtor, whether pursuing an action derivatively or otherwise, will be deemed to forever release, waive and discharge all liabilities, claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, right to equitable remedies, rights to payment, or Claims whatsoever in connection with or related to the Debtor, the Chapter 11 Case or the Plan (other than the rights of the Debtor and the Reorganized Debtor to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place*

*on or prior to the Confirmation Date, against Cardinal and any of its successors or assigns; provided, however, that nothing in this paragraph will be a waiver of any defense, offset or objection to any Claim Filed against the Debtor and its Estate by any Person or Entity.*

*As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, Cardinal will be deemed to forever release, waive and discharge the Cardinal Claims and all other liabilities, claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, right to equitable remedies, rights to payment, or Claims whatsoever in connection with or related to the Debtor, the Chapter 11 Case or the Plan (other than the rights of Cardinal to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Confirmation Date, against the Debtor and any of its successors or assigns.*

**f.**      ***Exculpation and Limitation of Liability***

*Except as otherwise specifically provided in the Plan or the Confirmation Order, none of (a) the Debtor, (b) the members, managers, officers and employees of the Debtor serving at any time during the pendency of the Chapter 11 Case, (c) the Professionals or Court-retained agents of the Debtor, (d) the Committee and its Professionals and, solely in their respective capacities as members or representatives of the Committee, each member of the Committee, or (e) or any of the successors or assigns of any of the parties identified in the foregoing clauses (a) through (d), will have or incur, and each is, by the Plan, released and exculpated from, any liability, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively in law or equity to any Holder of a Claim or an Interest, or any other party in interest, or any of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders or affiliates, or any of their respective successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Case, the formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence or willful misconduct. For the avoidance of doubt, this exculpation only applies to any acts or omissions of the exculpated parties that occurred on and after the filing of the Chapter 11 Case.*

*Notwithstanding any other provision of the Plan, no Holder of a Claim or an Interest, no other party in interest, none of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders or affiliates, and none of their respective successors or assigns, will have any right of action against (a) the Debtor, (b) the members, managers, officers or employees of the Debtor serving at any time during the pendency of the Chapter 11 Case, (c) the Professionals or Court-retained agents of the Debtor, (d) the members and professionals of the Committee, but only in their capacities as such, or (e) any of the*

*successors or assigns of any of the parties identified in the foregoing clauses (a) through (d), for any act or omission in connection with, relating to or arising out of, the Chapter 11 Case, the formulation, negotiation or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence or willful misconduct. For the avoidance of doubt, this paragraph only applies to any acts or omissions of such protected parties that occurred on and after the filing of the Chapter 11 Case.*

### 5.    Injunction

*Except as otherwise specifically provided in the Plan or the Confirmation Order, as of the Confirmation Date, all Persons and Entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, the Litigation Trust or their property on account of any such discharged Claims, debts or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to the Debtor; and (v) acting or proceeding, in any manner or in any place, that does not conform to or comply with the provisions of the Plan.*

*As of the Effective Date, all Persons and Entities that have held, currently hold or may hold a claim, demand, debt, right, cause of action or liability that is released pursuant to Articles X.D.1, X.D.2, X.D.3, X.D.4 (except to the extent of any "opt out" by the Holder of a Class 5 General Unsecured Claim) and X.D.5 of the Plan are permanently enjoined from taking any of the following actions on account of any such released claims, demands, debts, rights, causes of action or liabilities: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to a released party; and (v) acting or proceeding, in any manner or in any place, that does not conform to or comply with the provisions of the Plan.*

## I.    Retention of Jurisdiction

### 1.    Retention of Jurisdiction by the Court

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order, substantial Consummation of the Plan and occurrence of the Effective Date, the Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case, the Plan, the Litigation Trust Agreement and the Litigation Trust to the fullest extent permitted by law, including, among other things, jurisdiction to:

a)      To the extent not otherwise determined by the Plan, to determine the allowance, classification or priority of Claims upon objection by any party in interest entitled to File an objection;

b)      To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person or Entity, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order or any other order of the Court, to issue such orders as may be necessary for the implementation, execution, performance and Consummation of the Plan and all matters referred to in the Plan, and to determine all matters that may be pending before the Court in the Chapter 11 Case on or before the Effective Date with respect to any Person or Entity;

c)      To determine any and all applications for allowance of Professional Fee Claims;

d)      To determine any Priority Tax Claims, Priority Non-Tax Claims or Administrative Claims entitled to priority under section 507(a) of the Bankruptcy Code;

e)      To resolve any dispute arising under or related to the implementation, execution, Consummation or interpretation of the Plan and the making of Distributions under the Plan;

f)      To determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or Unexpired Leases or determine any issues arising from the deemed assumption or rejection of Executory Contracts and Unexpired Leases set forth in Article VII of the Plan;

g)      To hear and determine or resolve any and all matters related to Causes of Action and the Member Actions;

h)      To hear and determine or resolve all suits or adversary proceedings to recover assets of the Debtor and property of its Estate, wherever located;

i)      Except as otherwise provided in the Plan, to determine all applications, motions, adversary proceedings, contested matters, actions and any other litigated matters instituted in and prior to the closing of the Chapter 11 Case, including any remands;

j)      To enter a Final Order closing the Chapter 11 Case;

k)      To modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out their intent and purposes;

l)   To issue such orders in aid of Consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person or Entity, to the full extent authorized by the Bankruptcy Code;

m)   To determine any tax liability pursuant to section 505 of the Bankruptcy Code;

n)   To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

o)   To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the applicable Bar Date, the hearing to consider approval of the Disclosure Statement or the Confirmation Hearing or for any other purpose;

p)   To enforce any order of the Court entered in the Chapter 11 Case, and to resolve any dispute or matter arising under or in connection therewith;

q)   To resolve any disputes concerning any release, injunction, exculpation or other waiver or protection provided in the Plan;

r)   To approve, if necessary, any Distributions, or objections thereto, under the Plan;

s)   To approve, as may be necessary or appropriate, any Claims settlement entered into or offset exercised by the Litigation Trust;

t)   To resolve any dispute or matter arising under or in connection with the Litigation Trust;

u)   To order the production of documents, disclosures or information, or the appearance for deposition demanded pursuant to Bankruptcy Rule 2004; and

v)   To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

## 2.   Failure of Court to Exercise Jurisdiction

If the Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Article XI.A of the Plan, the provisions of Article XI of the Plan will have no effect upon and will not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

58448/0001-17147920v10

### J.      Miscellaneous Provisions

#### 1.      Modifications and Amendments

Subject to the Plan Support Agreement, the Debtor may alter, amend or modify the Plan or any Exhibits or schedules thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date and prior to substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, subject to the Plan Support Agreement, the Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan; provided, however, that prior notice of such proceedings will be served in accordance with the Bankruptcy Rules or order of the Court.

#### 2.      Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void or unenforceable, then the Court, at the request of the Debtor, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted provided that such alteration or interpretation is consistent with the material terms of the Plan.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

#### 3.      Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of that Person or Entity.

#### 4.      Payment of Statutory Fees

All fees payable through the Effective Date pursuant to 28 U.S.C. § 1930 will be paid on or as soon as practicable after the Effective Date by the Reorganized Debtor.

After the Effective Date, quarterly fees will continue to accrue and be timely paid until the Debtor's case is closed, dismissed or converted.  Subject to the following paragraph, such fees will be allocated between the parties as follows: the Reorganized Debtor will fund the quarterly fees payable on account of the Reorganized Debtor's disbursements, and the Litigation Trust will fund any additional incremental fees payable on account of the Litigation Trust's disbursements; the Litigation Trust will timely transfer its portion of the quarterly fees to the

58448/0001-17147920v10

Reorganized Debtor when such fees become due.  In addition, and subject to the following paragraph, the Reorganized Debtor will File post-confirmation quarterly reports or any pre-confirmation monthly operating reports not Filed as of the Confirmation Hearing in conformance with the U.S. Trustee Guidelines.  The U.S. Trustee will not be required to File a request for payment of its quarterly fees, which will be deemed an Administrative Claim against the Debtor and its Estate.

If the Litigation Trust requests in writing that the Reorganized Debtor delay in the Filing of a motion to close the Chapter 11 Case, the Litigation Trust will fund any additional quarterly fees and the costs incurred by the Reorganized Debtor for the preparation and filing of any additional post-confirmation quarterly reports required solely as a consequence of the delayed closure of the Chapter 11 Case; the Litigation Trust will timely transfer such amounts to the Reorganized Debtor when such quarterly fees become due.

Notwithstanding the foregoing, the Reorganized Debtor will remain responsible for the payment of U.S. Trustee fees subject to 28 U.S.C. § 1930 until the earlier of the time the Chapter 11 Case is closed, dismissed or converted.

### 5.      Revocation, Withdrawal or Non-Consummation

The Debtor reserves the right, subject to the Plan Support Agreement, to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtor revokes or withdraws the Plan, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (3) nothing contained in the Plan or Disclosure Statement will: (a) constitute a waiver or release of any claims held by the Debtor, Claims, Interests or Causes of Action; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

### 6.      Plan Supplement(s)

Exhibits and schedules to the Plan not attached to the Plan will be Filed in one or more Plan Supplements by the Plan Supplement Filing Date.  Any Plan Supplement (and amendments thereto) Filed by the Debtor will be deemed an integral part of the Plan and will be incorporated by reference as if fully set forth in the Plan.  Substantially contemporaneously with their filing, the Plan Supplements may be viewed at the Debtor's case website (www.kccllc.net/ Novum) or the Court's website (www.deb.uscourts.gov).  Copies of case pleadings, including the Plan Supplements, also may be examined between the hours of 8:00 a.m. and 4:00 p.m., Monday through Friday, excluding federal holidays, at the Office of the Clerk of the Court, 824 N. Market St., 3rd Floor, Wilmington, Delaware 19801.  Finally, copies of case pleadings also may be obtained by written request to the Claims Agent, at novuminfo@kccllc.com.  The documents contained in any Plan Supplements will be approved by the Court pursuant to the Confirmation Order.

## ARTICLE V

## VOTING REQUIREMENTS;
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.    General

The Bankruptcy Code requires that, in order to confirm the Plan, the Court must make a series of findings concerning the Plan and the Debtor, including that (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan has been proposed in good faith and not by any means forbidden by law; (iv) the disclosure required by section 1125 of the Bankruptcy Code has been made; (v) the Plan has been accepted by the requisite votes of Holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code) and Interests; (vi) the Plan is feasible and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless such liquidation or reorganization is proposed in the Plan; (vii) the Plan is in the "best interests" of all Holders of Claims in an Impaired Class by providing to such Holders on account of their Claims property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holders would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim in such Class has accepted the Plan; and (viii) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### B.    Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is Impaired if the legal, equitable or contractual rights to which the Claims or Interests of that Class entitle the Holders of such Claims or Interests are modified, other than by curing defaults and reinstating the Claims or Interests.  Classes that are not Impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes that receive no Distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

### C.    Classes Impaired and Entitled to Vote under the Plan

Holders of Claims in Class 3, 4 and 5 are Impaired under the Plan and entitled to vote thereon.  Holders of Claims in Classes 6 and 7 and Interest Holders in Class 9 are deemed to reject the Plan and are not entitled to vote.  Holders of Claims in Classes 1 and 2 and Interest Holders in Class 8 are deemed to accept the Plan and are not entitled to vote.

58448/0001-17147920v10

### D.  Voting Procedures and Requirements

#### 1.  Ballots

The Solicitation Procedures Order sets July 17, 2019 as the record date for voting on the Plan (the "Record Date").  Accordingly, only Holders of record as of the Record Date that are otherwise entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

In voting for or against the Plan, please use only the Ballot sent to you with this Disclosure Statement.  If you are a Holder of a Claim in Class 3, 4 or 5 and did not receive a Ballot, your Ballot is damaged or lost or you have any questions concerning voting procedures, please contact the Voting Agent at (877) 725-7523 or at novuminfo@kccllc.com.

If you are a Holder of a Class 5 General Unsecured Claim, your Ballot permits you exercise the Opt-Out Election by opting out of the release set forth in Article X.D.4 of the Plan. Any Holder of  a Class 5 General Unsecured Claim that does not check the "opt-out" box on his/her/its Ballot will be deemed to consent to the consensual third party releases contained in Article X.D.4 of the Plan, which provide for a release by such Holders of General Unsecured Claims of any Claims or Causes of Action relating to the Debtor, the Chapter 11 Case or the Plan that they may hold against the Debtor Release Parties.

#### 2.  Returning Ballots

If you are entitled to vote to accept or reject the Plan, you should read carefully, complete, sign and return your Ballot, with original signature, in the enclosed envelope.

**To be counted, your Ballot with your original signature indicating your acceptance or rejection of the Plan must be received no later than the Voting Deadline**.

#### 3.  Voting

Pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rules 2002(a)(7) and 3003(c)(2) and the Bar Date Order, any Creditors whose Claims (a) are Scheduled in the Debtor's Schedules as Disputed, Contingent or unliquidated and which are not the subject of a timely-Filed Proof of Claim, or a Proof of Claim deemed timely Filed with the Court pursuant to either the Bankruptcy Code or any order of the Court, or otherwise deemed timely Filed under applicable law; or (b) are not Scheduled and are not the subject of a timely-Filed Proof of Claim, or a Proof of Claim deemed timely Filed with the Court pursuant to either the Bankruptcy Code or any order of the Court, or otherwise deemed timely Filed under applicable law, will be denied treatment as Creditors with respect to such Claims for purposes of (a) voting on the Plan, (b) receiving Distributions under the Plan and (c) receiving notices, other than by publication, regarding the Plan.

For purposes of voting, the amount of a Claim used to calculate acceptance or rejection of the Plan under section 1126 of the Bankruptcy Code will be determined in accordance with the following hierarchy:

58448/0001-17147920v10

a.    if an order has been entered by the Court determining the amount of such Claim, whether pursuant to Bankruptcy Rule 3018 or otherwise, then in the amount prescribed by the order;

b.    if no such order has been entered, then in the liquidated amount contained in a timely-Filed Proof of Claim that is not the subject of an objection as of the Claims Objection Deadline (as defined in the Solicitation Procedures Order); and

c.    if no such Proof of Claim has been timely Filed, then in the liquidated, noncontingent and undisputed amount contained in the Debtor's Schedules.

For purposes of voting, the following conditions will apply to determine the amount and/or classification of a Claim:

a.    if a Claim is partially liquidated and partially unliquidated, such Claim will be allowed for voting purposes only in the liquidated amount;

b.    if a Scheduled or Filed Claim has been paid, such Claim will be disallowed for voting purposes; and

c.    the Holder of a timely-Filed Proof of Claim that is filed in a wholly unliquidated, Contingent, Disputed and/or unknown amount, and is not the subject of an objection as of the Claims Objection Deadline (as defined in the Solicitation Procedures Order), is entitled to vote in the amount of $1.00.

Pursuant to the Solicitation Procedures Order, the deadline for filing and serving motions pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of claims for the purpose of accepting or rejecting the Plan will be August 9, 2019 at 4:00 p.m. (Eastern Time) (the "Rule 3018(a) Motion Deadline").

## E.    Acceptance of Plan

As a condition to confirmation of a plan, the Bankruptcy Code requires that each class of impaired claims vote to accept the plan, except under certain circumstances.  See "Confirmation Without Necessary Acceptances; Cramdown" below.  A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of those that vote in such class vote to accept the plan.  A plan is accepted by an impaired class of interests if holders of at least two-thirds in amount of interests of those that vote in such class vote to accept the plan.  Only those holders of claims and interests who actually vote count in these tabulations.  Holders of claims and interests who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by a court to be in the best interests of each holder of a claim or interest in

58448/0001-17147920v10

such class.  See "Best Interests Test" below.  Moreover, each impaired class must accept the plan for the plan to be confirmed without application of the "fair and equitable" and "unfair discrimination" tests set forth in section 1129(b) of the Bankruptcy Code discussed below.  See "Confirmation Without Necessary Acceptances; Cramdown" below.

**F.      Confirmation Without Necessary Acceptances; Cramdown**

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (i) "does not discriminate unfairly" and (ii) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

Here, because Classes 6, 7 and 9 are deemed to reject the Plan, the Debtor will seek Confirmation of the Plan from the Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  The Debtor believes that such requirements are satisfied because the Holders of Interests in Class 8, which is junior to Classes 6 and 7, are contributing substantial cash and non-cash consideration to the Debtor (*i.e.*, the Substantial Contribution) in exchange for their treatment under the Plan, which includes the retention of their equity interests in the Debtor.

**1.      No Unfair Discrimination**

A plan "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtor believes that under the Plan all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtor believes the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

**2.      Fair and Equitable Test**

With respect to a dissenting class of claims or interests, the "fair and equitable" standard requires that a plan provide that either the claims or interests in each class received everything to which they are legally entitled or that classes junior in priority to the class receive nothing.  The strict requirement of the allocation of full value to dissenting classes before any junior class can receive distribution is known as the "absolute priority rule."

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and interests, which may be summarized as follows:

      a.     <u>Secured Claims</u>.  Either (i) each holder of a claim in an impaired class of secured claims retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (ii) each holder of a claim in an impaired class of secured claims realizes the indubitable equivalent of its allowed secured claim; or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

      b.     <u>Unsecured Claims</u>.  Either (i) each holder of a claim in an impaired class of unsecured claims receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

      c.     <u>Equity Interests</u>.  Either (i) each holder of an equity interest in an impaired class of interests will receive or retain under the chapter 11 plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock; or (ii) the holders of interests that are junior to the stock will not receive any property under the chapter 11 plan, subject to the applicability of the judicial doctrine of contributing new value.

      As discussed above, the Debtor believes that the Distributions provided under the Plan satisfy an exception or corollary to the absolute priority rule because the Holders of Interests in Class 8 are making Substantial Contribution payments under the Plan.

## ARTICLE VI

## <u>FEASIBILITY AND BEST INTERESTS OF CREDITORS</u>

**A.**    **Best Interests Test**

      Before the Plan may be confirmed, the Court must find the Plan provides, with respect to each Impaired Class, that each Holder of a Claim in such Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtor liquidated under chapter 7 of the Bankruptcy Code.

      Under the Plan, Classes 3, 4, 5, 6, 7 and 9 are Impaired.  Classes 6, 7 and 9 will not receive or retain any property under either the Plan or in a chapter 7 liquidation.  Classes 3, 4 and 5 are Impaired, but are projected to receive a Distribution under the Plan.  To the extent that Class 3, 4 or 5 does not vote in favor of the Plan, the Holders in such Classes must receive at least as much value under the Plan as they would in a chapter 7 liquidation in order for the Plan to be confirmable by the Court.  In accordance with the PSA, the Debtor anticipates that Classes 3 and 4 will vote in favor of the Plan.  Although the Debtor anticipates that most Holders of Class 5 Claims also will vote in favor of the Plan, it is doubtful that every such Holder will do so.  As such, in order to confirm the Plan, the Debtor must establish that the Claim Holders in Class 5 will receive at least as much value under the Plan as they would in a chapter 7 liquidation.

A comparison of the relative recoveries to Holders of General Unsecured Claims under the Plan and in a chapter 7 liquidation is attached hereto as <u>Exhibit B</u>. For the reasons set forth on <u>Exhibit B</u> hereto, the Debtor believes that Holders of Claims in Class 5 will receive or retain under the Plan property of a value, as of the Effective Date, that is greater than the amount that such Holders would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Moreover, the failure to confirm the Plan likely would lead to material delays in Distributions to Classes 3, 4 and 5, further reducing the effective recoveries to Holders in such Classes.

**B.      Feasibility**

In connection with confirmation of the Plan, the Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

To support its belief in the feasibility of the Plan, the Debtor has relied upon the financial projections that are annexed to this Disclosure Statement as <u>Exhibit C</u> (the "<u>Financial Projections</u>").

The Financial Projections indicate that the Reorganized Debtor should have sufficient cash flow to pay and service its debt obligations and to fund its operations through the Termination Date. Accordingly, the Debtor believes that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections are based on numerous assumptions, including Confirmation and Consummation of the Plan in accordance with its terms; realization of the operating strategy of Reorganized Debtor; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; the absence of material contingent or unliquidated litigation, indemnity or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.

To the extent that the assumptions inherent in the Financial Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates underlying the Financial Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor. Accordingly, the Financial Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Financial Projections will not be realized and that actual results will vary from the Financial Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Financial Projections. The Financial Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a

view to compliance with published guidelines of the SEC regarding projections or forecasts. The Financial Projections have not been audited, reviewed or compiled by the Debtor's independent public accountants. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors or any other Person that the Financial Projections can or will be achieved.

The Financial Projections should be read together with the information in Article VIII of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Financial Projections.

The Debtor does not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Further, the Debtor does not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

## ARTICLE VII

## EFFECT OF CONFIRMATION

### A.    Binding Effect of Confirmation

Confirmation will bind the Debtor and all Holders of Claims and Interests to the provisions of the Plan, whether or not the Claim or Interest of any such Holder is Impaired under the Plan and whether or not any such Holder of a Claim or Interest has accepted the Plan.

### B.    Good Faith

Confirmation of the Plan will constitute a finding that: (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all solicitations of acceptances or rejections of the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## ARTICLE VIII

## CERTAIN RISK FACTORS TO BE CONSIDERED

**The Plan and its implementation are subject to certain risks, including, but not limited to, the risk factors set forth below. Holders of Claims who are entitled to vote on the Plan should read and carefully consider the risk factors, as well as the other information set forth in this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan.**

### A.    Plan May Not Be Accepted

There can be no assurance that the requisite acceptances to confirm the Plan will be obtained. Thus, while the Debtor believes the Plan is confirmable under the standards set forth

71

in section 1129 of the Bankruptcy Code, there is no guarantee that the Plan will be accepted by the requisite Classes entitled to vote on the Plan.

**B.      Certain Bankruptcy Law Considerations**

Even if the Holders of Claims who are entitled to vote accept the Plan, the Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by the liquidation or the need for further financial reorganization of the Debtor, and that the value of Distributions to dissenting Holders of Claims or Interests may not be less than the value such Holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtor believes the Plan meets such requirements, there can be no assurance the Court will reach the same conclusion.

**C.      Distributions to Holders of Allowed Claims Under the Plan**

On the Effective Date, each Holder of an Allowed General Unsecured Claim will, by operation of the Plan, receive its Pro Rata share of the Litigation Trust Interests. Litigation Trust Interests will be reserved for Holders of Disputed General Unsecured Claims and issued by the Litigation Trust to, and held by the Litigation Trustee in, the Disputed Claims Reserve pending allowance or disallowance of such Claims. A substantial amount of time may elapse between the Effective Date and the receipt of Distributions because of the time required to achieve final resolution of Disputed Claims.

Moreover, although the Debtor has made a good faith estimate of projected recoveries to holders of Allowed General Unsecured Claims under the Plan, such recoveries will be less than projected if, among other things, (i) the aggregate amount of General Unsecured Claims asserted against the Debtor which ultimately are Allowed exceeds the estimated amount of such Claims or (ii) the recoveries from the litigation of Causes of Action are less than estimated by the Debtor and the Committee.

**D.      Conditions Precedent to Consummation of the Plan**

The Plan provides for certain conditions that must be satisfied (or waived) prior to Consummation of the Plan. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to Consummation of the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan, even if confirmed by the Court, will be consummated.

**E.      Certain Tax Considerations**

There are a number of material income tax considerations, risks and uncertainties associated with Consummation of the Plan. Holders of Claims voting on the Plan should read carefully the discussion of certain federal income tax consequences of the Plan set forth below.

# ARTICLE IX

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain United States federal income tax consequences of the Plan to the Holders of General Unsecured Claims.[17]  This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain.  No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below.  Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtor and the Holders of General Unsecured Claims.

This discussion does not purport to address all aspects of United States federal income taxation that may be relevant to the Debtor or the Holders of General Unsecured Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the United States federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, a holder of a Claim that is not a "United States person," as such term is defined in the Tax Code, persons whose functional currency is not the United States dollar, persons subject to the alternative minimum tax, persons holding Claims or Interests as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments), and entities treated as partnerships for United States federal income tax purposes or beneficial owners of such entities.  This discussion does not address the tax consequences to Holders of General Unsecured Claims who did not acquire such Claims at the issue price on original issue.  No aspect of foreign, state, local or estate and gift taxation is addressed.

This discussion does not address the United States federal income tax consequences to Holders of General Unsecured Claims who (a) are Unimpaired or otherwise entitled to payment in full in Cash on the Effective Date under the Plan or (b) are otherwise not entitled to vote under the Plan.  Moreover, the discussion assumes that the various debt and other arrangements to

---

[17]    Because the Debtor is a "pass through" entity for taxation purposes, the Plan does not have tax consequences for the Debtor itself.  Moreover, while the Plan will have tax consequences for the Holders of Class 3 and Class 4 Claims, the Holders of such Claims are sophisticated commercial entities that were able to evaluate such tax consequences prior to entering into the PSA.

which the Debtor and Reorganized Debtor are or will be parties will be respected for United States federal income tax purposes in accordance with their form.

Each Holder of a General Unsecured Claim is urged to consult with such Holder's tax advisors concerning the United States federal, state and local, and non-United States and other tax consequences of the Plan.

## A.    Tax Consequences to Creditors

### 1.    Holders of Claims

Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim. The tax basis of a Holder in a Claim will generally be equal to the Holder's cost. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.

A Holder who received Cash (or other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

### 2.    Non-United States Persons

A Holder of a Claim that is a non-United States Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is (or was) engaged in a trade or business in the United States to which income, gain or loss from the exchange is (or was) "effectively connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

58448/0001-17147920v10

B.      **Tax Treatment of the Litigation Trust**

Upon the Effective Date, the Litigation Trust will be established for the benefit of Holders of Allowed General Unsecured Claims, whether allowed on or after the Effective Date.

1.      **Classification of the Litigation Trust**

The Litigation Trust is intended to qualify as a liquidating trust for federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity).  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Litigation Trust has been structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Litigation Trustee and the Holders of beneficial interests in the Litigation Trust) are required to treat for United States federal income tax purposes the Litigation Trust as a grantor trust of which the Holders of Allowed General Unsecured Claims are the owners and grantors.  While the following discussion assumes that the Litigation Trust would be so treated for United States federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Litigation Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust as a grantor trust.  If the IRS were to challenge successfully such classification, the United States federal income tax consequences to the Litigation Trust and the Holders of Claims could vary from those discussed herein.

2.      **General Tax Reporting by the Trust and Beneficiaries**

For all United States federal income tax purposes, all parties (including the Litigation Trustee and the Holders of beneficial interests in the Litigation Trust) will be required to treat the transfer of assets to the Litigation Trust, in accordance with the terms of the Plan, as a transfer of those assets directly to the Holders of Allowed General Unsecured Claims followed by the transfer of such assets by such Holders to the Litigation Trust.  Consistent therewith, all parties are required to treat the Litigation Trust as a grantor trust of which such Holders are to be owners and grantors.  Thus, such Holders (and any subsequent Holders of interests in the Litigation Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Litigation Trust for all federal income tax purposes.  Accordingly, each Holder of a beneficial interest in the Litigation Trust will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Litigation Trust.

The United States federal income tax reporting obligation of a Holder of a beneficial interest in the Litigation Trust is not dependent upon the Litigation Trust distributing any cash or other proceeds.  Therefore, a Holder of a beneficial interest in the Litigation Trust may incur a United States federal income tax liability regardless of the fact that the Litigation Trust has not made, or will not make, any concurrent or subsequent distributions to the Holder.  If a Holder incurs a federal tax liability but does not receive distributions commensurate with the taxable

75

income allocated to it in respect of its beneficial interests in the Litigation Trust it holds, the Holder may be allowed a subsequent or offsetting loss.

The Litigation Trustee will file tax returns with the IRS for the Litigation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  The Litigation Trustee will also send to each Holder of a beneficial interest in the Litigation Trust a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct the Holder to report such items on its federal income tax return.

All payments to Creditors are subject to any applicable withholding (including employment tax withholding).  Under the Tax Code, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" then in effect. Backup withholding generally applies if the Holder (a) fails to furnish his or her social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax if an appropriate refund claim is filed with the IRS.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

### 3.      Allocations of Taxable Income and Loss

Allocations of taxable income of the Litigation Trust among Holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Litigation Trust had distributed all of its respective assets to the Holders of the beneficial interests in the Litigation Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust assets.

After the Effective Date, any amount a Holder receives as a Distribution from the Litigation Trust in respect of its beneficial interest in the Litigation Trust should not be included, for United States federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a Distribution received in respect of such Holder's beneficial interest in the Litigation Trust.

In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Litigation Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Holder's holding period in such assets will begin the day following the Effective Date.  Distributions to any Holder of an Allowed Claim will be allocated first to the original principal portion of such Claim as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim.  However, there is no assurance that the IRS will respect such allocation for United States federal income tax purposes.

The tax book value of the Litigation Trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.  Uncertainties with regard to United States federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

As soon as practicable after the Effective Date, the Litigation Trustee (to the extent that it deems it necessary or appropriate in the reasonable exercise of its discretion) will, in good faith, value the Litigation Trust Assets, and, as appropriate, will apprise the Holders of beneficial interests in the Litigation Trust of such valuation.  The valuation is required to be used consistently by all parties (including the Debtor, the Reorganized Debtor, the Litigation Trustee and the Holders) for all United States federal income tax purposes.  The Court will resolve any dispute regarding the valuation of the Assets.  No valuation will be deemed an admission or be admissible in any Cause of Action.

The Litigation Trust's taxable income will be allocated to the Holders of beneficial interests in the Litigation Trust in accordance with each such Holder's Pro Rata share of the Litigation Trust's interests.  The character of items of income, deduction and credit to any Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the United States federal income tax consequences of the Plan and the transactions contemplated thereunder.

C.      **Importance of Obtaining Professional Tax Assistance**

**The foregoing discussion is intended only as a summary of certain United States federal income tax consequences of the Plan.  The above discussion is for informational purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a Holder's particular circumstances.  Accordingly, Holders are urged to consult their own tax advisors about the United States federal, state and local, and applicable non-United States income and other tax consequences of the Plan**.

## ARTICLE X

## RECOMMENDATION AND CONCLUSION

This Disclosure Statement was approved by the Court after notice and a hearing. The Court has determined that this Disclosure Statement contains information adequate to permit Holders of Claims to make an informed judgment about the Plan. Such approval, however, does not mean that the Court recommends either acceptance or rejection of the Plan.

The Debtor believes that Confirmation and Consummation of the Plan is in the best interests of the Debtor, its Estate and its Creditors. The Plan provides for an equitable distribution to Creditors. The Debtor believes that any alternative to Confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in significant delay, litigation and additional costs, as well as a material reduction in the Distributions to Holders of Claims in Classes 3, 4 and 5. Consequently, the Debtor urges all eligible Holders of Impaired Claims in Classes 3, 4 and 5 to vote to ACCEPT the Plan, and to complete and return their Ballots so that they will be RECEIVED by the Voting Agent on or before the Voting Deadline.

Dated:  Wilmington, Delaware
        July 22, 2019

Novum Pharma, LLC
Debtor and Debtor-in-Possession

COLE SCHOTZ P.C.

By:  /s/ Thomas S. O'Donoghue, Jr.
     Thomas S. O'Donoghue, Jr.
     Chief Restructuring Officer

By:  /s/ David R. Hurst
     David R. Hurst (I.D. No. 3743)
     500 Delaware Avenue, Suite 1410
     Wilmington, Delaware 19801
     Telephone: (302) 652-3131

     – and –

     Jacob S. Frumkin
     25 Main Street
     Hackensack, New Jersey 07601
     Telephone: (201) 489-3000

     *Counsel for Debtor and
     Debtor-in-Possession*

<u>EXHIBIT A TO DISCLOSURE STATEMENT</u>

<u>Plan of Reorganization</u>

<u>EXHIBIT B TO DISCLOSURE STATEMENT</u>

<u>Hypothetical Class 5 Distribution Analysis</u>

Novum Pharma, LLC
Hypothetical Class 5 Distribution Analysis (1)

| | Chapter 11 Plan | | | Chapter 7 Liquidation | |
| --- | --- | --- | --- | --- | --- |
| | Estimated Maximum Distribution | Estimated Minimum Distribution | | Estimated Maximum Distribution | Estimated Minimum Distribution |
| Cash from Member Settlement (2) | $2,500,000 | $2,500,000 | | $2,000,000 | $1,000,000 |
| Additional Litigation Proceeds (3) | $5,000,000 | $0 | | $5,000,000 | $0 |
| Less Fees and Expenses (4) | $200,000 | $200,000 | | $300,000 | $300,000 |
| | $7,300,000 | $2,300,000 | | $6,700,000 | $700,000 |
| Less Liquidating Trustee Fees (5) | $30,000 | $30,000 | | | |
| Less Chapter 7 Trustee Fees (6) | | | | $224,250 | $38,250 |
| Cash Available for Distribution | $7,270,000 | $2,270,000 | | $6,475,750 | $661,750 |
| Unsecured Claims Pool (7) | $5,620,680 | $10,704,310 | | $79,720,450 | $79,720,450 |
| Estimated Recovery for Class 3 | 100.0% | 21.2% | | 8.1% | 0.8% |
| Funds Returned to Reorganized Debtor | $1,649,320 | $0 | | $0 | $0 |

(1) There are a number of estimates and assumptions underlying the analysis below that are inherently subject to significant uncertainties and contingencies beyond the control of the Debtor and its professionals.  Additionally, assumptions are made with respect to certain liquidation decisions which could be subject to change.  Accordingly, there can be no assurance that the values reflected in the analysis would be realized and actual results could vary materially from those shown here.

(2) Under the proposed chapter 11 plan, the Debtor's members are contributing $2.5 million in cash in exchange for the retention of their equity interests and the receipt of releases under the plan.  In a chapter 7 case, where the Debtor's members' equity would be worthless, it is assumed for purposes of comparison that the members would nonetheless pay between $1.0-$2.0 million to obtain releases in connection with a settlement of all potential claims and causes of action.  However, any such settlement is purely hypothetical, and the settlement payment made by the Debtor's members in a settlement, if any, may be materially less than the amounts shown.

(3) Under the proposed chapter 11 plan, the Debtor and its members are assigning certain claims and causes of action to the Litigation Trust.  For purposes of illustration, the Debtor estimates that these claims and causes of action could yield proceeds of $0-$5 million, although the actual proceeds of these litigation actions could exceed $5 million.  The Debtor is unable to assess the likelihood of sucess of the claims and causes of action being assigned to the Litigation Trust.

(4) The estimates provided for the costs of administration for the Litigation Trust and a chapter 7 trustee are being provided for illustrative purposes only; the actual costs of administration may vary materially from the estimates provided.  The Debtor has estimated that the fees and expenses incurred by a chapter 7 trustee would be 50% greater than those incurred by the Litigation Trust becaus a chapter 7 trustee (and its counsel) will have no familiarity with, among other things, the Debtor's books and records, the history of the chapter 11 case, the facts and circumstances underlying the disputed claims being asserted against the Debtor and the issues that have emerged during the course of the chapter 11 case.

(5) The estimate provided for Liquidating Trustee fees is based on a $5,000 monthly fee for a period of six months.  The Liquidating Trustee's fees may vary materially from this estimate.

(6) Pursuant to section 326 of the Bankruptcy Code, the fees of a chapter 7 trustee would be calculated based on disbursements as follows: 25% on the first $5,000; plus 10% on the amounts between $5,000 and $50,000; plus 5% on the amounts between $50,000 and $1 million; plus 3% on the amounts over $1 million.  See 11 U.S.C. § 326(a).

(7) The Debtor estimates that, under the proposed chapter 11 plan, allowed unsecured claims will range from approximately $5.234 to $10.318 million.  In a chapter 7 case, it is estimated that the unsecured claims pool would grow to approximately $79.334 million because the settlements under the plan which result in significant reductions in asserted claims would be void.  The actual amount of allowed unsecured claims may vary materially from these estimates.

EXHIBIT C TO DISCLOSURE STATEMENT

Financial Projections

**EXHIBIT C TO DISCLOSURE STATEMENT**

## Novum Pharma LLC - Key Financial Projections

### Income Statement

| | Q3 2019 (Sept Only) | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 |
|---|---|---|---|---|---|---|
| **Revenue** | **$5,339,130** | **$2,941,899** | **$1,372,250** | **$5,572,920** | **$6,382,603** | **$6,806,112** |
| Gross-to-Net Adjustments | ($931,745) | ($51,537) | ($210,156) | ($1,148,021) | ($1,273,044) | ($1,333,998) |
| **Net Revenue** | **$4,407,385** | **$2,890,362** | **$1,162,094** | **$4,424,898** | **$5,109,559** | **$5,472,114** |
| *GTN%* | | | | | | |
| Cost of Sales | ($57,994) | ($218,143) | ($254,910) | ($299,880) | ($335,805) | ($353,786) |
| **Gross Profit** | **$4,349,391** | **$2,672,219** | **$907,184** | **$4,125,018** | **$4,773,753** | **$5,118,327** |
| S&GA | ($1,771,600) | ($5,542,947) | ($3,310,408) | ($3,380,544) | ($3,433,139) | ($3,484,633) |
| Royalty Expense | ($36) | ($677) | ($2,124) | ($11,254) | ($12,993) | ($13,916) |
| Interest Expense | ($212,325) | ($703,625) | ($813,240) | ($828,125) | ($819,758) | ($800,695) |
| **Operating Income (Loss) Before Taxes** | **$2,365,430** | **($3,575,030)** | **($3,218,588)** | **($94,905)** | **$507,863** | **$819,083** |
| Approximate Income Tax Expense and State Taxes | $571,562 | $1,603,401 | $1,443,537 | $42,565 | ($227,777) | ($367,359) |
| **Net Income (Loss) After Tax** | **$2,936,992** | **($1,971,629)** | **($1,775,051)** | **($52,340)** | **$280,086** | **$451,724** |

### Key Balance Sheet Accounts

| | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 |
|---|---|---|---|---|---|---|
| Cash | $1,930,793 | $2,176,606 | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 |
| RGP PC Loan | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 |
| SPS DIP/ Exit Financing/ w Interest | $4,143,359 | $8,576,741 | $12,867,290 | $12,421,082 | $11,695,994 | $10,747,802 |
| Accrued Interest | $31,075 | $190,951 | $460,441 | $744,815 | $1,020,824 | $1,277,768 |

**Key Notes**

1) Period Q3 2019 includes only the period from September 1 through September 30, 2019, which is anticipated to be the first month of post-Effective Date business operations. Similarly, in the yearly summary on the last page of this Exhibit, calendar year 2019 includes only the period from September 1 through December 31, 2019.

2) For purposes of these projections, it is assumed that CH 105 takes delivery of the Pre-Paid Inventory (as defined in the Plan) in September 2019; the actual delivery date has not yet been determined. However, the timing for the delivery of the Pre-Paid Inventory will have no impact on cash balance, loan balances or cash flow.

3) Novum Pharma, LLC is a pass-through entity for federal and state income tax purposes; the "Approximate Income Tax" expense listed is an approximation of the tax expense or benefit projected to result from the operation of the business.

**EXHIBIT C TO DISCLOSURE STATEMENT**

## Novum Pharma LLC -
## Key Financial Projections

### Income Statement

| | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 |
|---|---|---|---|---|---|---|---|---|
| Revenue | $7,199,889 | $6,949,105 | $7,508,505 | $7,661,708 | $7,534,760 | $7,605,550 | $7,804,436 | $5,625,182 |
| Gross-to-Net Adjustments | ($1,519,177) | ($1,431,516) | ($1,497,257) | ($1,501,695) | ($1,589,834) | ($1,566,743) | ($1,556,354) | ($1,102,536) |
| **Net Revenue** | **$5,680,712** | **$5,517,589** | **$6,011,247** | **$6,160,013** | **$5,944,926** | **$6,038,807** | **$6,248,082** | **$4,522,646** |
| *GTN%* | | | | | | | | |
| Cost of Sales | ($370,281) | ($394,828) | ($412,395) | ($459,479) | ($13,239) | ($13,363) | ($13,713) | ($9,884) |
| **Gross Profit** | **$5,310,431** | **$5,122,761** | **$5,598,852** | **$5,700,534** | **$5,931,687** | **$6,025,443** | **$6,234,369** | **$4,512,763** |
| S&GA | ($3,810,346) | ($3,682,413) | ($3,711,426) | ($3,871,298) | ($3,979,386) | ($3,883,286) | ($3,953,620) | ($3,803,705) |
| Royalty Expense | ($14,452) | ($14,064) | ($15,312) | ($15,716) | ($15,145) | ($15,403) | ($15,946) | ($11,608) |
| Interest Expense | ($780,556) | ($758,863) | ($738,604) | ($717,402) | ($697,230) | ($677,071) | ($656,085) | ($637,435) |
| **Operating Income (Loss)  Before Taxes** | **$705,077** | **$667,421** | **$1,133,510** | **$1,096,118** | **$1,239,926** | **$1,449,683** | **$1,608,719** | **$60,014** |
| Approximate Income Tax Expense and State Taxes | ($316,227) | ($299,338) | ($508,379) | ($491,609) | ($556,107) | ($650,183) | ($721,510) | ($26,916) |
| **Net Income (Loss) After Tax** | **$388,850** | **$368,083** | **$625,131** | **$604,509** | **$683,819** | **$799,500** | **$887,208** | **$33,098** |

### Key Balance Sheet Accounts

| | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 |
|---|---|---|---|---|---|---|---|---|
| Cash | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 | $2,500,000 | $1,107,614 |
| RGP PC Loan | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 |
| SPS DIP/ Exit Financing/ w Interest | $9,863,354 | $8,947,034 | $8,025,958 | $7,101,670 | $6,236,658 | $5,303,473 | $4,371,000 | $6,620,737 |
| Accrued Interest | $1,514,574 | $1,729,687 | $1,924,541 | $2,098,193 | $2,251,673 | $2,384,994 | $2,497,328 | $30,451 |

**Key Notes**

1) Period Q3 2019 includes only the period from September 1 through September 30, 2019, which is anticipated to be the first month of post-Effective Date business operations. Similarly, in the yearly summary on the last page of this Exhibit, calendar year 2019 includes only the period from September 1 through December 31, 2019.

2) For purposes of these projections, it is assumed that CH 105 takes delivery of the Pre-Paid Inventory (as defined in the Plan) in September 2019; the actual delivery date has not yet been determined. However, the timing for the delivery of the Pre-Paid Inventory will have no impact on cash balance, loan balances or cash flow.

3) Novum Pharma, LLC is a pass-through entity for federal and state income tax purposes; the "Approximate Income Tax" expense listed is an approximation of the tax expense or benefit projected to result from the operation of the business.

**EXHIBIT C TO DISCLOSURE STATEMENT**

## Novum Pharma LLC - Key Financial Projections

### Income Statement

| | Q1 2023 | Q2 2023 | Q3 2023 | Q4 2023 | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 |
|---|---|---|---|---|---|---|---|---|
| Revenue | $9,635,407 | $9,618,182 | $9,615,146 | $9,648,233 | $11,087,017 | $10,931,361 | $10,931,361 | $10,931,361 |
| Gross-to-Net Adjustments | ($1,888,540) | ($1,885,164) | ($1,884,569) | ($1,891,054) | ($2,173,055) | ($2,142,547) | ($2,142,547) | ($2,142,547) |
| Net Revenue | $7,746,867 | $7,733,019 | $7,730,577 | $7,757,179 | $8,913,961 | $8,788,814 | $8,788,814 | $8,788,814 |
| *GTN%* | | | | | | | | |
| Cost of Sales | ($16,930) | ($16,899) | ($16,894) | ($16,952) | ($19,480) | ($19,207) | ($19,207) | ($19,207) |
| Gross Profit | $7,729,937 | $7,716,119 | $7,713,683 | $7,740,227 | $8,894,481 | $8,769,607 | $8,769,607 | $8,769,607 |
| S&GA | ($4,094,746) | ($3,883,286) | ($3,838,996) | ($3,820,996) | ($4,113,567) | ($4,069,817) | ($3,997,817) | ($3,979,817) |
| Royalty Expense | ($19,671) | ($19,639) | ($19,630) | ($19,697) | ($22,628) | ($22,315) | ($22,315) | ($22,315) |
| Interest Expense | ($693,546) | ($684,400) | ($650,408) | ($615,683) | ($580,175) | ($547,914) | ($521,094) | ($453,125) |
| Operating Income (Loss) Before Taxes | $2,921,974 | $3,128,794 | $3,204,649 | $3,283,851 | $4,178,111 | $4,129,562 | $4,228,382 | $4,314,350 |
| Approximate Income Tax Expense and State Taxes | ($1,310,506) | ($1,403,264) | ($1,437,285) | ($1,472,807) | ($1,873,883) | ($1,852,108) | ($1,896,429) | ($1,934,986) |
| Net Income (Loss) After Tax | $1,611,469 | $1,725,530 | $1,767,364 | $1,811,044 | $2,304,228 | $2,277,453 | $2,331,952 | $2,379,364 |

### Key Balance Sheet Accounts

| | Q1 2023 | Q2 2023 | Q3 2023 | Q4 2023 | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024 |
|---|---|---|---|---|---|---|---|---|
| Cash | $2,514,315 | $1,263,351 | $1,267,663 | $2,469,866 | $1,488,799 | $2,827,579 | $3,034,608 | $3,212,603 |
| RGP PC Loan | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $14,371,094 | $12,473,438 |
| SPS DIP/ Exit Financing w/ Interest | $6,750,728 | $5,248,497 | $3,716,560 | $2,150,154 | $548,503 | - | - | - |
| Accrued Interest | $50,256 | $43,137 | $31,732 | $20,071 | $8,148 | - | - | - |

**Key Notes**

1) Period Q3 2019 includes only the period from September 1 through September 30, 2019, which is anticipated to be the first month of post-Effective Date business operations. Similarly, in the yearly summary on the last page of this Exhibit, calendar year 2019 includes only the period from September 1 through December 31, 2019.

2) For purposes of these projections, it is assumed that CH 105 takes delivery of the Pre-Paid Inventory (as defined in the Plan) in September 2019; the actual delivery date has not yet been determined. However, the timing for the delivery of the Pre-Paid Inventory will have no impact on cash balance, loan balances or cash flow.

3) Novum Pharma, LLC is a pass-through entity for federal and state income tax purposes; the "Approximate Income Tax" expense listed is an approximation of the tax expense or benefit projected to result from the operation of the business.

**EXHIBIT C TO DISCLOSURE STATEMENT**

## Novum Pharma LLC - Key Financial Projections

### Income Statement

|  | 2019 (September 1 to December 31) | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Revenue | $11,938,053 | $20,133,884 | $29,319,206 | $28,569,929 | $38,516,968 | $43,881,099 |
| Gross-to-Net Adjustments | ($983,282) | ($3,965,219) | ($5,949,644) | ($5,815,468) | ($7,549,326) | ($8,600,695) |
| Net Revenue | $10,954,771 | $16,168,664 | $23,369,562 | $22,754,461 | $30,967,642 | $35,280,404 |
| GTN% | 8% | 20% | 20% | 20% | 20% | 20% |
| Cost of Sales | ($527,957) | ($1,244,382) | ($1,636,982) | ($50,198) | ($67,675) | ($77,100) |
| Gross Profit | $10,426,814 | $14,924,283 | $21,732,580 | $22,704,263 | $30,899,967 | $35,203,304 |
| S&GA | ($14,214,436) | ($13,608,724) | ($15,075,484) | ($15,619,999) | ($15,638,024) | ($16,161,019) |
| Royalty Expense | ($713) | ($40,288) | ($59,546) | ($58,102) | ($78,637) | ($89,573) |
| Interest Expense | ($915,951) | ($3,261,818) | ($2,995,425) | ($2,667,820) | ($2,644,037) | ($2,102,308) |
| Operating Income (Loss)  Before Taxes | ($4,704,285) | ($1,986,547) | $3,602,126 | $4,358,342 | $12,539,269 | $16,850,404 |
| Approximate Income Tax Expense and State Taxes | $2,109,872 | $890,966 | ($1,615,553) | ($1,954,717) | ($5,623,862) | ($7,557,406) |
| Net Income (Loss) After Tax | ($2,594,413) | ($1,095,581) | $1,986,572 | $2,403,626 | $6,915,407 | $9,292,998 |

### Key Balance Sheet Accounts

|  | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Cash | $2,176,606 | $2,500,000 | $2,500,000 | $1,107,614 | $2,469,866 | $3,212,603 |
| RGP PC Loan | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $16,268,750 | $12,473,438 |
| SPS DIP/ Exit Financing/ w Interest | $8,576,741 | $10,747,802 | $7,101,670 | $6,620,737 | $2,150,154 | - |
| Accrued Interest | $190,951 | $1,277,768 | $2,098,193 | $30,451 | $20,071 | - |

**Key Notes**

1) Period Q3 2019 includes only the period from September 1 through September 30, 2019, which is anticipated to be the first month of post-Effective Date business operations.  Similarly, in the yearly summary on the last page of this Exhibit, calendar year 2019 includes only the period from September 1 through December 31, 2019.

2) For purposes of these projections, it is assumed that CH 105 takes delivery of the Pre-Paid Inventory (as defined in the Plan) in September 2019; the actual delivery date has not yet been determined.  However, the timing for the delivery of the Pre-Paid Inventory will have no impact on cash balance, loan balances or cash flow.

3) Novum Pharma, LLC is a pass-through entity for federal and state income tax purposes; the "Approximate Income Tax" expense listed is an approximation of the tax expense or benefit projected to result from the operation of the business.